No. 13-3843

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

LINDA SUCHANEK, et al.,
Plaintiffs-Appellants

v.

STURM FOODS, INCORPORATED, et al.
Defendants-Appellees

Appeal from the United States District Court for the
Northern District of Illinois
District Court No. 3:11-cv-00565-GPM-PMF and 3:11-cv-00889-GPM,
3:11-cv-01035-GPM, 3:11-cv-01068-GPM and 3:12-cv-00224-GPM

**APPELLANTS' BRIEF**

Peter H. Burke
J. Allen Schreiber
BURKE HARVEY, LLC
2151 Highland Avenue South, Suite 120
Birmingham, AL 35205
Phone:      (205) 930-9091
Fax:        (205) 930-9054


Counsel for Appellants

## CORPORATE DISCLOSURE STATEMENT

All of the Appellants in this matter are individuals.

# Table of Contents

Corporate Disclosure Statement ............................................................................2

Table of Authorities ............................................................................................5

Statement Regarding Oral Argument ....................................................................9

Statement of Jurisdiction.....................................................................................9

Statement of Issues Presented for Review ............................................................9

Statement of the Case.......................................................................................10

    A. Facts Common to the Class...................................................................12

    B. Facts Specific to the Named Plaintiffs .....................................................16

    C. Facts Specific to Defendants' Intentional and Willful Conduct ...............21

    D. Relevant Procedural History ..................................................................25

Applicable Legal Standard..................................................................................28

Summary of the Argument..................................................................................29

Argument..........................................................................................................31

A. The District Court abused its Discretion in not certifying any Subclass
under any State's Consumer Protection Statute. ..................................................31

    1. This Court's recent Opinion in *Butler v. Sears* Demonstrates
    that the predominance Inquiry was Satisfied in this action. ............................32

    2. The District Court Committed Further Error by not Focusing on the
    Central Overriding Issue of whether Defendants' Packaging was
    Misleading or Deceptive or Tended to Mislead and Deceive, but Instead
    Focused on the Individual Purchasing decisions of the Consumer ..................35

    3. The District Court's Decision was Erroneous because it Presumed

that Many Class members did not Suffer Injury, which was both
Factually Incorrect but also Irrelevant at this Stage of the Proceedings ...........38

    4. As Defendants' Conduct Involved Fraudulent Omission, Causation
and Reliance for class members may be Presumed. .........................................41

B. The District Court Committed Clear Error in not Certifying the
California and New Jersey Subclasses.....................................................................43

C.  Each Plaintiff Presented a Question of fact for the Jury Regarding
Reliance and Causation. ..........................................................................................46

D.   Plaintiffs Presented a Jury Question on Whether Defendants'
Packaging was Misleading or Deceptive or Tended to Mislead and Deceive,
under the Objective Standard of a Reasonable Consumer in the
Context of the Purchasing Decision. ......................................................................49

E. Plaintiffs Presented a Jury Question on Whether Defendants were Unjustly
Enriched by selling the GSCs .................................................................................54

Conclusion .................................................................................................................55

Certificate of Compliance .........................................................................................56

Certificate of Service .................................................................................................57

# TABLE OF AUTHORITIES

*Adeyeye v. Heartland Sweeteners, LLC*., 721 F.3d 444, 449
(7th Cir. 2013) ............................................................................29

*Ackerman v. Coca-Cola Co.,* Not Reported in F.Supp.2d,
2010 WL 2925955, E.D.N.Y. 2010 ......................................................47

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013)......... 39, 40

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-51, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986) ......................................................29

*Astiana v. Kashi*, 2013 U.S. Dist. LEXIS 108445 at * 19
(S.D.Cal. July 30, 2013)......................................................36

*Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 172 (3d Cir. 2005)......................55

*Bank of Waunakee v. Rochester Cheese Sales, Inc.* 906 F.2d 1185, 1188
(7th Cir. 1990) ......................................................28

*Bowen v. Groome*, 2012 U.S. Dist. LEXIS 78829 at * 13
(June 7, 2012, S.D.Ill.) ......................................................41

*Brakke v. Economic Concepts, Inc.*, 213 Cal.App.4th 761, 772,
153 Cal. Rptr. 3d 1 (Cal. Ct. App. 2013)......................................................44

*Bronson v. Johnson & Johnson, Inc.***,** Slip Copy,
2013 WL 1629191, N.D.Cal.,2013 ......................................................53

*Bruno v. Quten Research Inst., LLC,* 280 F.R.D. 524, 534 (C.D. Cal. 2011)…..37

*Butler v. Sears*, 702 F.3d 359 (7th Cir. 2012) ......................................................26

*Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013) ......................................... 9, 27, 29, 32

*Butler v. Sears*, 727 F.3d 796, 801 (7th Cir. 2013) ......................................... 10, 28

*Butler v. Sears*, 727 F.3d 798 (7th Cir. 2013) ......................................................33

*Butler v. Sears*, 727 F.3d 799 (7th Cir. 2013) ........................................................38

*Butler v. Sears*, 727 F.3d 800 (7th Cir. 2013) ........................................................34

*C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*,
131 F. 3d 430, 434 (4th Cir. 1997)..........................................................................54

*Castrol, Inc. v. Pennzoil Quaker State Co.,* 169 F.Supp. 2d 332, 344
(D.N.J. 2001) ...........................................................................................................55

*Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1145
(N.D.Cal. 2005) .......................................................................................................36

*Cirone-Shadow v. Union Nissan*, 955 F.Supp. 938, 944 (N.D.Ill. 1997) ........ 30, 36

*Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th  249, 256........................ 12, 37

*Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, (N.D.Cal.2012) ................... 37, 53

*Engalla v. Permanente Med. Grp., Inc.,* 15 Cal. 4th 951, 976-77,
64 Cal. Rptr. 2d 843, 938 P.2d 903 (1997) .............................................................48

*Elias*, 252 F.R.D. at 249 (internal quotations omitted). .........................................44

*F.H. Prince & Co., Inc.* v. *Towers Fin. Corp.,* 275 Ill. App. 3d 792,
656 N.B. 2d 142, 151 (Ill. App. 1 Dist. 1995) ........................................................55

*Falk v. General Motors Corporation,* 496 F. Supp. 2d 1088, 1094 - 95
(N.D. Cal. 2007) ......................................................................................................43

*Forrest v. Prine,* 620 F.3d 739, 742-43 (7th Cir. 2010). .......................................29

*Ghirardo* v. *Antonioli,* 14 Cal. 4th 39,57 Cal. Rptr. 2d 687 (Cal. 1996) ..............55

*Guido v. L'Oreal, USA, Inc.,* 284 F.R.D. 468, 479 (C.D. Cal. 2012) ...................41

*Hilt v. Arizona Bev. Co... LLC,* 2009 U.S. Dist. LEXIS 16871,
at *16-19 (S.D. Cal. Feb. 4, 2009) ........................................................................52

*Hughes v. Kore of Indiana Enterprise, Inc.*, 2013 U.S. App. LEXIS

18873 at * 1 (7th Cir. September 10, 2013) ........................................................10

*Hughes v. Kore of Indiana Enterprise, Inc.*, 2013 U.S. App. LEXIS
18873 at * 6 (7th Cir. September 10, 2013) ........................................................34

*In re Google AdWords,* 2012 U.S. Dist. LEXIS 1216 at *10. ...........................44
*In re Steroid Hormone Product Cases*, 181 Cal.App.4th 145, 154,
104 Cal. Rptr. 3d 329 (Cal. Ct. App. 2010) ........................................................44

*In re Mercedes-Benz Tele Aid Contract Litig*., 267 F.R.D. 113, 164-165
(D.N.J. 2010) ........................................................................................................45

*In re Tobacco II Cases*, 46 Cal. 4th 298 (Cal. 2009) ..........................................49

*International Admin., Inc. v. Life Ins. Co. of N. Am.,* 753 F.2d 1373, 1378
(7th Cir. 1985). ....................................................................................................46

*International Union of Operating Engineers Local No. 68 Welfare Fund
v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086, 1087
(N.J. 2007) ................................................................................................31, 42, 45

*Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762
at * 35-36................................................................................................................52

*Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762
at *32 n.9 ..............................................................................................................53

*Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill. App. 3d 1139,
759 N.E.2d 66, 70, 259 Ill. Dec. 586 (Ill. App. 2001) ....................................30, 42

*Massachusetts Mutual Life Ins. Co. v. Superior Ct.*, 97 Cal.App.
4th 1282, 1289, 119 Cal. Rptr. 2d 190 (Cal. Ct. App. 2002) ..........................42, 44

*Matter of Cliffdale Associates, Inc*., 103 F.T.C. 110, 174 (1984) .............30, 36, 49

*Messner v. Northshore University HealthSystem,* 669 F.3d 802, 819
(7th Cir. 2012) ......................................................................................................28

*Mirand v. City of New York*, 84 NY2d 44, 51 (1994)............................................49

*Munson v. Friske,* 754 F.2d 683, 690 (7th Cir. 1985). ..........................................46

*New v. CitiFinancial Auto Credit, Inc.*, 2012 U.S. Dist. LEXIS 87936
(M.D. Ala. June 26, 2012) ......................................................................55

*Nilon v. Natural-Immunogenics Corp.*, 2013 U.S. Dist. LEXIS
141728 at *2 N. 2 (S.D. Cal September 30, 2013) ......................................... 11, 46

*Papaspiridakos v. Educational Affiliates, Inc.,* Slip Copy,
2013 WL 4899136, E.D.N.Y., 2013 ....................................................37

*Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 8...................................10

*Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 4......................30, 35, 38

*Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) ........................ 29, 30

*Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-514 (7th Cir. 2006) .......................38

*Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 52, 536
(N.D. Cal. 2012) .............................................................................44

*Ries v. Arizona Tea Beverage* 287 F.R.D. 523,530 (N.D.Cal. 2012) ..... 31,46,48,49

*Russell-Stanley Corp.* v. *Plant Indus.,* 595 A. 2d 534,550 (N.J. Super. eh. Div.
1991) ........................................................................................55

*Sears, Roebuck & Co. v. Butler,* 13-430 *and Whirlpool v. Glazer,* 13-431 ...........33

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ......................................36

*Strawn v. Caruso,* 657 A.2d 420, 430-431 n.4 (N.J. 1995). ..................................43

*Stutman v. Chemical Bank,* 731 N.E.2d 608, 612, 709 N.Y.S.2d 892
(N.Y. 2000) ..................................................................................42

*Waller v. Hewlett-Packard Co.*, 2013 U.S. Dist. LEXIS
141729 at * 42-43 (September 29, 2013) ...............................................44

*Williams v. Gerber Prods. Co.,* 552 F.3d 934, 938 (9th Cir. 2008) .....................44

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs request oral argument because the decisional process will be significantly aided by oral argument. The record is voluminous and complex and oral argument would aid the Court in understanding the record on appeal.

## STATEMENT OF JURISDICTION

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1291 as the district court's granting of summary judgment on November 20, 2013, was a final appealable order. (Docs. 161 and 162) Plaintiffs' Notice of Appeal was timely filed on December 18, 2013. (Doc. 163)

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the District Court erred as a matter of law, and therefore abused its discretion, in refusing to certify these small dollar claims despite the recent guidance provided in *Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013), which reiterates that the predominance inquiry of Rule 23(b)(3) is a question of efficiency?

Whether the District Court erred as a matter of law, and therefore abused its discretion, when it failed to certify California and New Jersey subclasses even though those states' statutes allow for a class wide presumption of reliance and causation?

Whether the District Court erred in granting summary judgment to Defendant on each Plaintiffs' individual consumer fraud claim, where it was

undisputed that each Plaintiff was deceived about the true nature of Defendant's product at the time of purchase, and only after taking it home from the grocery store for use in their Keurig machine did they realize the product was overwhelmingly instant coffee, i.e., was a jury question presented on the issues of reliance and causation?

Whether the District Court erred in not allowing a jury to decide, from the perspective of a reasonable consumer, whether Defendants' packaging was deceptive and misleading?

Whether the District Court erred in not allowing a jury to decide whether Defendants had been unjustly enriched through the sale of the GSCs?

## STATEMENT OF THE CASE

These consolidated lawsuits involve small dollar claims this Court has recognized as being proper for class certification.[1] Here, Plaintiffs are consumers from eight states, all of whom spent approximately $9.99 to purchase Defendant

---

[1] *Parko v. Shell Oil Co*., 2014 U.S. App. LEXIS 1018 at * 8 ("Also this doesn't appear to be one of those small-claims suits that as a practical matter can proceed only as a class action (e.g. overcharges of $5.50 for rental cars."); *Butler v. Sears*, 727 F.3d 796, 801 (7th Cir. 2013) ("It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30.... The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."); *Hughes v. Kore of Indiana Enterprise, Inc.*, 2013 U.S. App. LEXIS 18873 at * 1 (7th Cir. September 10, 2013) ("We have decided to allow the appeal in order to further the development of class action law . . . regarding issues of notice in cases in which the potential damages per class member are very slight, and the suitability of class action treatment of such cases.")

Sturm Foods, Inc.'s Grove Square Coffee ("GSC") single-serve cartridges for use in their Keurig machines. All Plaintiffs saw the same formulaic packaging of Defendant's product, which was specifically marketed for "use by owners of Keurig coffee makers," and designed to have the same look and feel as other available Keurig coffee products. All Plaintiffs purchased the product with the expectation that it was of the same kind and quality, i.e. a true National Brand Equivalent ("NBE") as the other single-serve coffee products then available for use in their Keurigs. After taking the product home from the store, removing it from the box and putting it in their Keurig, each Plaintiff discovered he or she bought an overwhelmingly instant coffee product.

Through its patent and use of licensing agreements, Keurig ensured all available coffee products for use in its machines contained 100% ground coffee with a filter. This was the standard prior to launch of Defendant's GSCs, and this is what each Plaintiff expected when purchasing the product. There simply was no reason for the unsuspecting public to think Defendants would put instant coffee in a cartridge to be run through a Keurig.[2] But this is where corporate greed enters the equation. Defendants began marketing their GSCs in late 2010 in order to

---

[2] *Nilon v. Natural-Immunogenics Corp.*, 2013 U.S. Dist. LEXIS 141728 at *2 N. 2 (S.D. Cal September 30, 2013) (The spirit of this case, like most false advertising cases brought under the UCL and CLRA, is that plaintiffs paid for a product that, with more accurate information, they would have either paid less for or not bought at all.)

situate themselves as first-movers in the market when Keurig's patent expired in September of 2012. Then, Defendants intended to sell a true NBE and reap the available profits in the billion dollar coffee market.[3] Until that time, Defendants were content to market the GSCs to consumers as a true NBE, knowing they weren't. In other words, they sold the GSCs as the real McCoy, knowing they were cheap knockoffs.

Plaintiffs alleged both active misrepresentation and fraud by omission. Active misrepresentation centered on the marketing of the GSCs as a true NBE, knowing they were not; fraud by omission centered on Defendants' failure to disclose on their formulaic packaging that their product was 95% to 96% instant freeze dried coffee and it did not contain a filter. These facts, if prominently disclosed on the packaging, would have been material facts for the consumer's purchasing decision.[4]

A. Facts Common to the Class

---

[3] An overriding goal was "to keep building the business leading up to 10 months from now when the GMCR patent expires and we have the filter cup and parity coffee." "We will be the first to market with this product the day GMCR's patent expires in Sept. 2012." "We will be shipping a true NBE value proposition by October of 2012." "Come September of 2012 we will be able to sell fresh roasted coffee in a cup with a filter which is something GMC's patent restricts us from doing until then." (Doc.99 pp. 15-16 of 45)

[4] *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 256 ("[A] fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a reasonable [consumer]' would deem it important in determining how to act in the transaction at issue.")

This consumer class action merits certification.  It is undisputed:

(1) Defendants targeted a specific group of consumers, Keurig owners, who believed they were purchasing a premium product for use in their coffee machines; (2) prior to the launch of Defendants' GSCs, consumers could only purchase a coffee product for use in their machines that contained 100% fresh ground coffee and a filter; (3) Defendants designed their package to look like Keurig's; (4) they marketed their product as a true NBE knowing it wasn't; (5) they used the word soluble on their packaging for a time instead of the word instant; (6) they never disclosed on the package that the product did not contain a filter; (7) they never disclosed on the package that it was 95% to 96% instant freeze dried coffee; (8) they engaged in a digital marketing campaign that masked the true nature of its product; (9) they lied to consumers who inquired about the nature of the product, including one of the class representatives; and (10) they fabricated favorable reviews.

Defendants purchased a marketing study that found all Keurig coffees "are premium branded products and consumers have the perception that they brew premium coffee in their machines." Similarly, the research showed "[c]onsumers perceive Keurig coffee as high quality, premium product." (Doc.99 at p.9 of 45). Keurig's patent, however, precluded Defendants from using a filter in their product which meant that their product would have to be overwhelmingly comprised of instant freeze dried coffee.

Defendants launched their GSCs in October 2010 as a 95% to 96% instant freeze dried product without a filter in order to "have the company positioned to make [a filtered] product," when Keurig's patent expired in September of 2012. Being the first mover was critical because "Sturm will have been packaging and

processing for 2 years (Grove Square) by the time this product ships. "During this time we have gained experience and improved production and packaging processes in areas where others have yet to start." (Doc.99 at p.15 of 45).

Although the GSCs were significantly different than other available coffee products -- because they contained instant freeze dried coffee and did not have a filter -- Sturm "rearrange[d] the packaging operation to put them into a display like Keurig had on the shelf," because Sturm wanted the finished product "to look like the Keurig product in box style," with a "round cartridge into a rectangular display similar to Keurig."[5] This formulaic packaging included the look and feel of the Keurig product, and the phrase "*For use by owners of Keurig coffee makers." Defendants' marketing agency, BD&H, warned them that "the use of the word 'instant' is a real no-no" and Defendants "should avoid any reference to it if at all possible." Instead, BD&H's brand strategy for the GSCs focused on "delivering a delicious traditional cup of freshly brewed

---

[5] Several retailers passed on selling the GSCs after taste testing showed they were not a true NBE. For example, a Target employee wrote Sturm and explained: "we did try them yesterday and unfortunately the feedback was not what I wanted to hear. . . .There was a group of 10 people including 2 avid Keurig users. Overall the group did not find the product to be equal to K-cups." John Perinotti, a buyer from A&P who was given samples of GSC, summed it up succinctly: "Jose, they put instant coffee in a K-cup… not cool. It would not take long for consumers to figure it out. I am not interested." One Sturm employee lamented: "Supervalue is looking at another supplier on single serve coffee because we failed QA. . . our quality is the issue." (Doc.99 at p.16 of 45).

hot coffee."[6]

The outcry from the consuming public was immediate and vitriolic.[7] The general counsel of Treehouse Foods noted in a February e-mail: "I am forwarding the link to the customer product comments based on the large number of negative reviews 42 of 44 and most of the comments extremely negative."[8] Amazingly, if

---

[6]The back of the packaging has a "quality promise" that states "Grove Square coffee is made with some of the world's highest quality Arabica beans, roasted and ground to ensure peak flavor, then packaged to lock in optimum freshness." (Doc.99 at p.10 of 45). Again, one would not expect a quality promise such as this to be associated with instant freeze dried coffee. Defendants went so far as to include a Coffee Lover's Bill of Rights on the package.

[7]In fact, a September 28, 2010, e-mail to Sturm employees cautioned: There is a possibility you might receive customer or third party inquiries associated with the launch of Sturm's Grove Square Coffee. The product started selling in certain Wal-Mart stores yesterday. The Legal Department would like to be made of all inquiries. We have coordinated a formal response to all inquiries and Eric Beringause will be the spokesperson. (Doc.99 at p.17 of 45).

[8] Some of the negative consumer feedback is quoted below: If I wanted instant coffee, I would have bought about 5 jars of what I paid for one box (18 servings) of your product." (GROVE SQUARE 0001968) (underline added) Sturm received this complaint November 11, 2010: "How greedy can a company get? You guys must be proud of yourself by screwing consumers every day. The fake coffee you guys sell is nothing more than garbage!!trying to pass off instant coffee as gourmet coffee for the keurig.you are a joke! Our united states is in the condition it is, because of companies like you. If I wanted instant coffee, I wouldn't need a keurig, would i? Charging consumers $9.98 for a quarter cup of no brand instant coffee is simply outrageous and irresponsible! Greed must be your first priority. you suck!!" (GROVE SQUARE 0001969) (underline added) "I have a Kuerig coffee maker and came across your Grove Square product the other day at Wal-Mart. As it was next to the Green Mountain brand I usually buy, and it was $2 cheaper, I thought I would try it. Imagine my disbelief when I took the first cup out of the package. It felt different in weight and upon shaking it, sounded different. I am a coffee drinker. If I'd wanted instant, I would have bought a jar for considerably less

a consumer complained the coffee was instant or didn't taste good, the Defendants' canned response was to lie: "we feel this is better quality than instant because it is not freeze dried or instantized."

Named Plaintiff, DiBenedetto, from New Jersey, is one of the consumers that Defendants lied to about the nature of the GSCs.[9] She e-mailed the Defendant and asked if the product was instant, and in response, she was told that the product was not instant coffee! (Doc. 53 at ¶¶ 27-28) An employee of Sturm warned his sales force: "If you're ever confronted with 'your coffee is instant coffee,' let them know there is no standard identity for instant coffee. Ours is NOT Freeze Dried." Defendants even fabricated favorable reviews on the internet: "Guys – please go online this weekend and write up some good reviews on GSC on Amazon. Tell all your friends too . . . ☺. . . I can help with language if needed."[10] (Doc. 99 at p. 20 of 45).

B.    Facts Specific to the Named Plaintiffs.

It is undisputed each Plaintiff purchased the GSCs at a retail

money than I paid for 2 boxes of your crap." (GROVE SQUARE 0001971 and GROVE SQUARE 0001972) (underline added) (Doc.141 at p.11 of 23, n.13).
[9] Extensive quotes from complaints of other consumers were set forth in Plaintiffs' Amd. Cpl. at ¶¶ 33 through 51. (Doc. 53)
[10]Market research further confirmed that Keurig consumers were easy targets for Defendants' fraudulent scheme because they could "choose from a wide assortment of brands," are not loyal to any, "purchase based on roast and flavor" from "formulaic packaging," **and "perceive no risk in choice**." (bold and underline added). (Doc.99 at p.9 of 45).

establishment, saw the same formulaic packaging on the product, and then decided to purchase the product. After purchasing the product, each of the Plaintiffs took the product home for use, and after using it felt misled or deceived after realizing he or she purchased a instant coffee product.

Edna Avakain, represents a California subclass. She purchased her GSCs in November, 2011 and she thought the labeling or the entire package was a misrepresentation. The fact that it was packaged in K-cups and it was for a Keurig Brewer, because the other K-cups she purchased were ground coffee. In her mind, Keurig is associated with a brewing cup of coffee: "For me, Keurig and brewing go hand-in-hand." (Doc.141 at p.5 of 23).

Benjamin Caps represents a subclass of South Carolina consumers. Paragraph 26 of the First Amended Complaint describes Mr. Capps' experience. It alleged:

> He purchased his boxes of Grove Square at a Big Lots store in Bluffton, SC. He was eager to try it as he had just purchased a Keurig, and was looking to try new varieties of K-cups. He had purchased K-cups from Big Lots before, the Donut House variety, which is made by Green Mountain Coffee, and he assumed that the Grove Square k-cups were similar. Capps purchased 3 boxes, one of each variety they had, with the intention of trying each one, and going back later that afternoon to get more of the ones he liked. After trying each of the varieties, and wondering about the taste, Capps cut open a single serve container and discovered it was filled with crystalline freeze dried coffee. He examined the box, and after 30 minutes of looking all over the box, he found in ridiculously small letters, "soluble and micro ground". Capps then researched the language to discover that he had paid the same price for instant coffee as he had for ground coffee. He

was furious, and threw the remaining boxes out in the trash. He then went online and went to the grove square website, and looked up their contact info. He called their number, and after numerous recordings got fed up and ended the call. He then went online and decided to write some reviews of the product wherever he could find it on sale online, as he did not want anyone else to be duped into buying instant coffee in a k-cup. (Doc.53 at p.8 of 38).

Charles Cardillo represents consumers from New York. He bought the GSCs because they were near other k-cup products; as he had previously tried all of the other brands, he was looking forward to tasting another brand of coffee. (Doc. 137 at p. 8 of 26).[11] After using the product at home, Mr. Cardillo wrote the Better Business Bureau and complained: "It is false advertisement. What is in that product is not what is portrayed on the box. All it is is instant coffee crystals in a cup that is supposed to be used for the Keurig coffee maker. All you need is hot water from the tap to make this coffee that they sell." (Doc. 100-11 at p. 3 of 13) Mr. Cardillo requested that the product be pulled off the shelves because of the false advertising.[12]

Carol Ritchie represented consumers from North Carolina. Like Plaintiff Cardillo, she wrote the BBB to complain about the GSCs:

---

[11] Plaintiff Cardillo "fits to a T" the profile of the Keurig consumer Defendants' marketing company described: (1) "is aware of many brands," (2) has "no strong brand preference," (3) purchases based "on roast and flavor" from (4) "formulaic packaging," and (5) perceives "no risk in choice." (Doc.141 at p.4-5 of 23).

[12] Paula Gladstone is another Plaintiff from New York. She purchased Defendants' product in New York. Gladstone believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. (Doc.141 at p.7 of 23).

The produce is Grove Square Coffee K-cups stating that the coffee is soluble & microground this is an instant coffee but who knew because nowhere on the package does it state this is instant coffee and not ground.  The word microground leads people to believe this is a ground coffee not instant at 10.00 dollars a box this can be a very expensive mistake. I've called the company and as of 2pm est on 10/3/2011 I am still waiting for a response. Packaging should be labeled clearly and in lettering large enough for people to see. . ." (Doc. 100-12 at p. 5 of 15)

Deborah DiBenedetto represents a subclass of New Jersey consumers. She feels she was misled because she bought a product that she thought was one thing and then realized it was really something else.  She remembers the K-cups on the front of the package and she read that it was for Keurig. When she made the coffee, it tasted like instant. She does not drink instant coffee so she emailed the company to complain.  A copy of her e-mail is reproduced below:

> **From:** Deborah DiBenedetto [redacted]
> **Sent:** Friday, January 14, 2011 5:52 PM
> **To:** info
> **Subject:** Grove Square Coffee
> I purchased a box of your Grove Square Coffee for my Keurig machine. I never read the box closely enough to see your play on words . ."soluble and microground arabica coffee." Shame on you; call it what it is in a language everyone is familiar with. ..INSTANT COFFEE IN A K-CUP. And, what does "natural flavor with other natural flavor" mean? Properly and clearly label your product as ***Instant Coffee***.
> Deborah DiBenedetto

In response, DiBenedetto received this e-mail:
> **Subject: Fwd: Grove Square Coffee**
> Hi Deborah:

Thank you for inquiring about Grove Square Single Serve Coffee Cups. This is a relatively new product and we are anxious to hear consumer feedback.
**While the Grove Square Coffee Cups are different from other K-cups, it is not instant coffee**. It is a similar concept to instant because it does dissolve, but it is actually a high quality coffee bean pulverized into a powder so fine that will dissolve. The natural flavor is coffee extracts. I hope you find this information helpful, please let me know if I can be of further assistance. (bold and underline added)
Jodi Rickert
Sturm Foods
Consumer Affairs

(Doc.53 at p.9 of 38).

Mr. McManus represents a subclass of Alabama consumers. He remembered the text on the box said it was great coffee, not instant coffee and it depicted coffee beans. The box said for use by owners of the Keurig coffee maker. "It was the most foul tasting thing I have ever had I my mouth. It was not coffee. It was instant coffee. It was absolutely awful." Mr. McManus regards the following aspects about the Grove Square packaging deceptive: 100% Arabica coffee, had coffee beans on it, its placement with the K-cups which are real coffee, with a filter and made for people who want a fresh brewed cup of coffee, nothing on the box says instant. (Doc.141 at p.6-7 of 23).

Linda Suchanek represents a subclass of Illinois consumers and she filed the first lawsuit against Defendants. Ms. Suchanek believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. The picture on box looked like a "nice, fresh cup of hot, brewed coffee." Ms. Suchanek tried

the Grove Square and it tasted like instant.   She looked at the box to see if it said instant on the box but did not say instant on the box. Ms. Suchanek felt it was misrepresented because it was not a freshly brewed cup.[13] (Doc.141 at p.7 of 23).

Ms. Carr represents a subclass of Tennessee consumers.   She bought the GSCs at a Big Lots in 2010.   She only made one K-cup and threw the rest away. She bought it because the box was attractive, it was a good price and it had a picture of a K-cup on it. She is a coffee drinker and coffee lover. Her expectation from the picture of the K-cup was that it was going to be as good as the other K-cup she has bought in the past. (Doc.141 at p.8 of 23).

Neal Roese, Defendants' expert, acknowledged all of the named Plaintiffs "believed that they were buying ground roast coffee," and all consistently complained "that they thought they had bought something different than soluble or instant coffee."   (Doc.141 at p8 of 23).

C.      Facts Specific to Defendants' Intentional and Willful Conduct

Robert Ruegger, Sturm's senior vice president, acknowledged Sturm "could have used ground coffee if we had been able to use a filter," but after realizing "we couldn't use a filter, we wanted to find a different way to provide a coffee and still

---

[13] She thought that the following quote meant that she was making a fresh, delicious cup that was going to be brewed: "The fresh, hot, delicious Grove Square coffee recaptures the rich, traditional cup and brings it home in a single-serve convenience." Further, "Keurig brews coffee," "[i]f I was going to buy a k-cup of instant coffee, I would have used my hot water tap that has boiling water at the sink instead of buying an expensive Keurig machine." (Doc.141 at p.7 of 23, n.7).

use the Keurig machine."  Hence, the inability to use a filter "pushed [Sturm] down the path of soluble coffee."  Ruegger testified:

> Q. You know that if you were going to sell this without a filter and use mostly soluble coffee, you would be the only people on the market doing that?
>
> A. **There was no one doing it.  In fact, there was no one else selling a cartridge that would work in a Keurig machine at that point**.
>
> Q. All of the other products on the market entirely, every other one of them, used the filter system of Keurig correct?
>
> A. **The other products were all licensed products of Keurig and they all used a filter, yes.  There was no one else that was not a licensed entity with Keurig selling a cartridge that would work in a Keurig machine at that point.**"  (Ruegger depo. P. 30, line 11 – p. 31, line 1). (bold added)

(Doc.141 at p.7-8 of 23).

Although Defendants have thousands of private label products, Defendants responded "nothing comes to mind," when asked if any of their other products were not a true analog of a NBE. (Doc.99 at p.15 of 45).  Ruegger testified that although Sturm typically did not spend much on marketing it spent $235,000 in 2010 for direct marketing of the product and in 2011 spent another $263,000. He acknowledged that spending half a million dollars over fifteen months was a lot of money for this particular product, and the "size of this business doesn't justify the amount of expense we incurred." (Doc.99 at p.19 of 45).

Jodi Rickert received permission from Beringause to refund consumers $10 if they complained that they bought instant coffee. "We aren't offering refunds but if consumer requests it I am sending $10 cash." This refund policy was the first time Rickert ever sent $10 to consumers that complained, and this was not normal practice for Sturm. Gary Ross, after talking to Rickert about these "duped" consumers, sent an October 22, 2010, e-mail to Harry Overly inquiring: "can we arm [Rickert] with more info on what to say? Now all she does is say sorry and send $10." Overly responded, "I am considering a digital strategy." (Doc.99 at p.19 of 45). This digital strategy – like the $10 refunds -- was highly unusual for Sturm.

Without a filter the GSCs weighed less than other true NBEs; hence, Sturm worried consumers might notice their product weighed distinctly less. "As with previous tests none of the participants noticed any difference between the single serve cups with respect to weight and none noticed the Sturm cup emitted a distinct rattle when shaken. When facts made known to participants they did not equate with quality." "By the way the difference in weight was noticed by 30% of respondents . . .but this recognition did not play into any negative assessment of Sturm . . .but this could be an issue if pointed out to the trade." "Minimal consumer Risk based on 2/23 Research; cup weight cup rattle Coffee color while dispensing." (Doc.99 at p.11-12 of 45).

The price at which the product sold added to the deception. Sturm's marketing study showed the best price gap for pricing the GSC was $1.50 below a true NBE. Hence, Defendants were keen to price their product to attract consumer attention, but not too much consumer attention, as Ruegger admitted: "Yes. I knew that there was a price gap. We felt there was a good gap. If you actually got the price too low, people would perceive it as poor quality. If you got the price too high, obviously it would be too close to the brand and might damage the sales of the product." (Ruegger depo. at P. 51 Lines 10-15). (Doc.99 at p.23 of 45).

Jodi Rickert and another employee of Defendants developed a script for the call center that was established to respond to consumer complaints. (Documents 16813; 16820; 16868; 16870; 16872; and 16881 are attached separately as Exhibit P). Rickert put on the form "not freeze dried," even though she claims she did not know the nature of the product. (Doc.99 at p.17 of 45). Amazingly, if a consumer complained that the coffee was instant and didn't taste good, the standard response to the consumer was "we feel this is better quality than instant because it is not freeze dried or instantized." (Doc.99 at p.18 of 45). After Rickert pointed out that Amazon sometimes called out the product as instant and other times did not, another employee named Gina responded: "I guess we can't say it's not instant anymore. Thanks for the info." (Rickert depo at p. 72, line 9 – p. 73, line 18). (Doc.99 at p.11 of 45).

In fact, Sturm's marketing agency, BD&H, informed it that the use of "the word `instant' is a real no-no, so they should avoid any reference to it if at all possible." (BDHM 239 attached as Exhibit Q)  Accordingly, the "online marketing campaign was carefully aligned with BD&H Marketing's brand strategy of delivering a delicious traditional cup of freshly brewed hot coffee." (Doc.99 at p.19 of 45).    Of course, there is nothing traditional about instant coffee and one does not need a Keurig brewer to make instant coffee.    Defendants went so far as to have friends and family write bogus reviews of the product.  In a January 21, 2011, e-mail Overly requested of eight employees: "Guys – please go online this weekend and write up some good reviews on GSC on Amazon. Tell all your friends too. ☺.. I can help with language if needed."  Ironically, a printout of a slide presentation Defendants gave to potential retailers posed this question: "So what are we selling Overly?" (Doc.99 at p.20 of 45).

D.    Relevant Procedural History

Four separate lawsuits were filed against Defendants in Illinois, New York, Alabama and Tennessee.  Three of those actions were transferred to the Southern District of Illinois and later consolidated into the *Suchanek* action which was pending before the district court. (Doc. 28.)  After consolidation, Plaintiffs filed an Amended Complaint on May 2, 2012. (Doc. 53)  Included in the Amended Complaint, were additional consumers representing subclasses from California,

New Jersey, New York, North Carolina and South Carolina.

On January 7, 2013, Plaintiffs filed their Motion for Class Certification and Memorandum in Support. (Doc. 99)   Plaintiffs Evidentiary Submission in Support contained two volumes of exhibits, with the second volume being filed under seal because of confidentiality issues. (Docs. 100 and 101)   Defendants filed their Opposition to Plaintiffs' Motion for Class Certification with their supporting exhibits on February 25, 2013. (Doc. 108)   On March 11, 2013, Plaintiffs filed their Reply Memorandum in support of class certification. (Doc. 111)

On April 15, 2013, the District Court held a hearing on Plaintiffs' Motion for Class Certification.   (Transcript attached to the Appendix)   On June 6, 2013, Defendants filed supplemental authority with the court pointing out that the Supreme Court had vacated this Court's earlier decision of *Butler v. Sears*, 702 F.3d 359 (7th Cir. 2012). (Doc. 132)   On June 14, 2013, Plaintiffs responded to Defendants' filing of supplemental authority. (Doc. 133)

On August 23, 2013, Defendants filed a Motion for Summary Judgment and Memorandum in Support. (Docs. 136 and 137)   Three days later, the district court entered its Memorandum and Order denying Plaintiffs' Motion for Class Certification for all subclasses.   (Doc. 138)   On September 5, 2013, Plaintiffs submitted a Motion to Reconsider the order denying class certification and alternatively to submit narrower class definition. (Doc. 140)   Importantly, Plaintiffs

informed the district court that on August 22, 2013, just four days before its order denying certification, this Court reinstated its earlier opinion in *Butler v. Sears*.

On September 20, 2013, Plaintiffs filed their Opposition to Defendants' Motion for Summary Judgment. (Doc. 141). On September 23, 2013, Defendants filed their Opposition to Plaintiffs' Motion to reconsider. (Doc. 142) On November 5, 2013, the district court heard oral argument on Defendants' Motion for Summary Judgment. (Transcript attached to the Appendix) On November 20, 2013, the district court entered its Memorandum and Order denying Plaintiffs' Motion to reconsider and granting Defendants' Motion for summary judgment. (Doc. 161) That same day, the court entered a final judgment. (Doc. 162) Plaintiffs filed their Notice of Appeal on December 18, 2013. (Doc. 163)

This Court should not allow the manifestly erroneous denial of certification to stand. The denial undermines this Court's recent decision in *Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013), which reiterates that the predominance inquiry of Rule 23(b)(3) is a question of efficiency. Rather than focusing on the overarching fraudulent conduct of Defendants -- which was clearly the predominant issue -- the district court focused instead on alleged differences in the purchase decisions of individual consumers, and in doing so, engaged in the type of analysis this Court just rejected in *Butler v. Sears*. As this Court explained:

> Sears thinks that predominance is determined simply by
> counting noses: that is, determining whether there are more common

issues or more individual issues, regardless of relative importance. That's incorrect. An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment. . . . But predominance requires a qualitative assessment too; it is not bean counting. . . . Or as we put it in *Messner v. Northshore University HealthSystem,* 669 F.3d 802, 819 (7th Cir. 2012), "Under the   district court's approach [which our decision in *Messner* rejected], Rule 23(b)(3) would require not only common evidence and methodology, but also common results for members of the class. That approach would come very close to requiring common proof of damages for class members, which is not required. To put it another way, the district court asked not for a showing of common questions, but for a showing of common answers to those questions. Rule 23(b)(3) does not impose such a heavy burden.

727 F.3d at 801. (underline added)

After deciding no subclass should be certified, the district court improperly weighed facts and decided for itself that none of the eight Plaintiffs could show reliance or causation under their state's respective consumer fraud statutes.  The district court made this finding, although all Plaintiffs purchased the product in person and saw the same formulaic packaging; all Plaintiffs testified that they were deceived as to the true nature of the Defendant's product; two of the Plaintiffs complained to the Better Business Bureau ("BBB") about the deceptive nature of the product; and, two other Plaintiffs wrote the company directly to complain/inquire about the product.  Clearly a jury question was presented on the issue of causation and reliance and summary judgment should be reversed.

## APPLICABLE LEGAL STANDARD

*Bank of Waunakee v. Rochester Cheese Sales, Inc.* 906 F.2d 1185, 1188 (7th

Cir. 1990) ("We review the district court's decision to grant summary judgment *de novo* and use the same standard of decision making as that employed by the district court." In *Adeyeye v. Heartland Sweeteners, LLC*., 721 F.3d 444, 449 (7th Cir. 2013) this Court reversed the district court's granting of summary judgment stating: "We must reverse if a genuine issue of material fact exists that would allow a reasonable jury to find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-51, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Forrest v. Prine,* 620 F.3d 739, 742-43 (7th Cir. 2010). To determine whether genuine issues of material fact exist, we ask if "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) ("We review the district court's decision not to certify a class for abuse of discretion.")

## SUMMARY OF THE ARGUMENT

The district court committed reversible error by not certifying any subclass of consumers under any states' consumer protection laws or the law of unjust enrichment. In doing so, it ignored this Court's guidance of *Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013), which equates the predominance inquiry with efficiency. It is clearly more efficient for these small dollar claims to be decided in a class action, especially where the overriding qualitative issue is the Defendants'

fraudulent conduct. *Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 4 ("Predominance is a qualitative rather than a quantitative concept. It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.")

Instead of focusing on these issues, the district court improperly applied its stringent reading of *Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006) to the purchasing decisions of the named Plaintiffs and members of the class. This focus was improper, as the resolution of whether Defendants' product was misleading or tended to deceive must be answered from the perspective of an objective consumer acting under reasonable circumstances. FTC Policy Statement on Deception, appended to *Matter of Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984). *Cirone-Shadow v. Union Nissan*, 955 F.Supp. 938, 944 (N.D.Ill. 1997) (standard for materiality of Illinois Consumer fraud Act claim is objective standard) Hence, the individual reasons behind the purchase were immaterial to this finding.

Moreover, the district court erred by not considering that Plaintiffs alleged fraudulent omission on the part of defendants which would allow for class wide presumption of reliance. *Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill. App. 3d 1139, 759 N.E.2d 66, 70, 259 Ill. Dec. 586 (Ill. App. 2001) ("it is not necessary . . . to show actual reliance in order to state a valid claim based on an omission or concealment under the Consumer Fraud Act."). This was especially true under

California and New Jersey law, and the court committed clear error in not certifying subclasses under the law of those states. *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007) ("[NJ CFA] essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss.").

The district court's granting of summary judgment against each Plaintiff was improper and entitled to no deference, as the court imposed a burden under Rule 56 that does not exist. All Plaintiffs presented sufficient facts showing a material question of fact existed on the issues of reliance and causation, and the court's finding to the contrary was against the evidence. *Ries v. Arizona Tea Beverage* 287 F.R.D. 523 (N.D.Cal. 2012) ("Defendants have neglected to identify any authority to suggest a more specific or greater showing of reliance is required to survive a motion under *Rule 56.*")

## ARGUMENT

A.  <u>The District Court abused its Discretion in not certifying any Subclass under any State's Consumer Protection Statute</u>.

The district court refused to certify any of the eight subclasses finding individual issues of causation and reliance would predominate. Its Memorandum Opinion states:

Here, as discussed in the Order denying class certification, the issue of liability requires individualized inquiry. The problem here is not that proof of damages requires looking at each individual class member, for as *Butler* makes clear, that does not preclude predominance. The problem with the proposed class here is that showing reliance or causation—as required to establish liability—requires an investigation of each purchaser. (Doc. 161 pp. 2-3)

As shown below, the district court's analysis misreads the teachings of *Butler v. Sears*, which explains that one central issue – such as a Defendant's liability -- may satisfy the predominance inquiry of Rule 23. Moreover, the district court failed to realize predominance is a question of efficiency which has a qualitative aspect to it. Instead of focusing on those elements of predominance, the district court erroneously dwelt upon the individual purchasing decisions of individual consumers or whether a consumer had been injured or harm. Finally, even if the district court's reasoning regarding reliance was not incorrect, it certainly is inapplicable to California and New Jersey consumers where a presumption of reliance and causation applies under those state's statutes.

      1.    This Court's recent Opinion in *Butler v. Sears* Demonstrates the predominance Inquiry was Satisfied in this action.

This Court's recent opinion in *Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013) shows that a consumer class case such as this one, which involves the sale of a product in common formulaic packaging to tens of thousands of consumers in

eight states, satisfies the predominance inquiry of Rule 23(b)(3).[14]  Judge Posner

reiterated:

> The basic question presented by the mold claim--are the
> machines defective in permitting mold to accumulate and generate
> noxious odors?--is common to the entire mold class, although
> damages are likely to vary across class members (the owners of the
> washing machines). <u>A class action is the efficient procedure for
> litigation of a case such as this, a case involving a defect that may
> have imposed costs on tens of thousands of consumers, yet not a cost
> to any one of them large enough to justify the expense of an
> individual suit</u>. A determination of liability could be followed by
> individual hearings to determine the damages sustained by each class
> member. The parties probably would agree on a schedule of damages
> based on the cost of fixing or replacing class members' mold-
> contaminated washing machines. In that event the hearings would be
> brief; indeed the case would probably be quickly settled.

727 F.3d at 798. (underline added)

The same reasoning holds true here.  The overriding issue presented by the

consumer fraud claims, whether Defendants' sale of the GSCs in standardized

formulaic packaging, deceived or tended to deceive a reasonable objective

consumer, is common to each subclasses though damages would vary among

---

[14] The significance of *Butler v. Sears* to this action cannot be overstated, as the
Defendants took great pains to point out to the district court, by letter dated June 5,
2013, that this Court's prior opinion had been vacated.  Defendants wrote:
"Plaintiffs in this action relied on the Seventh Circuit's now-vacated opinion in
*Butler* in both their initial memorandum in support of their motion for class
certification (Dkt. 99, pp. 26-27) and their reply memorandum. (Dkt. 111, p. 6,
14)" (Doc. 132).  Obviously, Plaintiffs' reliance on *Butler* has been vindicated,
especially in light of the orders from the United States Supreme Court on February
24, 2014, refusing to grant certiorari in S*ears, Roebuck & Co. v. Butler,* 13-430
*and Whirlpool v. Glazer,* 13-431.

consumers. Here, where the cost of the product involves $10 or less, the class mechanism is the only efficient manner by which such litigation will proceed because individual suits will not be brought.

The district court distinguished *Butler* referring only to the damages aspect of the ruling, i.e., "problem here is not that proof of damages requires looking at each individual class member, for as *Butler* makes clear, that does not preclude predominance," but by doing so, it altogether ignored the other aspect of the *Butler* ruling dealing with efficiency. (Doc. 161 at p. 2) As this Court made clear, predominance equates with efficiency:

> Sears argues that *Comcast* rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." 702 F.3d at 362. But in support of its argument Sears cites only the statement in the *dissenting* opinion in *Comcast* that "economies of time and expense" favor class certification, 133 S. Ct. at 1437--a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority *must* disapprove of.

727 F.3d at 800.

In sum, it is more efficient to have these small dollar claims, all focused on Defendants' fraudulent marketing of the GSCs, decided through the class mechanism. <u>See</u> *Hughes v. Kore of Indiana Enterprise, Inc.*, 2013 U.S. App. LEXIS 18873 at * 6 (7th Cir. September 10, 2013) ("The smaller the stakes to each victim of unlawful conduct, the greater the economies of class action treatment and

the likelier that the class members will receive some money rather than (without a class action) probably nothing, given the difficulty of interesting a lawyer in handling a suit for such modest statutory damages. . .")

2.   The District Court Committed Further Error by not Focusing on the Central Overriding Issue of whether Defendants' Packaging was Misleading or Deceptive or Tended to Mislead and Deceive, but Instead Focused on the Individual Purchasing decisions of the Consumer

Not only did the district court fail to recognize the efficiencies to be gained by having these actions proceed on a class basis, but also, the district court did not weigh the relative importance of the issues to be decided. *Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 4 ("Predominance is a qualitative rather than a quantitative concept. It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.")

Whether the Defendants' packaging is actively misleading, whether the packaging is misleading by omission, or whether the packaging is misleading for both of these reasons, are the overriding issues in this litigation.[15] According to the

_____

[15] There are other common issues, which all focus on the Defendants' conduct, whose resolution has nothing to do with the individual Plaintiffs or members of the class.  For example, did the Defendants intentionally deceive the Plaintiffs or was their conduct in marketing the GSCs willful?  Were the Defendants unjustly enriched by marketing the GSCs as a true NBE when in fact they were only a cheap instant coffee knockoff? Resolution of these issues will focus solely on Defendants' conduct.

Federal Trade Commission, deception requires a material representation, or an omission or practice that is likely to mislead a reasonable consumer acting reasonably in the circumstances. FTC Policy Statement on Deception, appended to *Matter of Cliffdale Associates, Inc*., 103 F.T.C. 110, 174 (1984). This Court should apply *Skidmore* deference to the views of the Federal Trade Commission. *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)

Defendants successfully convinced the district court to focus on the individual purchase decisions of the named Plaintiffs and/or members of the subclasses, i.e., what they remember seeing on the GSC package, whether they knew what soluble meant, did they know the product did not contain a filter, etc., and not on Defendants' wrongful conduct. None of the foregoing questions, however, is determinative as the actual inquiry must be judged from the perspective of an objective, reasonable consumer, not the subjective views of a plaintiff.[16]

As explained in *Astiana v. Kashi*, 2013 U.S. Dist. LEXIS 108445 at * 19 (S.D.Cal. July 30, 2013)

> Moreover, "individual experience with a product is irrelevant" because "the injury under the UCL, FAL and CLRA is established by an objective test. Specifically, this objective test states that injury is shown where the consumer has purchased a product that is marketed

---

[16] See *Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1145 (N.D.Cal. 2005); *Cirone-Shadow v. Union Nissan*, 955 F.Supp. 938, 944 (N.D.Ill. 1997) (standard for materiality of Illinois Consumer fraud Act claim is objective standard)

with a material misrepresentation, that is, in a manner such that 'members of the public are likely to be deceived.'" *citing Bruno v. Quten Research Inst., LLC,* 280 F.R.D. 524, 534 (C.D. Cal. 2011).

Whether one named Plaintiff saw one aspect of the packaging as opposed to another aspect, simply makes no difference as to whether the overall packaging was deceptive, or likely to mislead a consumer acting reasonably under the circumstances. *Papaspiridakos v. Educational Affiliates, Inc.,* Slip Copy, 2013 WL 4899136, E.D.N.Y., 2013 (Under the objective standard of N.Y. G.B.L. § 349, the challenged representation or omission must be one that is "likely to mislead a reasonable consumer acting reasonably under the circumstances.")[17] Again, all named Plaintiffs saw the packaging as they purchased the GSCs in person at a grocery store.

In sum, the qualitative overarching question for resolution is whether Defendants' packaging was deceptive or misleading to a reasonable consumer acting under reasonable circumstances.

---

[17] *Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, (N.D.Cal.2012) ("Defendant contends that no reasonable consumer could be misled in light of the nutrient label on the package. This argument is not persuasive. As the *Williams* court said, "We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging."); *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 256 ("[A] fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a reasonable [consumer]' would deem it important in determining how to act in the transaction at issue.")

3. <u>The District Court's Decision was Erroneous because it Presumed that Many Class members did not Suffer Injury, which was both Factually Incorrect but also Irrelevant at this Stage of the Proceedings</u>

The district Court cited *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-514 (7th Cir. 2006) for the proposition a class cannot be certified "when the class definition could include millions of people who were not injured." (Doc. 138 at pp. 3-4)  Apparently, the district court operated under the faulty assumption many consumers who purchased the GSCs were not injured or suffered any injury. *Butler v. Sears* shows this assumption was misplaced:

> Sears argued that most members of the plaintiff class had not experienced any mold problem. But if so, we pointed out, that was an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate Sears--a course it should welcome, as all class members who did not opt out of the class action would be bound by the judgment.

727 F.3d at 799.

Likewise, this Court's recent decision in *Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 4 further highlights the unsoundness of the district court's approach:

> We reject the argument. To require the district judge to determine whether each of the 150 members of the class has sustained an injury--on the theory that if 140 have not, and so lack standing, and so should be dropped from the class, certification should be denied and the 10 remaining plaintiffs be forced to sue (whether jointly or individually)--would make the class certification process unworkable; the process would require, in this case, 150 trials before the class could be certified.

The defendants are thus asking us to put the cart before the horse. How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified.[18]

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) also supports this result. Justice Ginsburg noted the case before them involved the interaction between federal securities-fraud laws and Rule 23's requirements for class certification; she then explained:

> The issue presented concerns the requirement stated in Rule 23(b)(3) that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Amgen contends that to meet the predominance requirement, Connecticut Retirement must do more than plausibly *plead* that Amgen's alleged misrepresentations and misleading omissions materially affected Amgen's stock price. According to Amgen, certification must be denied unless Connecticut Retirement *proves* materiality, for immaterial misrepresentations or omissions, by definition, would have no impact on Amgen's stock price in an efficient market.

[18] The district court erroneously concluded that Plaintiffs' proposed subclasses were not sufficiently "ascertainable" or "definite" because the subclasses could include "numerous people who have no claim at all," (Doc. 138 at p. 3), as they included "purchasers who knew, or who were indifferent to the product's insoluble coffee content." Id. at p. 4. Those purchasers, the district court found, could not "prove causation, reliance, or actual injury from Defendant's alleged misrepresentation." Id. While Plaintiffs believe that the court's speculation was misguided, as the overwhelming majority of consumers were in fact injured, the holding of *Parko v. Shell Oil Co* shows that the court improperly put the cart before the horse. Moreover, the district court's faulty conclusions also show it delved too deeply into the merits of the action. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-1195 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.")

> While Connecticut Retirement certainly must prove materiality to prevail on the merits, we hold that such proof is not a prerequisite to class certification. Rule 23(b)(3) requires a showing that *questions common to the class predominate, not that those questions will be answered*, on the merits, in favor of the class. Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class Connecticut Retirement would represent.

133 S. Ct. at 1191. (underline added)

Finally, on its facts *Oshana* is readily distinguished because it involved bare bones allegations Coca-Cola failed to disclose the unremarkable proposition Diet Coke from a fountain and bottled Diet Coke were not the same. As this Court correctly found, countless members of *Oshana's* putative class could not show any damage, let alone damage proximately caused by Coke's alleged deception. In fact, the Court wondered if anyone but the named plaintiff in *Oshana* shared his concerns about the alleged fraud. Additionally, there is no discussion in *Oshana* of how Coca-Cola ostensibly practiced its alleged deception.[19]

Here, Defendants targeted a specific class of consumer, Keurig coffee drinkers, who believed they were purchasing a premium product for use in their Keurigs. Instant freeze dried coffee, even if Defendants put it in a box to look like a true NBE, will never be considered a high quality, premium product. As they

---

[19] *Oshana* contains no discussion of standardized packaging – nor could there be – as one of the products was dispensed from a fountain. Here, all Plaintiffs and members of the subclasses purchased the product in identical formulaic packaging, designed to look like the Keurig product.

say, you can't make a silk purse from a sow's ear.[20]  All of the Plaintiffs in this action saw the same formulaic packaging, purchased the product expecting a certain kind and quality to the product, and after using the product, realized that they purchased something other than what they had expected.[21]

In sum, predominance was clearly met in this action. *Bowen v. Groome*, 2012 U.S. Dist. LEXIS 78829 at * 13 (June 7, 2012, S.D.Ill.)  ("Predominance is a test readily met in certain cases alleging consumer or securities fraud.").

> 4.    As Defendants' Conduct Involved Material Fraudulent Omissions, Causation and Reliance for class members may be Presumed.

Plaintiffs alleged active misrepresentation and fraud by omission, i.e., Defendants failed to disclose their product was 95% to 96% instant coffee and that it did not contain a filter.  The district court erred by not considering this aspect of Defendants' fraudulent conduct.

---

[20] Although the district court did not rely upon any expert testimony in reaching his decisions, Defendants' expert, Neal Roese, P.H.D. provided plentiful deposition testimony that supported Plaintiffs' theory of the case.  For example, he acknowledged that all of the named Plaintiffs "believed that they were buying ground roast coffee," and that they consistently complained "that they thought they had bought something different than soluble or instant coffee."  (Roese depo. At p 6, lines 7-21, attached to Evid. Sub. As Exhibit U)   Roese also admitted that there is a general opinion shared by consumers that instant coffee has a different level of quality than fresh brewed, p. 11, lines 12-17, and further noted that "Green Mountain coffee was perhaps marketed with a target toward premium-minded consumers." (Id. P.23, lines 6-8). (Doc 99 at pp 21-22 of 45).

[21] *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 479 (C.D. Cal. 2012) (finding typicality was satisfied where "each named plaintiff testified that she would not have purchased Serum or would have paid less for Serum had she known it had flammable characteristics").

In cases involving fraudulent omission, individual reliance is either not required or it may be inferred from the purchase itself. <u>See</u> *Mass Mutual Life Ins. Co. v. Superior Court of San Diego County,* 97 Cal. App. 4th 1282, 1293, 119 Cal. Rptr. 2d 190, (Cal. App. 2002) (if plaintiffs succeed in proving allegations of a failure to disclose a material fact associated with the purchase of life insurance policies, "the purchases common to each class member would in turn be sufficient to give rise to the inference of common reliance on representations which were materially deficient."); *Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill. App. 3d 1139, 759 N.E.2d 66, 70, 259 Ill. Dec. 586 (Ill. App. 2001) ("it is not necessary . . . to show actual reliance in order to state a valid claim based on an omission or concealment under the Consumer Fraud Act."); *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007) ("[NJ CFA] essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss."); *Stutman v. Chemical Bank,* 731 N.E.2d 608, 612, 709 N.Y.S.2d 892 (N.Y. 2000)("reliance is not an element of a [statutory consumer protection] claim.")

Here, Defendants were keenly aware of the omission aspect of their fraud. Early on, Defendants' market research focused on whether consumers would notice a difference in weight with the GSCs, and whether consumers would equate

this lesser weight with lesser quality.  (Doc. 99 at p. 18 of 45)  "Minimal consumer Risk based on 2/23 Research; cup weight cup rattle Coffee color while dispensing." (11432)  Nonetheless, Defendants never disclosed that their product did not contain a filter or that it was always comprised of 95% to 96% instant coffee.  These were facts within the knowledge of the Defendants, and would not otherwise be discoverable or known by the consuming public.  These facts were material and if disclosed to consumers would have helped alert consumers to the fact that the GSCs were not a true NBE.[22]

In sum, Defendants fraud by omission leads to a presumption of reliance.

B      The District Court Committed Clear Error in not Certifying the California and New Jersey Subclasses

This action involved four lawsuits, with consumers from eight states, consolidated together in the Southern District of Illinois.  Although the relevant inquiry under each state's consumer protection statute was the same -- whether the overall packaging was deceptive, or likely to mislead a consumer acting reasonably

---

[22] *Falk v. General Motors Corporation,* 496 F. Supp. 2d 1088, 1094 - 95 (N.D. Cal. 2007) (a CLRA claim exists for a failure to disclose or concealment when (1) the defendant had exclusive knowledge of material facts not known to the plaintiff; or (2) the defendant actively conceals a material fact from the plaintiff materiality under the CLRA is judged by the effect on a "reasonable consumer".); *Strawn v. Caruso,* 657 A.2d 420, 430-431 n.4 (N.J. 1995). ("a matter is material if: '(a) a reasonable person would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.

under the circumstances—two of the states, California and New Jersey, allow for a class wide presumption of reliance. It was clear error for the district court not to certify subclasses from those two states.

Recently, the court in *Waller v. Hewlett-Packard Co.*, 2013 U.S. Dist. LEXIS 141729 at * 42-43 (September 29, 2013) explained:

> Critically, relief under the UCL is available without any proof of deception, reliance, or damages. *Brakke v. Economic Concepts, Inc.*, 213 Cal.App.4th 761, 772, 153 Cal. Rptr. 3d 1 (Cal. Ct. App. 2013); *In re Steroid Hormone Product Cases*, 181 Cal.App.4th 145, 154, 104 Cal. Rptr. 3d 329 (Cal. Ct. App. 2010) . . . *Massachusetts Mutual Life Ins. Co. v. Superior Ct.*, 97 Cal.App.4th 1282, 1289, 119 Cal. Rptr. 2d 190 (Cal. Ct. App. 2002) ("[O]ur courts have not departed in any manner from the principle that liability for restitution under either the specific false advertising provisions of the [FAL] or the broader provisions of the UCL may be found without any individualized proof of deception and solely on the basis a defendant's conduct was likely to deceive customers."). As the Court has said above, this reflects a policy decision of the California legislature, and it focuses the analysis on more the objective conduct of the defendant rather than the plaintiffs' own circumstances.

See *Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 52, 536 (N.D. Cal. 2012); ("The focus of the UCL and FAL is on the actions of the defendants, not on the subjective state of mind of the class members."); *Williams v. Gerber Prods. Co.,* 552 F.3d 934, 938 (9th Cir. 2008) (Under California law there are no reliance and causation elements to a UCL claim in the first instance, and so 'the district court's concerns about reliance and causation were not well taken.'"); *In re Google AdWords,* 2012 U.S. Dist. LEXIS 1216 at *10. (UCL is focused "on the

defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices."

Likewise, as the court explained in *In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 164-165 (D.N.J. 2010):

> Under the NJCFA, Plaintiffs do not need to demonstrate that they actually relied on the company's misrepresentations or omissions. N.J. Stat. Ann. § 56:8-2 (allowing recovery "whether or not any person has in fact been misled, deceived or damaged" by the defendant's misrepresentation or omission); *Int'l Union of Operating Eng'rs*, 929 A.2d at 1087 ("Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover."). Rather, they must show an "ascertainable loss," meaning that they "paid for a product and got something less than what had been promised." *Elias*, 252 F.R.D. at 249 (internal quotations omitted).

Here, the New Jersey Plaintiff, Deborah DiBenedetto, purchased an instant coffee product she otherwise would not have bought if the packaging had not been misleading. As she wrote: "I purchased a box of your Grove Square Coffee for my Keurig machine. I never read the box closely enough to see your play on words . ."soluble and microground arabica coffee." Shame on you; call it what it is in a language everyone is familiar with. .. INSTANT COFFEE IN A K-CUP. And, what does "natural flavor with other natural flavor" mean? Properly and clearly label your product as ***Instant Coffee***."

In sum, it is evident the District Court committed clear error in refusing to

certify the two subclasses of California[23] and New Jersey consumers.

> C.    Each Plaintiff Presented a Question of fact for the Jury Regarding Reliance and Causation.

When determining if a district court properly granted summary judgment, "all factual inferences are to be taken against the moving party and in favor of the opposing party." *International Admin., Inc. v. Life Ins. Co. of N. Am.,* 753 F.2d 1373, 1378 (7th Cir. 1985). In instances where "inferences contrary to those drawn by the trial court might be permissible," a district court's grant of summary judgment must be reversed. *Munson v. Friske,* 754 F.2d 683, 690 (7th Cir. 1985).

While the district court wrote summary judgment was "the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events," the court essentially ignored Plaintiffs' favorable evidence and instead accepted the cherry picked references Defendants cited in their papers as uncontroverted facts. (Doc. 161 p. 6 of 7) In doing so, the court imposed a burden of proof under Rule 56 that was not proper. As the court in *Ries v. Arizona Tea Beverage* 287 F.R.D. 523 (N.D.Cal. 2012) explained:

---

[23] *Nilon v. Natural-Immunogenics Corp.*, 2013 U.S. Dist. LEXIS 141728 at *2 N. 2 (S.D. Cal September 30, 2013) (The spirit of this case, like most false advertising cases brought under the UCL and CLRA, is that plaintiffs paid for a product that, with more accurate information, they would have either paid less for or not bought at all.)

Turning to reliance, likewise, defendants may attempt to exploit plaintiffs' imperfect recollections to persuade the trier of fact to discount their testimony, but critically, because plaintiffs specifically recall defendants' representations of AriZona beverages as "natural," and indicate that statement was material to their purchase, this standing requirement is satisfied. Defendants have neglected to identify any authority to suggest a more specific or greater showing of reliance is required to survive a motion under *Rule 56.*

287 F.R.D. at 530.

Here, all of the Plaintiffs viewed the product in the store and based upon the formulaic packaging and its placement next to other Keurig products, purchased the product believing it was a true NBE, while never expecting the GSCs were overwhelmingly instant freeze dried coffee.[24] Plaintiffs contend the packaging was actively misleading and that there was also fraud by omission. Indeed, almost immediately after the purchase, Plaintiffs Cardillo and Ritchie wrote the BBB to complain. Plaintiff DiBenedetto e-mailed Sturm, and remarkably, was told the

---

[24] It is undisputed each Plaintiff took the product as a whole, from its placement next to other K-cups in the grocery store to the picture of the whole coffee beans on the package and the text on the package, and they understood the product to be a brewed coffee product similar to the other available products for use in Keurigs. In this regard, the facts are quite similar to those of *Ackerman v. Coca-Cola Co.,* Not Reported in F.Supp.2d, 2010 WL 2925955, E.D.N.Y. 2010 ("The plaintiffs have sufficiently alleged that the collective effect of the challenged statements was to mislead a reasonable consumer into believing that vitaminwater is either composed solely of vitamins and water, or that it is a beneficial source of nutrients rather than a "food of little or no nutritional value [which has been fortified] for the sole purpose of" claiming or implying that it is "healthy.")

product was not instant coffee![25]  Plaintiff Capps called the company to complain and wrote reviews to warn other unsuspecting consumers.  What other proof does the district court require for "each Plaintiff . . . to show that *he or she* was deceived and that he or she suffered some injury from the misleading packaging?"[26]

Again, the court's discussion in *Ries v. Arizona Tea Beverage* provides guidance on the issues of reliance and causation.  It explained:

> In other words, "[w]hile a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff   need not demonstrate it was the only cause," or "even the predominant or decisive factor influencing his conduct." *Id.* (quotation marks omitted) (quoting *Engalla v. Permanente Med. Grp., Inc.,* 15 Cal. 4th 951, 976-77, 64 Cal. Rptr. 2d 843, 938 P.2d 903 (1997)). "Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material," that is,   if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question," and as such materiality is generally a

---

[25] "Finally, to the extent defendants argue Ries has admitted she purchased the product without reading the label and solely because of thirst, they also acknowledge her testimony that she purchased the drink with the understanding and expectation it was 'natural,' as advertised. Again, resolving all inferences in favor of the non-moving party, there is a triable issue of material fact raised by Ries's testimony. Defendants are, of course, free to attempt to impeach Ries at trial with prior statements they believe are inconsistent, but such disputes preclude judgment as a matter of law at this stage." 287 F.R.D. at 530.

[26] "Here, plaintiffs have alleged they surrendered the purchase price on the mistaken premise that AriZona teas were 'natural.' Defendants maintain they are entitled to judgment because plaintiffs' alleged purchases are undocumented by receipts, and because neither plaintiff can recall the precise prices they paid, or the exact statements on the bottling of the beverages they purchased. Such arguments do not establish the absence of a disputed issue of material fact, but are instead about the relative weight of the evidence, and must be presented to the jury." *Ries*, 287 F.R.D. at 530.

> question of fact unless the "fact misrepresented is so obviously
> unimportant that the jury could not reasonably find that a reasonable
> man would have been influenced by it."

287 F.R.D. at 529-530.

In sum, each Plaintiff presented a question of fact on reliance and causation making summary judgment improper. *In re Tobacco II Cases*, 46 Cal. 4th 298 (Cal. 2009) ("[M]ateriality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.") "Proximate cause is a question of fact for the jury where varying inferences are possible." *Mirand v. City of New York*, 84 NY2d 44, 51 (1994).

D.   Plaintiffs Presented a Jury Question on Whether Defendants' Packaging was Misleading or Deceptive or Tended to Mislead and Deceive, under the Objective Standard of a Reasonable Consumer in the Context of the Purchasing Decision.

Whether the Defendants' packaging is actively misleading, whether the packaging is misleading by omission, or whether the packaging is misleading for both of these reasons, is a question of fact for the jury to decide. According to the FTC, deception requires a material representation, omission or practice that is likely to mislead a reasonable consumer acting reasonably in the circumstances. FTC Policy Statement on Deception, appended to *Matter of Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984).

Moreover, whether a defendant's representation, omission, or practice is likely to mislead an objective reasonable consumer cannot be resolved by looking at the representation, omission, or practice in a vacuum. The liability determination must rest on the actual words and images used in the packaging and the context in which those words and images are used. Defendants actually concede this point, perhaps unwittingly, when they contend:

> [A]ny misunderstandings regarding the nature of the product came from general assumptions about k-cup products used in Keurig brewers and the fact that the GROVE SQUARE product they bought was a coffee product in a cartridge in the same shape and used the same way, i.e., in Keurig brewers, as many other k-cups that contain ground coffee, and was sold next to k-cups containing only ground coffee. (Doc. 141 at p. 2 of 23)

N.Y. GBL § 350-a provides: "In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations . . ." For purposes of § 350, advertising includes product labels and packaging. N.Y. GBL § 350-a. Omissions are actionable under § 349 and § 350. Moreover, according to the New Jersey Consumer Fraud Act ("NJCFA") a defendant is liable "for omission of material facts whether "any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2.

Plaintiffs' produced facts showing the GSCs' packaging was false, misleading and deceptive or, at the very least, showing there exists a genuine issue of fact as to whether the GSCs' packaging was false, misleading and/ or deceptive. Plaintiffs' have contended since the inception of this suit that the entirety of the GSC packaging, branding and messaging is misleading. (Plaintiffs' Amnd. Complaint ¶10-12)  Each Plaintiff took the product as a whole, from its placement next to other K-cups in the grocery store to the picture of the whole coffee beans on the package and the text on the package, and understood it to be a brewed coffee product similar to the other products packaged for use in single serve coffee brewing systems.[27]

As soon as they launched their GSCs, Defendants began to receive consumer complaints and inquiries about the product.  Tellingly, these complaints and inquiries continued for well over two years and even after Defendants changed their formulaic packaging to include the word "instant" instead of "soluble."  <u>See</u> Exhibit S to the Evidentiary Submission in Support of Class certification previously filed under seal. (Doc. 101)  This Exhibit shows that throughout 2012, "first time users" continued complaining on a weekly basis about the deceptive nature of the packaging and the fact that the GSCs were instant. <u>See</u> *Hilt v.*

---

[27] Defendants' script acknowledge "we have been receiving feedback from consumers that this is not what they are accustomed to with a Keurig." (16881) (Doc 141 at p. 14 of 23, n. 18)

*Arizona Bev. Co… LLC,* 2009 U.S. Dist. LEXIS 16871, at *16-19 (S.D. Cal. Feb. 4, 2009) (permitting plaintiff "the opportunity to present evidence, such as a consumer survey, showing that [Defendant's] labeling and promotion is likely to deceive a reasonable consumer).

The court in *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 at * 35-36, denied Sturm summary judgment on Keurig's trade dress claim finding material facts existed regarding the existence of a consistent overall look between the two products. The trade dress was described as:

> [1] an image of single-serve beverage cartridges, with at least one beverage cartridge depicted on its side and one beverage cartridge depicted right-side up, and a tagline below the image of the cartridges that states they are for use in Keurig brewers, [2] an image of spilled coffee beans, [3] an indication of the coffee's roast strength on a graded bar with shading varying from light to dark, along with an indication whether the coffee is caffeinated, [4] perforations for opening the package that form an opening that is tapered in a vshape and ending in a u-shaped tab, [5] prominent lettering displaying the name of the beverage, and [6] another face of the packaging providing a product story.

As previously noted, Sturm had to "rearrange the packaging operation to put them into a display like Keurig had on the shelf," because Sturm wanted the GSCs "to look like the Keurig product in box style," with a "round cartridge into a rectangular display similar to Keurig." (Doc. 99 at p. 22 of 45) The GSCs contain text on the bottom left hand corner of the front of the package that reads "*For use by owners of Keurig coffee makers." (Doc. 53 at ¶

16.) See *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 at \*32 n.9 ("For instance, with respect to factor four, actual confusion (a highly relevant factor), plaintiff has produced survey, consumer testimonial and consumer complaint evidence which suggests that defendant's use of the word "Keurig®" on its packaging is misleading.")

Finally, Plaintiffs expect Defendants to argue to this Court that no Plaintiffs or class members could possibly be deceived or misled by their packaging because nothing on the packaging was "literally false". Such a contention has no merit in law or fact. *Bronson v. Johnson & Johnson, Inc.***,** Slip Copy, 2013 WL 1629191, N.D.Cal.,2013("Deceptive labeling claims under the UCL, the FAL, and the CLRA are evaluated by whether a "reasonable consumer" would likely be deceived. Williams, 552 F.3d at 938 (<u>citing</u> *Freeman v. Time, Inc.,* 68 F.3d 285, 289 (9th Cir.1995)). The California Supreme Court has recognized "<u>that these laws prohibit not only advertising which is false, but also advertising which</u>[,] **<u>although true</u>**<u>, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public</u>." *Id.* (quoting *Kasky v. Nike, Inc.,* 27 Cal.4th 939, 450 (2002)) (internal quotations omitted) (bold and underline added).[28]

---

[28]*Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, N.D.Cal.,2012. ("Defendant contends that no reasonable consumer could be misled in light of the nutrient label on the package. This argument is not persuasive. As the *Williams* court said, "We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those

Defendants' expert, Roese, acknowledged that generally speaking "certain advertisements or certain marketing information could be misleading even if the statement were true," and furthermore, recognized that it is true that just "because something might be true doesn't mean it can't also be misleading." (P. 103, lines 4-15). He also discussed consumer's "inattention blindness," or people's expectations "can be a guide to how they interpret something." (P. 91, lines 21-22). *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F. 3d 430, 434 (4th Cir. 1997) ("For liability to arise under the false advertising provision of the Lanham Act, "the contested statement of representation must be either false on its face or, **although literally true**, likely to mislead and to confuse consumers given the merchandising context.") (bold and underline added)(Doc 141at p. 18 of 23).

In sum, for all the foregoing reasons, Plaintiffs presented a question of fact for the jury on this issue.

E.   Plaintiffs Presented a Jury Question on Whether Defendants were Unjustly Enriched by selling the GSCs

Finally, the district court should have allowed a jury to determine whether defendants were unjustly enriched by selling the GSCs as a NBE, when in fact they

---

misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging.")

were a cheap instant freeze dried knockoff. The basis for Plaintiffs' unjust enrichment claim is that the Defendants marketed the GSCs as a true NBE knowing they were not, and in doing so, were able to achieve a premium price for their product.[29]

Disgorgement of Defendant's profits, under a theory of unjust enrichment, is a purely equitable remedy. *Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 172 (3d Cir. 2005). *Castrol, Inc. v. Pennzoil Quaker State Co.,* 169 F.Supp. 2d 332, 344 (D.N.J. 2001). Plaintiffs computed unjust enrichment damages based upon three different methodologies, which relied on Defendants' own internal calculations for those figures. A jury should decide this issue.

## CONCLUSION

This Court should reverse the district court's grant of summary judgment and remand the action with instructions to certify the subclasses.

---

[29] *New v. CitiFinancial Auto Credit, Inc.*, 2012 U.S. Dist. LEXIS 87936 (M.D. Ala. June 26, 2012) "The doctrine of unjust enrichment . . . permit[s] the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Ghirardo* v. *Antonioli,* 14 Cal. 4th 39,57 Cal. Rptr. 2d 687 (Cal. 1996) elements are: (1) defendant must receive a benefit (2) the benefit must be at the expense of plaintiff (3) defendant must have knowledge of the benefit and (4) the retention of the benefit by defendant must be unjust; *F.H. Prince & Co., Inc.* v. *Towers Fin. Corp.,* 275 Ill. App. 3d 792, 656 N.B. 2d 142, 151 (Ill. App. 1 Dist. 1995) elements are: (1) defendant must receive a benefit (2) the benefit must be at the expense of plaintiff (3) defendant must have knowledge of the benefit and (4) the retention of the benefit by defendant must be unjust; *Russell-Stanley Corp.* v. *Plant Indus.,* 595 A. 2d 534,550 (N.J. Super. eh. Div. 1991) elements are: (1) that defendant received a benefit and (2) that the retention of that benefit without payment would be unjust.

# CERTIFICATE OF COMPLIANCE

This brief contains 13,286 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (a)(7)(B)(iii).

Respectfully submitted,

By: ___/s/ Peter H. Burke_____
Peter H. Burke

**OF COUNSEL:**

J. Allen Schreiber, Esq.
BURKE HARVEY, LLC
2151 Highland Avenue, Suite 120
Birmingham, Alabama 35205
Telephone:  (205) 930-9091
Facsimile:   (205) 930-9054

Patrick C. Cooper
James Ward
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, Al 35209

*Attorneys for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of March, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by CM/ECF system. If some of the participants in the case are not, I have mailed the foregoing document by First-Class Mail, postage prepaid to the following:

Rebecca R. Hanson
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
*Attorneys for Defendants Sturm Foods, Inc.*
*and TreeHouse Foods, Inc.*

*/s/ Peter H. Burke*
OF COUNSEL