No. 13-3843

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

LINDA SUCHANEK, et al.,
Plaintiffs-Appellants

v.

STURM FOODS, INCORPORATED, et al.
Defendants-Appellees

Appeal from the United States District Court for the
Northern District of Illinois
District Court No. 3:11-cv-00565-GPM-PMF and 3:11-cv-00889-GPM,
3:11-cv-01035-GPM, 3:11-cv-01068-GPM and 3:12-cv-00224-GPM

**APPELLANTS' BRIEF**

Peter H. Burke
J. Allen Schreiber
BURKE HARVEY, LLC
2151 Highland Avenue South, Suite 120
Birmingham, AL 35205
Phone:    (205) 930-9091
Fax:    (205) 930-9054

Counsel for Appellants

# CORPORATE DISCLOSURE STATEMENT

All of the Appellants in this matter are individuals.

# Table of Contents

Corporate Disclosure Statement ............................................................2

Table of Authorities ...........................................................................5

Statement Regarding Oral Argument ......................................................9

Statement of Jurisdiction.....................................................................9

Statement of Issues Presented for Review ..............................................10

Statement of the Case........................................................................11

    A. Facts Common to the Class.......................................................13

    B. Facts Specific to the Named Plaintiffs .......................................17

    C. Facts Specific to Defendants' Intentional and Willful Conduct ...............22

    D. Relevant Procedural History ....................................................26

Applicable Legal Standard...................................................................29

Summary of the Argument...................................................................30

Argument........................................................................................32

A. The District Court abused its Discretion in not certifying any Subclass
under any State's Consumer Protection Statute. ......................................32

    1. This Court's recent Opinion in *Butler v. Sears* Demonstrates
    that the predominance Inquiry was Satisfied in this action. .............................33

    2. The District Court Committed Further Error by not Focusing on the
    Central Overriding Issue of whether Defendants' Packaging was
    Misleading or Deceptive or Tended to Mislead and Deceive, but Instead
    Focused on the Individual Purchasing decisions of the Consumer ..................36

    3. The District Court's Decision was Erroneous because it Presumed

that Many Class members did not Suffer Injury, which was both
Factually Incorrect but also Irrelevant at this Stage of the Proceedings ..........39

4. As Defendants' Conduct Involved Fraudulent Omission, Causation
and Reliance for class members may be Presumed. ........................................42

B. The District Court Committed Clear Error in not Certifying the
California and New Jersey Subclasses....................................................................44

C. Each Plaintiff Presented a Question of fact for the Jury Regarding
Reliance and Causation. .........................................................................................47

D. Plaintiffs Presented a Jury Question on Whether Defendants'
Packaging was Misleading or Deceptive or Tended to Mislead and Deceive,
under the Objective Standard of a Reasonable Consumer in the
Context of the Purchasing Decision. .....................................................................50

E. Plaintiffs Presented a Jury Question on Whether Defendants were Unjustly
Enriched by selling the GSCs .................................................................................55

Conclusion .................................................................................................................56

Certificate of Compliance .........................................................................................57

Certificate of Service .................................................................................................58

# TABLE OF AUTHORITIES

*Adeyeye v. Heartland Sweeteners, LLC*., 721 F.3d 444, 449
(7th Cir. 2013) ............................................................................30

*Ackerman v. Coca-Cola Co.,* Not Reported in F.Supp.2d,
2010 WL 2925955, E.D.N.Y. 2010 ....................................................48

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013)......... 40, 41

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-51, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986) ...............................................................30

*Astiana v. Kashi*, 2013 U.S. Dist. LEXIS 108445 at * 19
(S.D.Cal. July 30, 2013)................................................................37

*Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 172 (3d Cir. 2005).......................56

*Bank of Waunakee v. Rochester Cheese Sales, Inc.* 906 F.2d 1185, 1188
(7th Cir. 1990) ...........................................................................29

*Bowen v. Groome*, 2012 U.S. Dist. LEXIS 78829 at * 13
(June 7, 2012, S.D.Ill.)..................................................................42

*Brakke v. Economic Concepts, Inc.*, 213 Cal.App.4th 761, 772,
153 Cal. Rptr. 3d 1 (Cal. Ct. App. 2013).................................................45

*Bronson v. Johnson & Johnson, Inc.***,** Slip Copy,
2013 WL 1629191, N.D.Cal.,2013 ......................................................54

*Bruno v. Quten Research Inst., LLC,* 280 F.R.D. 524, 534 (C.D. Cal. 2011)…..38

*Butler v. Sears*, 702 F.3d 359 (7th Cir. 2012) ........................................27

*Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013) ..................................... 10, 28, 30, 33

*Butler v. Sears*, 727 F.3d 796, 801 (7th Cir. 2013) ......................................... 11, 29

*Butler v. Sears*, 727 F.3d 798 (7th Cir. 2013) ........................................34

*Butler v. Sears*, 727 F.3d 799 (7th Cir. 2013) .........................................39

*Butler v. Sears*, 727 F.3d 800 (7th Cir. 2013) .........................................35

*C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F. 3d 430, 434 (4th Cir. 1997).............................................................55

*Castrol, Inc. v. Pennzoil Quaker State Co.,* 169 F.Supp. 2d 332, 344 (D.N.J. 2001) ...........................................................................................56

*Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1145 (N.D.Cal. 2005) ......................................................................................37

*Cirone-Shadow v. Union Nissan*, 955 F.Supp. 938, 944 (N.D.Ill. 1997) ........ 31, 37

*Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 256....................... 12, 38

*Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, (N.D.Cal.2012) ................... 38, 54

*Engalla v. Permanente Med. Grp., Inc.,* 15 Cal. 4th 951, 976-77, 64 Cal. Rptr. 2d 843, 938 P.2d 903 (1997) ............................................49

*Elias*, 252 F.R.D. at 249 (internal quotations omitted). .......................................46

*F.H. Prince & Co., Inc.* v. *Towers Fin. Corp.,* 275 Ill. App. 3d 792, 656 N.B. 2d 142, 151 (Ill. App. 1 Dist. 1995) .......................................56

*Falk v. General Motors Corporation,* 496 F. Supp. 2d 1088, 1094 - 95 (N.D. Cal. 2007) ......................................................................................44

*Forrest v. Prine,* 620 F.3d 739, 742-43 (7th Cir. 2010). .......................................30

*Ghirardo* v. *Antonioli,* 14 Cal. 4th 39,57 Cal. Rptr. 2d 687 (Cal. 1996) ..............56

*Guido v. L'Oreal, USA, Inc.,* 284 F.R.D. 468, 479 (C.D. Cal. 2012) ...................42

*Hilt v. Arizona Bev. Co… LLC,* 2009 U.S. Dist. LEXIS 16871, at *16-19 (S.D. Cal. Feb. 4, 2009) ......................................................53

*Hughes v. Kore of Indiana Enterprise, Inc.*, 2013 U.S. App. LEXIS

18873 at * 1 (7th Cir. September 10, 2013) ...........................................11

*Hughes v. Kore of Indiana Enterprise, Inc.*, 2013 U.S. App. LEXIS
18873 at * 6 (7th Cir. September 10, 2013) ...........................................35

*In re Google AdWords,* 2012 U.S. Dist. LEXIS 1216 at *10. .............................45
*In re Steroid Hormone Product Cases*, 181 Cal.App.4th 145, 154,
104 Cal. Rptr. 3d 329 (Cal. Ct. App. 2010) .........................................45

*In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 164-165
(D.N.J. 2010) ......................................................................46

*In re Tobacco II Cases*, 46 Cal. 4th 298 (Cal. 2009)................................50

*International Admin., Inc. v. Life Ins. Co. of N. Am.,* 753 F.2d 1373, 1378
(7th Cir. 1985). ...................................................................47

*International Union of Operating Engineers Local No. 68 Welfare Fund
v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086, 1087
(N.J. 2007) ..............................................................32, 43, 46

*Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762
at * 35-36...........................................................................53

*Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762
at *32 n.9 .........................................................................54

*Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill. App. 3d 1139,
759 N.E.2d 66, 70, 259 Ill. Dec. 586 (Ill. App. 2001) ......................... 31, 43

*Massachusetts Mutual Life Ins. Co. v. Superior Ct.*, 97 Cal.App.
4th 1282, 1289, 119 Cal. Rptr. 2d 190 (Cal. Ct. App. 2002) ......................... 43, 45

*Matter of Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984) .............31, 37, 50

*Messner v. Northshore University HealthSystem,* 669 F.3d 802, 819
(7th Cir. 2012) ....................................................................29

*Mirand v. City of New York*, 84 NY2d 44, 51 (1994).................................50

*Munson v. Friske,* 754 F.2d 683, 690 (7th Cir. 1985). ..........................................47

*New v. CitiFinancial Auto Credit, Inc.*, 2012 U.S. Dist. LEXIS 87936
(M.D. Ala. June 26, 2012) ......................................................................................56

*Nilon v. Natural-Immunogenics Corp.*, 2013 U.S. Dist. LEXIS
141728 at *2 N. 2 (S.D. Cal September 30, 2013) ......................................... 12, 47

*Papaspiridakos v. Educational Affiliates, Inc.,* Slip Copy,
2013 WL 4899136, E.D.N.Y., 2013 .....................................................................38

*Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 8...................................11

*Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 4.......................31, 36, 39

*Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) ........................ 30, 31

*Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-514 (7th Cir. 2006) .......................39

*Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 52, 536
(N.D. Cal. 2012) ....................................................................................................45

*Ries v. Arizona Tea Beverage* 287 F.R.D. 523,530 (N.D.Cal. 2012) ..... 32,47,49,50

*Russell-Stanley Corp.* v. *Plant Indus.,* 595 A. 2d 534,550 (N.J. Super. eh. Div.
1991) ......................................................................................................................56

S*ears, Roebuck & Co. v. Butler,* 13-430 *and Whirlpool v. Glazer,* 13-431 ...........34

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .....................................................37

*Strawn v. Caruso,* 657 A.2d 420, 430-431 n.4 (N.J. 1995). ..................................44

*Stutman v. Chemical Bank,* 731 N.E.2d 608, 612, 709 N.Y.S.2d 892
(N.Y. 2000) ............................................................................................................43

*Waller v. Hewlett-Packard Co.*, 2013 U.S. Dist. LEXIS
141729 at * 42-43 (September 29, 2013) ...............................................................45

*Williams v. Gerber Prods. Co.,* 552 F.3d 934, 938 (9th Cir. 2008) .....................45

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs request oral argument because the decisional process will be significantly aided by oral argument. The record is voluminous and complex and oral argument would aid the Court in understanding the record on appeal.

## STATEMENT OF JURISDICTION

In accordance with all the requirements of Circuit Rule 28(a)(4)(A)(B)(C)(D), jurisdiction in the district court was based on diversity of jurisdiction under 28 U.S.C. §1332(d)(2), the Class Action Fairness Act ("CAFA"). 28 U.S.C. § 1332(d)(2) provides that district courts have "original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000" and is a class action in which "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2).

The named Plaintiffs to the consolidated complaints are listed below with their citizenship for purposes of diversity jurisdiction: Avakian – California; Cardillo - New York; Capps - South Carolina; Carr – Tennessee; DiBenedetto - New Jersey; Gladstone – New York; McManus – Alabama; Ritchie - North Carolina; and Suchanek – Illinois. Defendant Sturm Foods, Inc. ("Sturm") is a Wisconsin corporation with its principal place of business in Wisconsin. Treehouse Foods, Inc. ("Treehouse"), is a Delaware Corporation with its principal

place of business in Illinois. The amount in controversy is satisfied because there are tens of thousands if not hundreds of thousands of Class members. Neither Defendant has contested the amount in controversy requirement.

This Court has jurisdiction pursuant to 28 U.S.C. §1291. The district court's granting of summary judgment on November 20, 2013, was a final appealable order. (Docs. 161 and 162) The Notice of Appeal was filed with the district court on December 18, 2013. (Doc. 163) Hence, this appeal is from an order that is a final judgment that adjudicated all of the claims with respect to all parties.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the District Court erred as a matter of law, and therefore abused its discretion, in refusing to certify these small dollar claims despite the recent guidance provided in *Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013), which reiterates that the predominance inquiry of Rule 23(b)(3) is a question of efficiency?

Whether the District Court erred as a matter of law, and therefore abused its discretion, when it failed to certify California and New Jersey subclasses even though those states' statutes allow for a class wide presumption of reliance and causation?

Whether the District Court erred in granting summary judgment to Defendant on each Plaintiffs' individual consumer fraud claim, where it was undisputed that each Plaintiff was deceived about the true nature of Defendant's

product at the time of purchase, and only after taking it home from the grocery store for use in their Keurig machine did they realize the product was overwhelmingly instant coffee, i.e., was a jury question presented on the issues of reliance and causation?

Whether the District Court erred in not allowing a jury to decide, from the perspective of a reasonable consumer, whether Defendants' packaging was deceptive and misleading?

Whether the District Court erred in not allowing a jury to decide whether Defendants had been unjustly enriched through the sale of the GSCs?

## STATEMENT OF THE CASE

These consolidated lawsuits involve small dollar claims this Court has recognized as being proper for class certification.[1] Here, Plaintiffs are consumers from eight states, all of whom spent approximately $9.99 to purchase Defendant Sturm Foods, Inc.'s Grove Square Coffee ("GSC") single-serve cartridges for use

---

[1] *Parko v. Shell Oil Co*., 2014 U.S. App. LEXIS 1018 at * 8 ("Also this doesn't appear to be one of those small-claims suits that as a practical matter can proceed only as a class action (e.g. overcharges of $5.50 for rental cars."); *Butler v. Sears*, 727 F.3d 796, 801 (7th Cir. 2013) ("It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30.... The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."); *Hughes v. Kore of Indiana Enterprise, Inc.*, 2013 U.S. App. LEXIS 18873 at * 1 (7th Cir. September 10, 2013) ("We have decided to allow the appeal in order to further the development of class action law . . . regarding issues of notice in cases in which the potential damages per class member are very slight, and the suitability of class action treatment of such cases.")

in their Keurig machines. All Plaintiffs saw the same formulaic packaging of Defendant's product, which was specifically marketed for "use by owners of Keurig coffee makers," and designed to have the same look and feel as other available Keurig coffee products. All Plaintiffs purchased the product with the expectation that it was of the same kind and quality, i.e. a true National Brand Equivalent ("NBE") as the other single-serve coffee products then available for use in their Keurigs. After taking the product home from the store, removing it from the box and putting it in their Keurig, each Plaintiff discovered he or she bought an overwhelmingly instant coffee product.

Through its patent and use of licensing agreements, Keurig ensured all available coffee products for use in its machines contained 100% ground coffee with a filter. This was the standard prior to launch of Defendant's GSCs, and this is what each Plaintiff expected when purchasing the product. There simply was no reason for the unsuspecting public to think Defendants would put instant coffee in a cartridge to be run through a Keurig.[2] But this is where corporate greed enters the equation. Defendants began marketing their GSCs in late 2010 in order to situate themselves as first-movers in the market when Keurig's patent expired in

---

[2] *Nilon v. Natural-Immunogenics Corp.*, 2013 U.S. Dist. LEXIS 141728 at *2 N. 2 (S.D. Cal September 30, 2013) (The spirit of this case, like most false advertising cases brought under the UCL and CLRA, is that plaintiffs paid for a product that, with more accurate information, they would have either paid less for or not bought at all.)

September of 2012. Then, Defendants intended to sell a true NBE and reap the available profits in the billion dollar coffee market.[3] Until that time, Defendants were content to market the GSCs to consumers as a true NBE, knowing they weren't. In other words, they sold the GSCs as the real McCoy, knowing they were cheap knockoffs.

Plaintiffs alleged both active misrepresentation and fraud by omission. Active misrepresentation centered on the marketing of the GSCs as a true NBE, knowing they were not; fraud by omission centered on Defendants' failure to disclose on their formulaic packaging that their product was 95% to 96% instant freeze dried coffee and it did not contain a filter. These facts, if prominently disclosed on the packaging, would have been material facts for the consumer's purchasing decision.[4]

A.    Facts Common to the Class

This consumer class action merits certification. It is undisputed:

---

[3] An overriding goal was "to keep building the business leading up to 10 months from now when the GMCR patent expires and we have the filter cup and parity coffee." "We will be the first to market with this product the day GMCR's patent expires in Sept. 2012." "We will be shipping a true NBE value proposition by October of 2012." "Come September of 2012 we will be able to sell fresh roasted coffee in a cup with a filter which is something GMC's patent restricts us from doing until then." (Doc.99 pp. 15-16 of 45)

[4] *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 256 ("[A] fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a reasonable [consumer]' would deem it important in determining how to act in the transaction at issue.")

(1) Defendants targeted a specific group of consumers, Keurig owners, who believed they were purchasing a premium product for use in their coffee machines; (2) prior to the launch of Defendants' GSCs, consumers could only purchase a coffee product for use in their machines that contained 100% fresh ground coffee and a filter; (3) Defendants designed their package to look like Keurig's; (4) they marketed their product as a true NBE knowing it wasn't; (5) they used the word soluble on their packaging for a time instead of the word instant; (6) they never disclosed on the package that the product did not contain a filter; (7) they never disclosed on the package that it was 95% to 96% instant freeze dried coffee; (8) they engaged in a digital marketing campaign that masked the true nature of its product; (9) they lied to consumers who inquired about the nature of the product, including one of the class representatives; and (10) they fabricated favorable reviews.

Defendants purchased a marketing study that found all Keurig coffees "are premium branded products and consumers have the perception that they brew premium coffee in their machines." Similarly, the research showed "[c]onsumers perceive Keurig coffee as high quality, premium product." (Doc.99 at p.9 of 45). Keurig's patent, however, precluded Defendants from using a filter in their product which meant that their product would have to be overwhelmingly comprised of instant freeze dried coffee.

Defendants launched their GSCs in October 2010 as a 95% to 96% instant freeze dried product without a filter in order to "have the company positioned to make [a filtered] product," when Keurig's patent expired in September of 2012. Being the first mover was critical because "Sturm will have been packaging and processing for 2 years (Grove Square) by the time this product ships. "During this

time we have gained experience and improved production and packaging processes in areas where others have yet to start." (Doc.99 at p.15 of 45).

Although the GSCs were significantly different than other available coffee products -- because they contained instant freeze dried coffee and did not have a filter -- Sturm "rearrange[d] the packaging operation to put them into a display like Keurig had on the shelf," because Sturm wanted the finished product "to look like the Keurig product in box style," with a "round cartridge into a rectangular display similar to Keurig."[5]  This formulaic packaging included the look and feel of the Keurig product, and the phrase "*For use by owners of Keurig coffee makers."  Defendants' marketing agency, BD&H, warned them that "the use of the word 'instant' is a real no-no" and Defendants "should avoid any reference to it if at all possible."  Instead, BD&H's brand strategy for the GSCs focused on "delivering a delicious traditional cup of freshly brewed hot coffee."[6]

---

[5] Several retailers passed on selling the GSCs after taste testing showed they were not a true NBE.  For example, a Target employee wrote Sturm and explained: "we did try them yesterday and unfortunately the feedback was not what I wanted to hear. . . .There was a group of 10 people including 2 avid Keurig users. Overall the group did not find the product to be equal to K-cups." John Perinotti, a buyer from A&P who was given samples of GSC, summed it up succinctly: "Jose, they put instant coffee in a K-cup… not cool.  It would not take long for consumers to figure it out. I am not interested."  One Sturm employee lamented: "Supervalue is looking at another supplier on single serve coffee because we failed QA. . . our quality is the issue." (Doc.99 at p.16 of 45).

[6] The back of the packaging has a "quality promise" that states "Grove Square

The outcry from the consuming public was immediate and vitriolic.[7]  The general counsel of Treehouse Foods noted in a February e-mail: "I am forwarding the link to the customer product comments based on the large number of negative reviews 42 of 44 and most of the comments extremely negative."[8]  Amazingly,  if a consumer complained the coffee was instant or didn't taste good, the

---

coffee is made with some of the world's highest quality Arabica beans, roasted and ground to ensure peak flavor, then packaged to lock in optimum freshness." (Doc.99 at p.10 of 45).  Again, one would not expect a quality promise such as this to be associated with instant freeze dried coffee.  Defendants went so far as to include a Coffee Lover's Bill of Rights on the package.

[7]In fact, a September 28, 2010, e-mail to Sturm employees cautioned: There is a possibility you might receive customer or third party inquiries associated with the launch of Sturm's Grove Square Coffee.  The product started selling in certain Wal-Mart stores yesterday. The Legal Department would like to be made of all inquiries.  We have coordinated a formal response to all inquiries and Eric Beringause will be the spokesperson.  (Doc.99 at p.17 of 45).

[8] Some of the negative consumer feedback is quoted below:  <u>If I wanted instant coffee, I would have bought about 5 jars of what I paid for one box (18 servings) of your product</u>." (GROVE SQUARE 0001968) (underline added)  Sturm received this complaint November 11, 2010:  "How greedy can a company get?  You guys must be proud of yourself by screwing consumers every day.  <u>The fake coffee you guys sell is nothing more than garbage!!trying to pass off instant coffee as gourmet coffee for the keurig.you are a joke</u>!  Our united states is in the condition it is, because of companies like you. <u>If I wanted instant coffee, I wouldn't need a keurig, would i?</u> Charging consumers $9.98 for a quarter cup of no brand instant coffee is simply outrageous and irresponsible! Greed must be your first priority. you suck!!" (GROVE SQUARE 0001969) (underline added) "I have a Kuerig coffee maker and came across your Grove Square product the other day at Wal-Mart.  <u>As it was next to the Green Mountain brand I usually buy, and it was $2 cheaper, I thought I would try it.  Imagine my disbelief when I took the first cup out of the package.  It felt different in weight and upon shaking it, sounded different.  I am a coffee drinker.  If I'd wanted instant, I would have bought a jar for considerably less money than I paid for 2 boxes of your crap</u>." (GROVE SQUARE 0001971 and GROVE SQUARE 0001972) (underline added) (Doc.141 at p.11 of 23, n.13).

Defendants' canned response was to lie: "we feel this is better quality than instant because it is not freeze dried or instantized."

Named Plaintiff, DiBenedetto, from New Jersey, is one of the consumers that Defendants lied to about the nature of the GSCs.[9]  She e-mailed the Defendant and asked if the product was instant, and in response, she was told that the product was not instant coffee! (Doc. 53 at ¶¶ 27-28)  An employee of Sturm warned his sales force: "If you're ever confronted with 'your coffee is instant coffee,' let them know there is no standard identity for instant coffee. Ours is NOT Freeze Dried."  Defendants even fabricated favorable reviews on the internet: "Guys – please go online this weekend and write up some good reviews on GSC on Amazon. Tell all your friends too . . . ☺. . . I can help with language if needed."[10] (Doc. 99 at p. 20 of 45).

B.    <u>Facts Specific to the Named Plaintiffs</u>.

It is undisputed each Plaintiff purchased the GSCs at a retail establishment, saw the same formulaic packaging on the product, and then decided to purchase the product. After purchasing the product, each of the

---

[9] Extensive quotes from complaints of other consumers were set forth in Plaintiffs' Amd. Cpl. at ¶¶ 33 through 51. (Doc. 53)

[10] Market research further confirmed that Keurig consumers were easy targets for Defendants' fraudulent scheme because they could "choose from a wide assortment of brands," are not loyal to any, "purchase based on roast and flavor" from "formulaic packaging," **and "perceive no risk in choice**." (bold and underline added).  (Doc.99 at p.9 of 45).

Plaintiffs took the product home for use, and after using it felt misled or deceived after realizing he or she purchased a instant coffee product.

Edna Avakain, represents a California subclass. She purchased her GSCs in November, 2011 and she thought the labeling or the entire package was a misrepresentation. The fact that it was packaged in K-cups and it was for a Keurig Brewer, because the other K-cups she purchased were ground coffee. In her mind, Keurig is associated with a brewing cup of coffee: "For me, Keurig and brewing go hand-in-hand." (Doc.141 at p.5 of 23).

Benjamin Caps represents a subclass of South Carolina consumers. Paragraph 26 of the First Amended Complaint describes Mr. Capps' experience. It alleged:

> He purchased his boxes of Grove Square at a Big Lots store in Bluffton, SC. He was eager to try it as he had just purchased a Keurig, and was looking to try new varieties of K-cups. He had purchased K-cups from Big Lots before, the Donut House variety, which is made by Green Mountain Coffee, and he assumed that the Grove Square k-cups were similar. Capps purchased 3 boxes, one of each variety they had, with the intention of trying each one, and going back later that afternoon to get more of the ones he liked. After trying each of the varieties, and wondering about the taste, Capps cut open a single serve container and discovered it was filled with crystalline freeze dried coffee. He examined the box, and after 30 minutes of looking all over the box, he found in ridiculously small letters, "soluble and micro ground". Capps then researched the language to discover that he had paid the same price for instant coffee as he had for ground coffee. He was furious, and threw the remaining boxes out in the trash. He then went online and went to the grove square website, and looked up their contact info. He called their number, and after numerous recordings got fed up and ended the call. He then went online and decided to

18

write some reviews of the product wherever he could find it on sale online, as he did not want anyone else to be duped into buying instant coffee in a k-cup. (Doc.53 at p.8 of 38).

Charles Cardillo represents consumers from New York.  He bought the GSCs because they were near other k-cup products; as he had previously tried all of the other brands, he was looking forward to tasting another brand of coffee. (Doc. 137 at p. 8 of 26).[11]   After using the product at home, Mr. Cardillo wrote the Better Business Bureau and complained: "It is false advertisement. What is in that product is not what is portrayed on the box. All it is is instant coffee crystals in a cup that is supposed to be used for the Keurig coffee maker.  All you need is hot water from the tap to make this coffee that they sell." (Doc. 100-11 at p. 3 of 13)  Mr. Cardillo requested that the product be pulled off the shelves because of the false advertising.[12]

Carol Ritchie represented consumers from North Carolina.  Like Plaintiff Cardillo, she wrote the BBB to complain about the GSCs:

> The produce is Grove Square Coffee K-cups stating that the coffee is soluble & microground this is an instant coffee but who knew because nowhere on the package does it state this is instant coffee

---

[11]  Plaintiff Cardillo "fits to a T" the profile of the Keurig consumer Defendants' marketing company described: (1) "is aware of many brands," (2) has "no strong brand preference," (3) purchases based "on roast and flavor" from (4) "formulaic packaging," and (5) perceives "no risk in choice." (Doc.141 at p.4-5 of 23).

[12] Paula Gladstone is another Plaintiff from New York.   She purchased Defendants' product in New York.  Gladstone believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. (Doc.141 at p.7 of 23).

and not ground.  The word microground leads people to believe this is a ground coffee not instant at 10.00 dollars a box this can be a very expensive mistake. I've called the company and as of 2pm est on 10/3/2011 I am still waiting for a response. Packaging should be labeled clearly and in lettering large enough for people to see. . ." (Doc. 100-12 at p. 5 of 15)

Deborah DiBenedetto represents a subclass of New Jersey consumers. She feels she was misled because she bought a product that she thought was one thing and then realized it was really something else.  She remembers the K-cups on the front of the package and she read that it was for Keurig. When she made the coffee, it tasted like instant. She does not drink instant coffee so she emailed the company to complain.  A copy of her e-mail is reproduced below:

> **From:** Deborah DiBenedetto [redacted]
> **Sent:** Friday, January 14, 2011 5:52 PM
> **To:** info
> **Subject:** Grove Square Coffee
> I purchased a box of your Grove Square Coffee for my Keurig machine. I never read the box closely enough to see your play on words . ."soluble and microground arabica coffee." Shame on you; call it what it is in a language everyone is familiar with. .. INSTANT COFFEE IN A K-CUP. And, what does "natural flavor with other natural flavor" mean? Properly and clearly label your product as ***Instant Coffee***.
> Deborah DiBenedetto

In response, DiBenedetto received this e-mail:
> **Subject: Fwd: Grove Square Coffee**
> Hi Deborah:
> Thank you for inquiring about Grove Square Single Serve Coffee Cups. This is a relatively new product and we are anxious to hear consumer feedback.
> **<u>While the Grove Square Coffee Cups are different from other K-cups, it is not instant coffee</u>**. It is a similar concept to instant

because it does dissolve, but it is actually a high quality coffee bean pulverized into a powder so fine that will dissolve. The natural flavor is coffee extracts. I hope you find this information helpful, please let me know if I can be of further assistance. (bold and underline added)
Jodi Rickert
Sturm Foods
Consumer Affairs

(Doc.53 at p.9 of 38).

Mr. McManus represents a subclass of Alabama consumers. He remembered the text on the box said it was great coffee, not instant coffee and it depicted coffee beans. The box said for use by owners of the Keurig coffee maker. "It was the most foul tasting thing I have ever had I my mouth. It was not coffee. It was instant coffee. It was absolutely awful." Mr. McManus regards the following aspects about the Grove Square packaging deceptive: 100% Arabica coffee, had coffee beans on it, its placement with the K-cups which are real coffee, with a filter and made for people who want a fresh brewed cup of coffee, nothing on the box says instant. (Doc.141 at p.6-7 of 23).

Linda Suchanek represents a subclass of Illinois consumers and she filed the first lawsuit against Defendants. Ms. Suchanek believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. The picture on box looked like a "nice, fresh cup of hot, brewed coffee." Ms. Suchanek tried the Grove Square and it tasted like instant. She looked at the box to see if it said

instant on the box but did not say instant on the box. Ms. Suchanek felt it was misrepresented because it was not a freshly brewed cup.[13] (Doc.141 at p.7 of 23).

Ms. Carr represents a subclass of Tennessee consumers. She bought the GSCs at a Big Lots in 2010. She only made one K-cup and threw the rest away. She bought it because the box was attractive, it was a good price and it had a picture of a K-cup on it. She is a coffee drinker and coffee lover. Her expectation from the picture of the K-cup was that it was going to be as good as the other K-cup she has bought in the past. (Doc.141 at p.8 of 23).

Neal Roese, Defendants' expert, acknowledged all of the named Plaintiffs "believed that they were buying ground roast coffee," and all consistently complained "that they thought they had bought something different than soluble or instant coffee." (Doc.141 at p8 of 23).

C.    Facts Specific to Defendants' Intentional and Willful Conduct

Robert Ruegger, Sturm's senior vice president, acknowledged Sturm "could have used ground coffee if we had been able to use a filter," but after realizing "we couldn't use a filter, we wanted to find a different way to provide a coffee and still use the Keurig machine." Hence, the inability to use a filter "pushed [Sturm]

---

[13] She thought that the following quote meant that she was making a fresh, delicious cup that was going to be brewed: "The fresh, hot, delicious Grove Square coffee recaptures the rich, traditional cup and brings it home in a single-serve convenience." Further, "Keurig brews coffee," "[i]f I was going to buy a k-cup of instant coffee, I would have used my hot water tap that has boiling water at the sink instead of buying an expensive Keurig machine." (Doc.141 at p.7 of 23, n.7).

down the path of soluble coffee." Ruegger testified:

> Q. You know that if you were going to sell this without a filter and use mostly soluble coffee, you would be the only people on the market doing that?
>
> A. **There was no one doing it.  In fact, there was no one else selling a cartridge that would work in a Keurig machine at that point**.
>
> Q. All of the other products on the market entirely, every other one of them, used the filter system of Keurig correct?
>
> A. **The other products were all licensed products of Keurig and they all used a filter, yes.  There was no one else that was not a licensed entity with Keurig selling a cartridge that would work in a Keurig machine at that point.**"  (Ruegger depo. P. 30, line 11 – p. 31, line 1). (bold added)

(Doc.141 at p.7-8 of 23).

Although Defendants have thousands of private label products, Defendants responded "nothing comes to mind," when asked if any of their other products were not a true analog of a NBE. (Doc.99 at p.15 of 45).  Ruegger testified that although Sturm typically did not spend much on marketing it spent $235,000 in 2010 for direct marketing of the product and in 2011 spent another $263,000. He acknowledged that spending half a million dollars over fifteen months was a lot of money for this particular product, and the "size of this business doesn't justify the amount of expense we incurred." (Doc.99 at p.19 of 45).

Jodi Rickert received permission from Beringause to refund consumers $10 if they complained that they bought instant coffee. "We aren't offering refunds but if consumer requests it I am sending $10 cash." This refund policy was the first time Rickert ever sent $10 to consumers that complained, and this was not normal practice for Sturm. Gary Ross, after talking to Rickert about these "duped" consumers, sent an October 22, 2010, e-mail to Harry Overly inquiring: "can we arm [Rickert] with more info on what to say? Now all she does is say sorry and send $10." Overly responded, "I am considering a digital strategy." (Doc.99 at p.19 of 45). This digital strategy – like the $10 refunds -- was highly unusual for Sturm.

Without a filter the GSCs weighed less than other true NBEs; hence, Sturm worried consumers might notice their product weighed distinctly less. "As with previous tests none of the participants noticed any difference between the single serve cups with respect to weight and none noticed the Sturm cup emitted a distinct rattle when shaken. When facts made known to participants they did not equate with quality." "By the way the difference in weight was noticed by 30% of respondents . . .but this recognition did not play into any negative assessment of Sturm . . .but this could be an issue if pointed out to the trade." "Minimal consumer Risk based on 2/23 Research; cup weight cup rattle Coffee color while dispensing." (Doc.99 at p.11-12 of 45).

The price at which the product sold added to the deception. Sturm's marketing study showed the best price gap for pricing the GSC was $1.50 below a true NBE. Hence, Defendants were keen to price their product to attract consumer attention, but not too much consumer attention, as Ruegger admitted: "Yes. I knew that there was a price gap. We felt there was a good gap. If you actually got the price too low, people would perceive it as poor quality. If you got the price too high, obviously it would be too close to the brand and might damage the sales of the product." (Ruegger depo. at P. 51 Lines 10-15). (Doc.99 at p.23 of 45).

Jodi Rickert and another employee of Defendants developed a script for the call center that was established to respond to consumer complaints. (Documents 16813; 16820; 16868; 16870; 16872; and 16881 are attached separately as Exhibit P). Rickert put on the form "not freeze dried," even though she claims she did not know the nature of the product. (Doc.99 at p.17 of 45). Amazingly, if a consumer complained that the coffee was instant and didn't taste good, the standard response to the consumer was "we feel this is better quality than instant because it is not freeze dried or instantized." (Doc.99 at p.18 of 45). After Rickert pointed out that Amazon sometimes called out the product as instant and other times did not, another employee named Gina responded: "I guess we can't say it's not instant anymore. Thanks for the info." (Rickert depo at p. 72, line 9 – p. 73, line 18). (Doc.99 at p.11 of 45).

In fact, Sturm's marketing agency, BD&H, informed it that the use of "the word `instant' is a real no-no, so they should avoid any reference to it if at all possible." (BDHM 239 attached as Exhibit Q)  Accordingly, the "online marketing campaign was carefully aligned with BD&H Marketing's brand strategy of delivering a delicious traditional cup of freshly brewed hot coffee." (Doc.99 at p.19 of 45).    Of course, there is nothing traditional about instant coffee and one does not need a Keurig brewer to make instant coffee.    Defendants went so far as to have friends and family write bogus reviews of the product.  In a January 21, 2011, e-mail Overly requested of eight employees: "Guys – please go online this weekend and write up some good reviews on GSC on Amazon. Tell all your friends too. ☺.. I can help with language if needed."  Ironically, a printout of a slide presentation Defendants gave to potential retailers posed this question: "So what are we selling Overly?" (Doc.99 at p.20 of 45).

D.    Relevant Procedural History

Four separate lawsuits were filed against Defendants in Illinois, New York, Alabama and Tennessee.  Three of those actions were transferred to the Southern District of Illinois and later consolidated into the *Suchanek* action which was pending before the district court. (Doc. 28.)  After consolidation, Plaintiffs filed an Amended Complaint on May 2, 2012. (Doc. 53)  Included in the Amended Complaint, were additional consumers representing subclasses from California,

New Jersey, New York, North Carolina and South Carolina.

On January 7, 2013, Plaintiffs filed their Motion for Class Certification and Memorandum in Support. (Doc. 99)  Plaintiffs Evidentiary Submission in Support contained two volumes of exhibits, with the second volume being filed under seal because of confidentiality issues. (Docs. 100 and 101)  Defendants filed their Opposition to Plaintiffs' Motion for Class Certification with their supporting exhibits on February 25, 2013. (Doc. 108)  On March 11, 2013, Plaintiffs filed their Reply Memorandum in support of class certification. (Doc. 111)

On April 15, 2013, the District Court held a hearing on Plaintiffs' Motion for Class Certification.  (Transcript attached to the Appendix)  On June 6, 2013, Defendants filed supplemental authority with the court pointing out that the Supreme Court had vacated this Court's earlier decision of *Butler v. Sears*, 702 F.3d 359 (7th Cir. 2012). (Doc. 132)  On June 14, 2013, Plaintiffs responded to Defendants' filing of supplemental authority. (Doc. 133)

On August 23, 2013, Defendants filed a Motion for Summary Judgment and Memorandum in Support. (Docs. 136 and 137)  Three days later, the district court entered its Memorandum and Order denying Plaintiffs' Motion for Class Certification for all subclasses.  (Doc. 138)  On September 5, 2013, Plaintiffs submitted a Motion to Reconsider the order denying class certification and alternatively to submit narrower class definition. (Doc. 140)  Importantly, Plaintiffs

informed the district court that on August 22, 2013, just four days before its order denying certification, this Court reinstated its earlier opinion in *Butler v. Sears*.

On September 20, 2013, Plaintiffs filed their Opposition to Defendants' Motion for Summary Judgment. (Doc. 141). On September 23, 2013, Defendants filed their Opposition to Plaintiffs' Motion to reconsider. (Doc. 142) On November 5, 2013, the district court heard oral argument on Defendants' Motion for Summary Judgment. (Transcript attached to the Appendix) On November 20, 2013, the district court entered its Memorandum and Order denying Plaintiffs' Motion to reconsider and granting Defendants' Motion for summary judgment. (Doc. 161) That same day, the court entered a final judgment. (Doc. 162) Plaintiffs filed their Notice of Appeal on December 18, 2013. (Doc. 163)

This Court should not allow the manifestly erroneous denial of certification to stand. The denial undermines this Court's recent decision in *Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013), which reiterates that the predominance inquiry of Rule 23(b)(3) is a question of efficiency. Rather than focusing on the overarching fraudulent conduct of Defendants -- which was clearly the predominant issue -- the district court focused instead on alleged differences in the purchase decisions of individual consumers, and in doing so, engaged in the type of analysis this Court just rejected in *Butler v. Sears*. As this Court explained:

> Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common

28

issues or more individual issues, regardless of relative importance. That's incorrect. An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment. . . . But predominance requires a qualitative assessment too; it is not bean counting. . . . Or as we put it in *Messner v. Northshore University HealthSystem,* 669 F.3d 802, 819 (7th Cir. 2012), "Under the district court's approach [which our decision in *Messner* rejected], Rule 23(b)(3) would require not only common evidence and methodology, but also common results for members of the class. That approach would come very close to requiring common proof of damages for class members, which is not required. To put it another way, the district court asked not for a showing of common questions, but for a showing of common answers to those questions. Rule 23(b)(3) does not impose such a heavy burden.

727 F.3d at 801. (underline added)

After deciding no subclass should be certified, the district court improperly weighed facts and decided for itself that none of the eight Plaintiffs could show reliance or causation under their state's respective consumer fraud statutes. The district court made this finding, although all Plaintiffs purchased the product in person and saw the same formulaic packaging; all Plaintiffs testified that they were deceived as to the true nature of the Defendant's product; two of the Plaintiffs complained to the Better Business Bureau ("BBB") about the deceptive nature of the product; and, two other Plaintiffs wrote the company directly to complain/inquire about the product. Clearly a jury question was presented on the issue of causation and reliance and summary judgment should be reversed.

## APPLICABLE LEGAL STANDARD

*Bank of Waunakee v. Rochester Cheese Sales, Inc.* 906 F.2d 1185, 1188 (7th

Cir. 1990) ("We review the district court's decision to grant summary judgment *de novo* and use the same standard of decision making as that employed by the district court." In *Adeyeye v. Heartland Sweeteners, LLC*., 721 F.3d 444, 449 (7th Cir. 2013) this Court reversed the district court's granting of summary judgment stating: "We must reverse if a genuine issue of material fact exists that would allow a reasonable jury to find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-51, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Forrest v. Prine,* 620 F.3d 739, 742-43 (7th Cir. 2010). To determine whether genuine issues of material fact exist, we ask if "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) ("We review the district court's decision not to certify a class for abuse of discretion.")

## SUMMARY OF THE ARGUMENT

The district court committed reversible error by not certifying any subclass of consumers under any states' consumer protection laws or the law of unjust enrichment. In doing so, it ignored this Court's guidance of *Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013), which equates the predominance inquiry with efficiency. It is clearly more efficient for these small dollar claims to be decided in a class action, especially where the overriding qualitative issue is the Defendants'

fraudulent conduct. *Parko v. Shell Oil Co*., 2014 U.S. App. LEXIS 1018 at * 4 ("Predominance is a qualitative rather than a quantitative concept. It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.")

Instead of focusing on these issues, the district court improperly applied its stringent reading of *Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006) to the purchasing decisions of the named Plaintiffs and members of the class. This focus was improper, as the resolution of whether Defendants' product was misleading or tended to deceive must be answered from the perspective of an objective consumer acting under reasonable circumstances. FTC Policy Statement on Deception, appended to *Matter of Cliffdale Associates, Inc*., 103 F.T.C. 110, 174 (1984). *Cirone-Shadow v. Union Nissan*, 955 F.Supp. 938, 944 (N.D.Ill. 1997) (standard for materiality of Illinois Consumer fraud Act claim is objective standard) Hence, the individual reasons behind the purchase were immaterial to this finding.

Moreover, the district court erred by not considering that Plaintiffs alleged fraudulent omission on the part of defendants which would allow for class wide presumption of reliance. *Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill. App. 3d 1139, 759 N.E.2d 66, 70, 259 Ill. Dec. 586 (Ill. App. 2001) ("it is not necessary . . . to show actual reliance in order to state a valid claim based on an omission or concealment under the Consumer Fraud Act."). This was especially true under

California and New Jersey law, and the court committed clear error in not certifying subclasses under the law of those states. *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007) ("[NJ CFA] essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss.").

The district court's granting of summary judgment against each Plaintiff was improper and entitled to no deference, as the court imposed a burden under Rule 56 that does not exist. All Plaintiffs presented sufficient facts showing a material question of fact existed on the issues of reliance and causation, and the court's finding to the contrary was against the evidence. *Ries v. Arizona Tea Beverage* 287 F.R.D. 523 (N.D.Cal. 2012) ("Defendants have neglected to identify any authority to suggest a more specific or greater showing of reliance is required to survive a motion under *Rule 56.*")

## ARGUMENT

A.  <u>The District Court abused its Discretion in not certifying any Subclass under any State's Consumer Protection Statute.</u>

The district court refused to certify any of the eight subclasses finding individual issues of causation and reliance would predominate. Its Memorandum Opinion states:

Here, as discussed in the Order denying class certification, the issue of liability requires individualized inquiry. The problem here is not that proof of damages requires looking at each individual class member, for as *Butler* makes clear, that does not preclude predominance. The problem with the proposed class here is that showing reliance or causation—as required to establish liability—requires an investigation of each purchaser. (Doc. 161 pp. 2-3)

As shown below, the district court's analysis misreads the teachings of *Butler v. Sears*, which explains that one central issue – such as a Defendant's liability -- may satisfy the predominance inquiry of Rule 23. Moreover, the district court failed to realize predominance is a question of efficiency which has a qualitative aspect to it. Instead of focusing on those elements of predominance, the district court erroneously dwelt upon the individual purchasing decisions of individual consumers or whether a consumer had been injured or harm. Finally, even if the district court's reasoning regarding reliance was not incorrect, it certainly is inapplicable to California and New Jersey consumers where a presumption of reliance and causation applies under those state's statutes.

1. This Court's recent Opinion in *Butler v. Sears* Demonstrates the predominance Inquiry was Satisfied in this action.

This Court's recent opinion in *Butler v. Sears*, 727 F.3d 796 (7th Cir. 2013) shows that a consumer class case such as this one, which involves the sale of a product in common formulaic packaging to tens of thousands of consumers in

33

eight states, satisfies the predominance inquiry of Rule 23(b)(3).[14]   Judge Posner

reiterated:

> The basic question presented by the mold claim--are the machines defective in permitting mold to accumulate and generate noxious odors?--is common to the entire mold class, although damages are likely to vary across class members (the owners of the washing machines). <u>A class action is the efficient procedure for litigation of a case such as this, a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost to any one of them large enough to justify the expense of an individual suit</u>. A determination of liability could be followed by individual hearings to determine the damages sustained by each class member. The parties probably would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines. In that event the hearings would be brief; indeed the case would probably be quickly settled.

727 F.3d at 798. (underline added)

The same reasoning holds true here.  The overriding issue presented by the

consumer fraud claims, whether Defendants' sale of the GSCs in standardized

formulaic packaging, deceived or tended to deceive a reasonable objective

consumer, is common to each subclasses though damages would vary among

---

[14] The significance of *Butler v. Sears* to this action cannot be overstated, as the Defendants took great pains to point out to the district court, by letter dated June 5, 2013, that this Court's prior opinion had been vacated.  Defendants wrote: "Plaintiffs in this action relied on the Seventh Circuit's now-vacated opinion in *Butler* in both their initial memorandum in support of their motion for class certification (Dkt. 99, pp. 26-27) and their reply memorandum. (Dkt. 111, p. 6, 14)" (Doc. 132).  Obviously, Plaintiffs' reliance on *Butler* has been vindicated, especially in light of the orders from the United States Supreme Court on February 24, 2014, refusing to grant certiorari in S*ears, Roebuck & Co. v. Butler,* 13-430 *and Whirlpool v. Glazer,* 13-431.

consumers.  Here, where the cost of the product involves $10 or less, the class mechanism is the only efficient manner by which such litigation will proceed because individual suits will not be brought.

The district court distinguished *Butler* referring only to the damages aspect of the ruling, i.e., "problem here is not that proof of damages requires looking at each individual class member, for as *Butler* makes clear, that does not preclude predominance," but by doing so, it altogether ignored the other aspect of the *Butler* ruling dealing with efficiency. (Doc. 161 at p. 2) As this Court made clear, predominance equates with efficiency:

> Sears argues that *Comcast* rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." 702 F.3d at 362. But in support of its argument Sears cites only the statement in the *dissenting* opinion in *Comcast* that "economies of time and expense" favor class certification, 133 S. Ct. at 1437--a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority *must* disapprove of.

727 F.3d at 800.

In sum, it is more efficient to have these small dollar claims, all focused on Defendants' fraudulent marketing of the GSCs, decided through the class mechanism. See *Hughes v. Kore of Indiana Enterprise, Inc.*, 2013 U.S. App. LEXIS 18873 at * 6 (7th Cir. September 10, 2013) ("The smaller the stakes to each victim of unlawful conduct, the greater the economies of class action treatment and

the likelier that the class members will receive some money rather than (without a class action) probably nothing, given the difficulty of interesting a lawyer in handling a suit for such modest statutory damages. . .")

>   2.   The District Court Committed Further Error by not Focusing on the Central Overriding Issue of whether Defendants' Packaging was Misleading or Deceptive or Tended to Mislead and Deceive, but Instead Focused on the Individual Purchasing decisions of the Consumer

Not only did the district court fail to recognize the efficiencies to be gained by having these actions proceed on a class basis, but also, the district court did not weigh the relative importance of the issues to be decided. *Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 4 ("Predominance is a qualitative rather than a quantitative concept. It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.")

Whether the Defendants' packaging is actively misleading, whether the packaging is misleading by omission, or whether the packaging is misleading for both of these reasons, are the overriding issues in this litigation.[15]  According to the

---

[15] There are other common issues, which all focus on the Defendants' conduct, whose resolution has nothing to do with the individual Plaintiffs or members of the class.  For example, did the Defendants intentionally deceive the Plaintiffs or was their conduct in marketing the GSCs willful?  Were the Defendants unjustly enriched by marketing the GSCs as a true NBE when in fact they were only a cheap instant coffee knockoff? Resolution of these issues will focus solely on Defendants' conduct.

Federal Trade Commission, deception requires a material representation, or an omission or practice that is likely to mislead a reasonable consumer acting reasonably in the circumstances. FTC Policy Statement on Deception, appended to *Matter of Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984). This Court should apply *Skidmore* deference to the views of the Federal Trade Commission. *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)

Defendants successfully convinced the district court to focus on the individual purchase decisions of the named Plaintiffs and/or members of the subclasses, i.e., what they remember seeing on the GSC package, whether they knew what soluble meant, did they know the product did not contain a filter, etc., and not on Defendants' wrongful conduct. None of the foregoing questions, however, is determinative as the actual inquiry must be judged from the perspective of an objective, reasonable consumer, not the subjective views of a plaintiff.[16]

As explained in *Astiana v. Kashi*, 2013 U.S. Dist. LEXIS 108445 at * 19 (S.D.Cal. July 30, 2013)

> Moreover, "individual experience with a product is irrelevant" because "the injury under the UCL, FAL and CLRA is established by an objective test. Specifically, this objective test states that injury is shown where the consumer has purchased a product that is marketed

---

[16] See *Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1145 (N.D.Cal. 2005); *Cirone-Shadow v. Union Nissan*, 955 F.Supp. 938, 944 (N.D.Ill. 1997) (standard for materiality of Illinois Consumer fraud Act claim is objective standard)

with a material misrepresentation, that is, in a manner such that 'members of the public are likely to be deceived.'" *citing Bruno v. Quten Research Inst., LLC,* 280 F.R.D. 524, 534 (C.D. Cal. 2011).

Whether one named Plaintiff saw one aspect of the packaging as opposed to another aspect, simply makes no difference as to whether the overall packaging was deceptive, or likely to mislead a consumer acting reasonably under the circumstances. *Papaspiridakos v. Educational Affiliates, Inc.,* Slip Copy, 2013 WL 4899136, E.D.N.Y., 2013 (Under the objective standard of N.Y. G.B.L. § 349, the challenged representation or omission must be one that is "likely to mislead a reasonable consumer acting reasonably under the circumstances.")[17]  Again, all named Plaintiffs saw the packaging as they purchased the GSCs in person at a grocery store.

In sum, the qualitative overarching question for resolution is whether Defendants' packaging was deceptive or misleading to a reasonable consumer acting under reasonable circumstances.

---

[17] *Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, (N.D.Cal.2012) ("Defendant contends that no reasonable consumer could be misled in light of the nutrient label on the package. This argument is not persuasive. As the *Williams* court said, "We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging."); *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 256 ("[A] fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a reasonable [consumer]' would deem it important in determining how to act in the transaction at issue.")

### 3. The District Court's Decision was Erroneous because it Presumed that Many Class members did not Suffer Injury, which was both Factually Incorrect but also Irrelevant at this Stage of the Proceedings

The district Court cited *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-514 (7th Cir. 2006) for the proposition a class cannot be certified "when the class definition could include millions of people who were not injured." (Doc. 138 at pp. 3-4)  Apparently, the district court operated under the faulty assumption many consumers who purchased the GSCs were not injured or suffered any injury. *Butler v. Sears* shows this assumption was misplaced:

> Sears argued that most members of the plaintiff class had not experienced any mold problem. But if so, we pointed out, that was an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate Sears--a course it should welcome, as all class members who did not opt out of the class action would be bound by the judgment.

727 F.3d at 799.

Likewise, this Court's recent decision in *Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 4 further highlights the unsoundness of the district court's approach:

> We reject the argument. To require the district judge to determine whether each of the 150 members of the class has sustained an injury--on the theory that if 140 have not, and so lack standing, and so should be dropped from the class, certification should be denied and the 10 remaining plaintiffs be forced to sue (whether jointly or individually)--would make the class certification process unworkable; the process would require, in this case, 150 trials before the class could be certified.

The defendants are thus asking us to put the cart before the horse. How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified.[18]

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) also supports this result. Justice Ginsburg noted the case before them involved the interaction between federal securities-fraud laws and Rule 23's requirements for class certification; she then explained:

> The issue presented concerns the requirement stated in Rule 23(b)(3) that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Amgen contends that to meet the predominance requirement, Connecticut Retirement must do more than plausibly *plead* that Amgen's alleged misrepresentations and misleading omissions materially affected Amgen's stock price. According to Amgen, certification must be denied unless Connecticut Retirement *proves* materiality, for immaterial misrepresentations or omissions, by definition, would have no impact on Amgen's stock price in an efficient market.

---

[18] The district court erroneously concluded that Plaintiffs' proposed subclasses were not sufficiently "ascertainable" or "definite" because the subclasses could include "numerous people who have no claim at all," (Doc. 138 at p. 3), as they included "purchasers who knew, or who were indifferent to the product's insoluble coffee content." Id. at p. 4. Those purchasers, the district court found, could not "prove causation, reliance, or actual injury from Defendant's alleged misrepresentation." Id. While Plaintiffs believe that the court's speculation was misguided, as the overwhelming majority of consumers were in fact injured, the holding of *Parko v. Shell Oil Co* shows that the court improperly put the cart before the horse. Moreover, the district court's faulty conclusions also show it delved too deeply into the merits of the action. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-1195 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.")

> While Connecticut Retirement certainly must prove materiality to prevail on the merits, we hold that such proof is not a prerequisite to class certification. Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class. Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class Connecticut Retirement would represent.

133 S. Ct. at 1191. (underline added)

Finally, on its facts *Oshana* is readily distinguished because it involved bare bones allegations Coca-Cola failed to disclose the unremarkable proposition Diet Coke from a fountain and bottled Diet Coke were not the same. As this Court correctly found, countless members of *Oshana's* putative class could not show any damage, let alone damage proximately caused by Coke's alleged deception. In fact, the Court wondered if anyone but the named plaintiff in *Oshana* shared his concerns about the alleged fraud. Additionally, there is no discussion in *Oshana* of how Coca-Cola ostensibly practiced its alleged deception.[19]

Here, Defendants targeted a specific class of consumer, Keurig coffee drinkers, who believed they were purchasing a premium product for use in their Keurigs. Instant freeze dried coffee, even if Defendants put it in a box to look like a true NBE, will never be considered a high quality, premium product. As they

---

[19] *Oshana* contains no discussion of standardized packaging – nor could there be – as one of the products was dispensed from a fountain. Here, all Plaintiffs and members of the subclasses purchased the product in identical formulaic packaging, designed to look like the Keurig product.

say, you can't make a silk purse from a sow's ear.[20]  All of the Plaintiffs in this action saw the same formulaic packaging, purchased the product expecting a certain kind and quality to the product, and after using the product, realized that they purchased something other than what they had expected.[21]

In sum, predominance was clearly met in this action. *Bowen v. Groome*, 2012 U.S. Dist. LEXIS 78829 at * 13 (June 7, 2012, S.D.Ill.)  ("Predominance is a test readily met in certain cases alleging consumer or securities fraud.").

> **4.** **As Defendants' Conduct Involved Material Fraudulent Omissions, Causation and Reliance for class members may be Presumed.**

Plaintiffs alleged active misrepresentation and fraud by omission, i.e., Defendants failed to disclose their product was 95% to 96% instant coffee and that it did not contain a filter.  The district court erred by not considering this aspect of Defendants' fraudulent conduct.

---

[20] Although the district court did not rely upon any expert testimony in reaching his decisions, Defendants' expert, Neal Roese, P.H.D. provided plentiful deposition testimony that supported Plaintiffs' theory of the case.  For example, he acknowledged that all of the named Plaintiffs "believed that they were buying ground roast coffee," and that they consistently complained "that they thought they had bought something different than soluble or instant coffee."  (Roese depo. At p 6, lines 7-21, attached to Evid. Sub. As Exhibit U)   Roese also admitted that there is a general opinion shared by consumers that instant coffee has a different level of quality than fresh brewed, p. 11, lines 12-17, and further noted that "Green Mountain coffee was perhaps marketed with a target toward premium-minded consumers." (Id. P.23, lines 6-8). (Doc 99 at pp 21-22 of 45).

[21] *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 479 (C.D. Cal. 2012) (finding typicality was satisfied where "each named plaintiff testified that she would not have purchased Serum or would have paid less for Serum had she known it had flammable characteristics").

In cases involving fraudulent omission, individual reliance is either not required or it may be inferred from the purchase itself. <u>See</u> *Mass Mutual Life Ins. Co. v. Superior Court of San Diego County,* 97 Cal. App. 4th 1282, 1293, 119 Cal. Rptr. 2d 190, (Cal. App. 2002) (if plaintiffs succeed in proving allegations of a failure to disclose a material fact associated with the purchase of life insurance policies, "the purchases common to each class member would in turn be sufficient to give rise to the inference of common reliance on representations which were materially deficient."); *Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill. App. 3d 1139, 759 N.E.2d 66, 70, 259 Ill. Dec. 586 (Ill. App. 2001) ("it is not necessary . . . to show actual reliance in order to state a valid claim based on an omission or concealment under the Consumer Fraud Act."); *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007) ("[NJ CFA] essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss."); *Stutman v. Chemical Bank,* 731 N.E.2d 608, 612, 709 N.Y.S.2d 892 (N.Y. 2000)("reliance is not an element of a [statutory consumer protection] claim.")

Here, Defendants were keenly aware of the omission aspect of their fraud. Early on, Defendants' market research focused on whether consumers would notice a difference in weight with the GSCs, and whether consumers would equate

this lesser weight with lesser quality. (Doc. 99 at p. 18 of 45) "Minimal consumer Risk based on 2/23 Research; cup weight cup rattle Coffee color while dispensing." (11432) Nonetheless, Defendants never disclosed that their product did not contain a filter or that it was always comprised of 95% to 96% instant coffee. These were facts within the knowledge of the Defendants, and would not otherwise be discoverable or known by the consuming public. These facts were material and if disclosed to consumers would have helped alert consumers to the fact that the GSCs were not a true NBE.[22]

In sum, Defendants fraud by omission leads to a presumption of reliance.

B    The District Court Committed Clear Error in not Certifying the California and New Jersey Subclasses

This action involved four lawsuits, with consumers from eight states, consolidated together in the Southern District of Illinois. Although the relevant inquiry under each state's consumer protection statute was the same -- whether the overall packaging was deceptive, or likely to mislead a consumer acting reasonably

---

[22] *Falk v. General Motors Corporation,* 496 F. Supp. 2d 1088, 1094 - 95 (N.D. Cal. 2007) (a CLRA claim exists for a failure to disclose or concealment when (1) the defendant had exclusive knowledge of material facts not known to the plaintiff; or (2) the defendant actively conceals a material fact from the plaintiff materiality under the CLRA is judged by the effect on a "reasonable consumer".); *Strawn v. Caruso,* 657 A.2d 420, 430-431 n.4 (N.J. 1995). ("a matter is material if: '(a) a reasonable person would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.

under the circumstances—two of the states, California and New Jersey, allow for a class wide  presumption of reliance.  It was clear error for the district court not to certify subclasses from those two states.

Recently, the court in *Waller v. Hewlett-Packard Co.*, 2013 U.S. Dist. LEXIS 141729 at * 42-43 (September 29, 2013) explained:

> Critically, relief under the UCL is available without any proof of deception, reliance, or damages. *Brakke v. Economic Concepts, Inc.*, 213 Cal.App.4th 761, 772, 153 Cal. Rptr. 3d 1 (Cal. Ct. App. 2013); *In re Steroid Hormone Product Cases*, 181 Cal.App.4th 145, 154, 104 Cal. Rptr. 3d 329 (Cal. Ct. App. 2010) .  .  . *Massachusetts Mutual Life Ins. Co. v. Superior Ct.*, 97 Cal.App.4th 1282, 1289, 119 Cal. Rptr. 2d 190 (Cal. Ct. App. 2002) ("[O]ur courts have not departed in any manner from the principle that liability for restitution under either the specific false advertising provisions of the [FAL] or the broader provisions of the UCL may be found without any individualized proof of deception and solely on the basis a defendant's conduct was likely to deceive customers."). As the Court has said above, this reflects a policy decision of the California legislature, and it focuses the analysis on more the objective conduct of the defendant rather than the plaintiffs' own circumstances.

See *Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 52, 536 (N.D. Cal. 2012); ("The focus of the UCL and FAL is on the actions of the defendants, not on the subjective state of mind of the class members."); *Williams v. Gerber Prods. Co.,* 552 F.3d 934, 938 (9th Cir. 2008) (Under California law there are no reliance and causation elements to a UCL claim in the first instance, and so 'the district court's concerns about reliance and causation were not well taken.'"); *In re Google AdWords,* 2012 U.S. Dist. LEXIS 1216 at *10. (UCL is focused "on the

defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices."

Likewise, as the court explained in *In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 164-165 (D.N.J. 2010):

> Under the NJCFA, Plaintiffs do not need to demonstrate that they actually relied on the company's misrepresentations or omissions. N.J. Stat. Ann. § 56:8-2 (allowing recovery "whether or not any person has in fact been misled, deceived or damaged" by the defendant's misrepresentation or omission); *Int'l Union of Operating Eng'rs*, 929 A.2d at 1087 ("Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover."). Rather, they must show an "ascertainable loss," meaning that they "paid for a product and got something less than what had been promised." *Elias*, 252 F.R.D. at 249 (internal quotations omitted).

Here, the New Jersey Plaintiff, Deborah DiBenedetto, purchased an instant coffee product she otherwise would not have bought if the packaging had not been misleading. As she wrote: "I purchased a box of your Grove Square Coffee for my Keurig machine. I never read the box closely enough to see your play on words . ."soluble and microground arabica coffee." Shame on you; call it what it is in a language everyone is familiar with. .. INSTANT COFFEE IN A K-CUP. And, what does "natural flavor with other natural flavor" mean? Properly and clearly label your product as ***Instant Coffee*."

In sum, it is evident the District Court committed clear error in refusing to

certify the two subclasses of California[23] and New Jersey consumers.

    <u>C</u>.    <u>Each Plaintiff Presented a Question of fact for the Jury Regarding Reliance and Causation</u>.

When determining if a district court properly granted summary judgment, "all factual inferences are to be taken against the moving party and in favor of the opposing party." *International Admin., Inc. v. Life Ins. Co. of N. Am.,* 753 F.2d 1373, 1378 (7th Cir. 1985). In instances where "inferences contrary to those drawn by the trial court might be permissible," a district court's grant of summary judgment must be reversed. *Munson v. Friske,* 754 F.2d 683, 690 (7th Cir. 1985).

While the district court wrote summary judgment was "the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events," the court essentially ignored Plaintiffs' favorable evidence and instead accepted the cherry picked references Defendants cited in their papers as uncontroverted facts. (Doc. 161 p. 6 of 7) In doing so, the court imposed a burden of proof under Rule 56 that was not proper. As the court in *Ries v. Arizona Tea Beverage* 287 F.R.D. 523 (N.D.Cal. 2012) explained:

---

[23] *Nilon v. Natural-Immunogenics Corp*., 2013 U.S. Dist. LEXIS 141728 at *2 N. 2 (S.D. Cal September 30, 2013) (The spirit of this case, like most false advertising cases brought under the UCL and CLRA, is that plaintiffs paid for a product that, with more accurate information, they would have either paid less for or not bought at all.)

Turning to reliance, likewise, defendants may attempt to exploit plaintiffs' imperfect recollections to persuade the trier of fact to discount their testimony, but critically, because plaintiffs specifically recall defendants' representations of AriZona beverages as "natural," and indicate that statement was material to their purchase, this standing requirement is satisfied. Defendants have neglected to identify any authority to suggest a more specific or greater showing of reliance is required to survive a motion under *Rule 56.*

287 F.R.D. at 530.

Here, all of the Plaintiffs viewed the product in the store and based upon the formulaic packaging and its placement next to other Keurig products, purchased the product believing it was a true NBE, while never expecting the GSCs were overwhelmingly instant freeze dried coffee.[24]  Plaintiffs contend the packaging was actively misleading and that there was also fraud by omission.  Indeed, almost immediately after the purchase, Plaintiffs Cardillo and Ritchie wrote the BBB to complain.  Plaintiff DiBenedetto e-mailed Sturm, and remarkably, was told the

---

[24] It is undisputed each Plaintiff took the product as a whole, from its placement next to other K-cups in the grocery store to the picture of the whole coffee beans on the package and the text on the package, and they understood the product to be a brewed coffee product similar to the other available products for use in Keurigs. In this regard, the facts are quite similar to those of *Ackerman v. Coca-Cola Co.,* Not Reported in F.Supp.2d, 2010 WL 2925955, E.D.N.Y. 2010 ("The plaintiffs have sufficiently alleged that the collective effect of the challenged statements was to mislead a reasonable consumer into believing that vitaminwater is either composed solely of vitamins and water, or that it is a beneficial source of nutrients rather than a "food of little or no nutritional value [which has been fortified] for the sole purpose of" claiming or implying that it is "healthy.")

product was not instant coffee![25]  Plaintiff Capps called the company to complain and wrote reviews to warn other unsuspecting consumers.  What other proof does the district court require for "each Plaintiff . . . to show that *he or she* was deceived and that he or she suffered some injury from the misleading packaging?"[26]

Again, the court's discussion in *Ries v. Arizona Tea Beverage* provides guidance on the issues of reliance and causation.  It explained:

> In other words, "[w]hile a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff   need not demonstrate it was the only cause," or "even the predominant or decisive factor influencing his conduct." *Id.* (quotation marks omitted) (quoting *Engalla v. Permanente Med. Grp., Inc.,* 15 Cal. 4th 951, 976-77, 64 Cal. Rptr. 2d 843, 938 P.2d 903 (1997)). "Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material," that is,   if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question," and as such materiality is generally a

---

[25] "Finally, to the extent defendants argue Ries has admitted she purchased the product without reading the label and solely because of thirst, they also acknowledge her testimony that she purchased the drink with the understanding and expectation it was 'natural,' as advertised. Again, resolving all inferences in favor of the non-moving party, there is a triable issue of material fact raised by Ries's testimony. Defendants are, of course, free to attempt to impeach Ries at trial with prior statements they believe are inconsistent, but such disputes preclude judgment as a matter of law at this stage." 287 F.R.D. at 530.

[26] "Here, plaintiffs have alleged they surrendered the purchase price on the mistaken premise that AriZona teas were 'natural.' Defendants maintain they are entitled to judgment because plaintiffs' alleged purchases are undocumented by receipts, and because neither plaintiff can recall the precise prices they paid, or the exact statements on the bottling of the beverages they purchased. Such arguments do not establish the absence of a disputed issue of material fact, but are instead about the relative weight of the evidence, and must be presented to the jury." *Ries*, 287 F.R.D. at 530.

question of fact unless the "fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it."

287 F.R.D. at 529-530.

In sum, each Plaintiff presented a question of fact on reliance and causation making summary judgment improper. *In re Tobacco II Cases*, 46 Cal. 4th 298 (Cal. 2009) ("[M]ateriality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.") "Proximate cause is a question of fact for the jury where varying inferences are possible." *Mirand v. City of New York*, 84 NY2d 44, 51 (1994).

    D.    <u>Plaintiffs Presented a Jury Question on Whether Defendants'</u> <u>Packaging was Misleading or Deceptive or Tended to Mislead and</u> <u>Deceive, under the Objective Standard of a Reasonable Consumer in</u> <u>the Context of the Purchasing Decision</u>.

Whether the Defendants' packaging is actively misleading, whether the packaging is misleading by omission, or whether the packaging is misleading for both of these reasons, is a question of fact for the jury to decide. According to the FTC, deception requires a material representation, omission or practice that is likely to mislead a reasonable consumer acting reasonably in the circumstances. FTC Policy Statement on Deception, appended to *Matter of Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984).

Moreover, whether a defendant's representation, omission, or practice is likely to mislead an objective reasonable consumer cannot be resolved by looking at the representation, omission, or practice in a vacuum. The liability determination must rest on the actual words and images used in the packaging and the context in which those words and images are used. Defendants actually concede this point, perhaps unwittingly, when they contend:

> [A]ny misunderstandings regarding the nature of the product came from general assumptions about k-cup products used in Keurig brewers and the fact that the GROVE SQUARE product they bought was a coffee product in a cartridge in the same shape and used the same way, i.e., in Keurig brewers, as many other k-cups that contain ground coffee, and was sold next to k-cups containing only ground coffee. (Doc. 141 at p. 2 of 23)

N.Y. GBL § 350-a provides: "In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations . . ." For purposes of § 350, advertising includes product labels and packaging. N.Y. GBL § 350-a. Omissions are actionable under § 349 and § 350. Moreover, according to the New Jersey Consumer Fraud Act ("NJCFA") a defendant is liable "for omission of material facts whether "any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2.

Plaintiffs' produced facts showing the GSCs' packaging was false, misleading and deceptive or, at the very least, showing there exists a genuine issue of fact as to whether the GSCs' packaging was false, misleading and/ or deceptive. Plaintiffs' have contended since the inception of this suit that the entirety of the GSC packaging, branding and messaging is misleading. (Plaintiffs' Amnd. Complaint ¶10-12)   Each Plaintiff took the product as a whole, from its placement next to other K-cups in the grocery store to the picture of the whole coffee beans on the package and the text on the package, and understood it to be a brewed coffee product similar to the other products packaged for use in single serve coffee brewing systems.[27]

As soon as they launched their GSCs, Defendants began to receive consumer complaints and inquiries about the product.   Tellingly, these complaints and inquiries continued for well over two years and even after Defendants changed their formulaic packaging to include the word "instant" instead of "soluble."  <u>See</u> Exhibit S to the Evidentiary Submission in Support of Class certification previously filed under seal. (Doc. 101)  This Exhibit shows that throughout 2012, "first time users" continued complaining on a weekly basis about the deceptive nature of the packaging and the fact that the GSCs were instant. <u>See</u> *Hilt  v.*

---

[27] Defendants' script acknowledge "we have been receiving feedback from consumers that this is not what they are accustomed to with a Keurig." (16881) (Doc 141 at p. 14 of 23, n. 18)

*Arizona Bev. Co… LLC,* 2009 U.S. Dist. LEXIS 16871, at *16-19 (S.D. Cal. Feb. 4, 2009) (permitting plaintiff "the opportunity to present evidence, such as a consumer survey, showing that [Defendant's] labeling and promotion is likely to deceive a reasonable consumer).

The court in *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 at * 35-36, denied Sturm summary judgment on Keurig's trade dress claim finding material facts existed regarding the existence of a consistent overall look between the two products. The trade dress was described as:

> [1] an image of single-serve beverage cartridges, with at least one beverage cartridge depicted on its side and one beverage cartridge depicted right-side up, and a tagline below the image of the cartridges that states they are for use in Keurig brewers, [2] an image of spilled coffee beans, [3] an indication of the coffee's roast strength on a graded bar with shading varying from light to dark, along with an indication whether the coffee is caffeinated, [4] perforations for opening the package that form an opening that is tapered in a vshape and ending in a u-shaped tab, [5] prominent lettering displaying the name of the beverage, and [6] another face of the packaging providing a product story.

As previously noted, Sturm had to "rearrange the packaging operation to put them into a display like Keurig had on the shelf," because Sturm wanted the GSCs "to look like the Keurig product in box style," with a "round cartridge into a rectangular display similar to Keurig." (Doc. 99 at p. 22 of 45) The GSCs contain text on the bottom left hand corner of the front of the package that reads "*For use by owners of Keurig coffee makers." (Doc. 53 at ¶

16.) <u>See</u> *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 at *32 n.9 ("For instance, with respect to factor four, actual confusion (a highly relevant factor), plaintiff has produced survey, consumer testimonial and consumer complaint evidence which suggests that defendant's use of the word "Keurig®" on its packaging is misleading.")

Finally, Plaintiffs expect Defendants to argue to this Court that no Plaintiffs or class members could possibly be deceived or misled by their packaging because nothing on the packaging was "literally false".  Such a contention has no merit in law or fact. *Bronson v. Johnson & Johnson, Inc.***,** Slip Copy, 2013 WL 1629191, N.D.Cal.,2013("Deceptive labeling claims under the UCL, the FAL, and the CLRA are evaluated by whether a "reasonable consumer" would likely be deceived. Williams, 552 F.3d at 938 (<u>citing</u> *Freeman v. Time, Inc.,* 68 F.3d 285, 289 (9th Cir.1995)). The California Supreme Court has recognized "<u>that these laws prohibit not only advertising which is false, but also advertising which</u>[,] **although true**<u>, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.</u>" *Id.* (quoting *Kasky v. Nike, Inc.,* 27 Cal.4th 939, 450 (2002)) (internal quotations omitted) (bold and underline added).[28]

---

[28]*Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, N.D.Cal.,2012. ("Defendant contends that no reasonable consumer could be misled in light of the nutrient label on the package. This argument is not persuasive. As the *Williams* court said, "We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those

Defendants' expert, Roese, acknowledged that generally speaking "certain advertisements or certain marketing information could be misleading even if the statement were true," and furthermore, recognized that it is true that just "because something might be true doesn't mean it can't also be misleading." (P. 103, lines 4-15). He also discussed consumer's "inattention blindness," or people's expectations "can be a guide to how they interpret something." (P. 91, lines 21-22). *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F. 3d 430, 434 (4th Cir. 1997) ("For liability to arise under the false advertising provision of the Lanham Act, "the contested statement of representation must be either false on its face or, **although literally true**, likely to mislead and to confuse consumers given the merchandising context.") (bold and underline added)(Doc 141at p. 18 of 23).

In sum, for all the foregoing reasons, Plaintiffs presented a question of fact for the jury on this issue.

E.     Plaintiffs Presented a Jury Question on Whether Defendants were
       Unjustly Enriched by selling the GSCs

Finally, the district court should have allowed a jury to determine whether defendants were unjustly enriched by selling the GSCs as a NBE, when in fact they

---

misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging.")

were a cheap instant freeze dried knockoff. The basis for Plaintiffs' unjust enrichment claim is that the Defendants marketed the GSCs as a true NBE knowing they were not, and in doing so, were able to achieve a premium price for their product.[29]

Disgorgement of Defendant's profits, under a theory of unjust enrichment, is a purely equitable remedy. *Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 172 (3d Cir. 2005). *Castrol, Inc. v. Pennzoil Quaker State Co.,* 169 F.Supp. 2d 332, 344 (D.N.J. 2001). Plaintiffs computed unjust enrichment damages based upon three different methodologies, which relied on Defendants' own internal calculations for those figures. A jury should decide this issue.

## CONCLUSION

This Court should reverse the district court's grant of summary judgment and remand the action with instructions to certify the subclasses.

---

[29] *New v. CitiFinancial Auto Credit, Inc.*, 2012 U.S. Dist. LEXIS 87936 (M.D. Ala. June 26, 2012) "The doctrine of unjust enrichment . . . permit[s] the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Ghirardo* v. *Antonioli,* 14 Cal. 4th 39,57 Cal. Rptr. 2d 687 (Cal. 1996) elements are: (1) defendant must receive a benefit (2) the benefit must be at the expense of plaintiff (3) defendant must have knowledge of the benefit and (4) the retention of the benefit by defendant must be unjust; *F.H. Prince* & *Co., Inc.* v. *Towers Fin. Corp.,* 275 Ill. App. 3d 792, 656 N.B. 2d 142, 151 (Ill. App. 1 Dist. 1995) elements are: (1) defendant must receive a benefit (2) the benefit must be at the expense of plaintiff (3) defendant must have knowledge of the benefit and (4) the retention of the benefit by defendant must be unjust; *Russell-Stanley Corp.* v. *Plant Indus.,* 595 A. 2d 534,550 (N.J. Super. eh. Div. 1991) elements are: (1) that defendant received a benefit and (2) that the retention of that benefit without payment would be unjust.

## CERTIFICATE OF COMPLIANCE

This brief contains 13,504 words, excluding the parts of the brief exempted

by Fed. R. App. P. 32 (a)(7)(B)(iii).

Respectfully submitted,


By:    /s/ Peter H. Burke
Peter H. Burke


**OF COUNSEL:**

J. Allen Schreiber, Esq.
BURKE HARVEY, LLC
2151 Highland Avenue, Suite 120
Birmingham, Alabama 35205
Telephone:  (205) 930-9091
Facsimile:   (205) 930-9054

Patrick C. Cooper
James Ward
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, Al 35209

*Attorneys for Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of April, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by CM/ECF system. If some of the participants in the case are not, I have mailed the foregoing document by First-Class Mail, postage prepaid to the following:

Rebecca R. Hanson
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
*Attorneys for Defendants Sturm Foods, Inc.*
*and TreeHouse Foods, Inc.*

*/s/ Peter H. Burke*
OF COUNSEL

No. 13-3843

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

LINDA SUCHANEK, et al.,
Plaintiffs-Appellants

v.

STURM FOODS, INCORPORATED, et al.
Defendants-Appellees

Appeal from the United States District Court for the
Northern District of Illinois
District Court No. 3:11-cv-00565-GPM-PMF and 3:11-cv-00889-GPM,
3:11-cv-01035-GPM, 3:11-cv-01068-GPM and 3:12-cv-00224-GPM

**APPELLANTS' APPENDIX TO BRIEF**

Peter H. Burke
J. Allen Schreiber
BURKE HARVEY, LLC
2151 Highland Avenue South, Suite 120
Birmingham, AL 35205
Phone:     (205) 930-9091
Fax:       (205) 930-9054


Counsel for Appellants

## STATEMENT THAT ALL REQUIRED MATERIALS ARE IN APPENDIX

Undersigned counsel hereby certifies that all materials required by parts (a) and (b) of Circuit Rule 30 are included.

## INDEX TO APPENDIX

| TAB | DESCRIPTION |
|-----|-------------|
| 1 | Notice of Appeal |
| 2 | Judgment in a Civil Case |
| 3 | Memorandum and Order denying Plaintiffs' Motion for Reconsideration and Granting Defendants' Motion for Summary Judgment |
| 4 | Plaintiffs' Motion to Reconsider Memorandum and Order (Doc 138) and Alternatively to Submit Narrower Subclass Definitions |
| 5 | Memorandum and Order denying Plaintiffs' Motion for Class Certification |
| 6 | Transcript for Proceedings held on 11/05/2013 |
| 7 | Transcript for Proceedings held on 04/15/2013 |

Respectfully submitted,

By:   /s/ Peter H. Burke
Peter H. Burke, Esq.

**OF COUNSEL:**
J. Allen Schreiber, Esq.
BURKE HARVEY, LLC
One Highland Place
2151 Highland Avenue, Suite 120
Birmingham, Alabama 35205
Telephone:  (205) 930-9091
Facsimile:   (205) 930-9054
*Attorneys for Plaintiffs – Appellants*

Patrick C. Cooper
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, Al 35209

## **CERTIFICATE OF SERVICE**

I do hereby certify that on the ___ day of March, 2014, I served the foregoing via U.S. Mail to the following:

Rebecca R. Hanson
FOLEY & LARDNER LLP
321 North Clark Street
Suite 2800
Chicago, IL 60654-5313

*Attorneys for Defendants/Appellants*
*Sturm Foods, Inc. and TreeHouse Foods, Inc.*

/s/ Peter H. Burke_____
Of Counsel

# TAB

## "1"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LINDA SUCHANEK, RICHARD      )
MCMANUS, CAROL CARR,          )
PAULA GLADSTONE, EDNA         )
AVAKIAN, CHARLES CARDILLO,    )
BEN CAPPS, DEBORAH            )
DIBENEDETTO, and CAROL        )
J. RITCHIE, et al.            )
                              )
            Plaintiffs,       )        Case No. 3:11-cv-00565-GPM
                              )
v.                            )        Consolidated Cases:
                              )        11-889-GPM
STURM FOODS, INC., and        )        11-1035-GPM
TREEHOUSE FOODS, INC.,        )        11-1068-GPM
                              )        12-224-GPM
            Defendants.       )

## NOTICE OF APPEAL

Notice is hereby given that all Plaintiffs, Linda Suchanek, Richard McManus, Carol Carr,

Paula Gladstone, Edna Avakian, Charles Cardillo, Ben Capps, Deborah DiBenedetto and Carol J.

Ritchie, in the above consolidated cases, hereby appeal to the United States Court of Appeals for

the Seventh Circuit from the following orders and judgments:

1.     Memorandum and Opinion denying Plaintiff's Motion for Class Certification

entered on August 26, 2013. (Doc. No. 138)

2.     Memorandum and Opinion denying Plaintiffs' Motion to Reconsider Class

Certification entered on November 20, 2013. (Doc. No. 161)

3.     Memorandum and Opinion granting Defendants' Motion for Summary Judgment

entered on November 20, 2013. (Doc. No. 161)

4.     Judgment in a Civil Case entered on November 20, 2013 (Doc. No. 162)

5.     Plaintiffs further appeal any and all final orders or judgments to which they have a

right of appeal.

Respectfully submitted,


By:___ /s/ Peter H. Burke_____
Peter H. Burke


**OF COUNSEL:**

Peter H. Burke, Esq.
J. Allen Schreiber, Esq.
W. Todd Harvey, Esq.
BURKE HARVEY & FRANKOWSKI, LLC
2151 Highland Avenue, Suite 120
Birmingham, Alabama 35205
Telephone:  (205) 930-9091
Facsimile:   (205) 930-9054
E-Mail:   pburke@bhflegal.com
            tharvey@bhflegal.com
*Attorneys for Plaintiffs Richard Mcmanus,*
*Edna Avakian, Charles Cardillo, Ben Capps,*
*Deborah Dibenedetto, and Carol J. Ritchie*

Patrick C. Cooper
James Ward
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, Al 35209
*Attorney for Plaintiff Edna Avakian*

Randy L. Gori
D. Todd Mathews
GORI, JULIAN AND ASSOC, P.C.
156 N. Main Street
Edwardsville, IL 62025
*Attorney for Plaintiff Linda Suchanek*

B. J. Wade
SKOUTERIS AND MAGEE, PLLC
Morgan Keegan Tower
50 N. Front Suite 920
Memphis, TN  38103
*Attorney for Plaintiff Carol Carr*

2

Michael H. Maizes
MAIZES & MAIZES LLP
2027 Williamsbridge Road, 2nd Floor
Bronz, NY 10461-1630
*Attorney for Plaintiff Paula Gladstone*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 18th day of December, 2013, I served the foregoing via the Court's CM/ECF which will send notification to the following:

Michael Conway
Rebecca R. Hanson
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
*Attorneys for Defendants Sturm Foods, Inc.*
*and TreeHouse Foods, Inc.*

/s/ Peter H. Burke
Of Counsel

# TAB

# "2"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

LINDA SUCHANEK, RICHARD            )
MCMANUS, CAROL CARR, PAULA         )
GLADSTONE, EDNA AVAKIAN,           )
CHARLES CARDILLO, BEN CAPPS,       )
DEBORAH DIBENEDETTO, AND           )
CAROL J. RITCHIE,                  )
                                   )
      Plaintiffs,                 )
                                   )
vs.                                )   CIVIL NO. 11-565-GPM
                                   )
STURM FOODS, INC. AND TREEHOUSE    )   Consolidated Cases:
FOODS, INC.,                       )   11-889-GPM
                                   )   11-1035-GPM
      Defendants.                 )   11-1068-GPM
                                   )   12-224-GPM

## JUDGMENT IN A CIVIL CASE

     This action came before the Court, District Judge G. Patrick Murphy, and the following

decision was reached:

     **IT IS ORDERED** that Plaintiffs shall recover nothing, the action be **DISMISSED on**

**the merits**, and each party shall bear their own costs.

     **DATED**: November 20, 2013

                      NANCY J. ROSENSTENGEL, CLERK


                      By:     s/ Linda M. McGovern_____
                           Deputy Clerk


APPROVED:    *s/ G. Patrick Murphy*
                 G. Patrick Murphy
                 United States District Judge

# TAB

## "3"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LINDA SUCHANEK, RICHARD MCMANUS, CAROL CARR, PAULA GLADSTONE, EDNA AVAKIAN, CHARLES CARDILLO, BEN CAPPS, DEBORAH DIBENEDETTO, and CAROL J. RITCHIE, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CIVIL NO. 11-565-GPM |
| STURM FOODS, INC. and TREEHOUSE FOODS, INC., | ) ) ) | Consolidated Cases: 11-889-GPM 11-1035-GPM |
| Defendants. | ) ) ) | 11-1068-GPM 12-224-GPM |

## <u>MEMORANDUM AND ORDER</u>

**MURPHY, District Judge:**

This case alleges violations of the Alabama Deceptive Trade Practices Act, California Legal Remedies Act, California Business and Professions Code, New York Deceptive Act and Practices Law, New York False Advertising Law, South Carolina Unfair Trade Practices Act, New Jersey Fraud in Sales or Advertising of Merchandise Law, North Carolina Deceptive Trade Practices Act, and unjust enrichment against Defendants for their allegedly misrepresentative packaging of Grove Square individual coffee cartridges (Doc. 53). The action was brought on behalf of the following putative class:

> All persons or consumers that during the Class Period – from September of 2010, until and including the present who purchased in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee Defendants' Grove Square Coffee ("GSC") products. Excluded from the Class are: (a) Defendants' Board members or executive-level officers, including its

attorneys; (b) persons or entities who purchased the GSQ primarily for resale; (c) retailers or re-sellers of the GSQ; (d) governmental entities; and (e) any consumer that already received a refund from Defendants.

(Doc. 99).   After briefing and an in-court hearing, the Court denied certification of that class on August 26, 2013 (Doc. 138).   Now before the Court is Plaintiffs' motion to reconsider that Order (Doc. 140).   Defendants have filed a motion for summary judgment (Doc. 136).   The motions have been fully briefed, and Defendants filed additional motions to exclude expert reports included in Plaintiffs' response to the motion for summary judgment (Docs. 149, 150).

Plaintiffs' Motion to Reconsider Class Certification

The crux of Plaintiffs' request for reconsideration is the Seventh Circuit Court of Appeal's opinion in *Butler v. Sears, Roebuck and Co.* (Doc. 140).   727 F.3d 796 (7th Cir. 2013).   In *Butler*, plaintiffs sought to certify classes bringing breach-of-warranty claims for defective washing machines.   *Id.* at 797.   In finding class certification appropriate, Judge Posner wrote that common proof of damages amongst class members is not required to satisfy Rule 23(b):

> It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages…the fact that damages are not identical across all class members should not preclude class certification. Otherwise defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits.

*Id.* at 801.   In *Butler* however, there was one "single, central, common issue of liability:   whether the Sears washing machine was defective."   *Id.*   Here, as discussed in the Order denying class certification, the issue of liability requires individualized inquiry.   The problem here is not that proof of damages requires looking at each individual class member, for as *Butler* makes clear, that does not preclude predominance.   The problem with the proposed class here is that showing

reliance or causation—as required to establish liability—requires an investigation of each purchaser (Doc. 138, p. 24-25).   That problem would remain regardless of any subclass division. Of *course* all the facts as between individual class members needn't be identical in order to satisfy Rule 23—that is not the standard the Court held Plaintiffs to (as Plaintiffs suggest in their motion Doc. 140, p. 15).   But legal inquiries required to determine liability must predominate.   They do not here.   The Court has considered all of Plaintiffs' grounds for reconsideration of the Order denying class certification and holds with the reasoning and outcome of the Order.   Plaintiffs' motion is **DENIED**.

Defendants' Motion for Summary Judgment

Defendants ask the Court to find that the Grove Square coffee packaging was not deceptive and did not injure Plaintiffs (Doc. 137, p. 6).   Defendants also argue Plaintiffs cannot prove successful claims under the state fraud laws.   To this end, Defendants march through each Plaintiff:   Charles Cardillo did not read the packaging prior to purchase or rely on packaging when he chose the product; Linda Suchanek read the term "soluble" on the package and understood that term meant the product dissolved in water; Carol Carr purchased the product because of the price; Richard McManus did not read the packaging; Edna Avakian was not motivated to purchase the product because of any representation on the packaging; Carol Ritchie thought the product contained finely ground coffee, but her purchase was largely motivated by shelf placement; Deborah Dibenedetto also purchased the product because it was shelved near other individual coffee products and because of the price; Paula Gladstone thought the product packaging looked good and assumed it was ground coffee, not instant, because in part the package pictures an image of coffee beans; Benjamin Capps bought the product because he likes to try new

things (Doc. 137, p. 3-7).

Plaintiffs argue in response that Defendants have mischaracterized their rationales for purchase by cherry-picking statements from their depositions.   According to Plaintiffs:

> Defendants attempt to focus the Court's attention on each purchasing decision of the individual consumer and thereby deflect the inquiry away from the central issue before the Court:   under each states' consumer protection statute, from an objective standpoint of a reasonable consumer, is the packaging of the Grove Square Coffees…deceptive or misleading, or did it have the capacity, likelihood or tendency to mislead the public?

(Doc. 141, p. 1).

Therein lies Plaintiffs' problem.   The Court believes that each Plaintiff does indeed need to show that *he or she* was deceived and that he or she suffered some injury from the misleading packaging.   Linda Suchanek must show: some deceptive practice by Defendants; that Defendants intended her to rely on that deception; and that she incurred damages *proximately caused by* the deception.   *See Avery v. State Farm Mut. Auto Ins. Co.,* 835 N.W.2d 801, 850 (Ill.2005).   She understood the terms on the packaging and bought the product because of the price.   Plaintiffs' basic complaint is that they were misled into purchasing instant coffee (Doc. 53, p. 3).   Ms. Suchanek just was not misled by the packaging—she knew what soluble meant.   Richard McManus must show *actual* deception by false advertising.   *See Billions v. White & Stafford Furniture Co.,* 528 So.2d 878, 880 (Ala. Civ. App. 1988).   Mr. McManus did not rely on the package when he decided to purchase.   Carol Carr needn't prove reliance, but still must show Defendants' alleged deception proximately caused her injury.   *See Cloud Nine, LLC v. Whaley,* 650 F.Supp.2d 798, 797-98 (E.D. Tenn. 2009).   Ms. Carr stated that she was misled because the package was attractive and had a picture of an individual coffee "cup" on the box (Doc. 141, p. 8). But she did not read any of the text on the packaging.   Paula Gladstone must also show that a

material deception caused her injury.  *See Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir. 2005).  And while Ms. Gladstone may have "believed she was purchasing fresh ground with a filter", that belief was premised on the fact that the Grove Square cup can be used in a Keurig machine—which it can (Doc. 141, p. 7).  Edna Avakian thought the product was ground coffee, not instant, because it could be used in a Keurig brewing machine (Doc. 141, p. 5), but she stated in her deposition that she was motivated by the price and her desire to try new products.  She cannot prove the requisite causation or reliance.  In their response brief, even Plaintiffs do not argue that the packaging motivated Charles Cardillo to purchase the product (Doc. 141, p. 4).  The facts of Mr. Cardillo's purchase cannot support a state deception claim, as he is required to prove causation.  *See Stutman v. Chem. Bank,* 731 N.E.2d 608, 611-12 (N.Y. 2000).  Ben Capps must also show a causal relationship.  S.C. Code Ann. § 39-5-140(a) (1985).  Mr. Capps apparently only looked at certain information on the packaging (Doc. 141, p. 6).  He saw, in part, a picture of whole beans and language stating the Grove Square coffee was made from Arabica beans.  However, the indication that this particular individual coffee serving is soluble is also on the packaging.  Further Mr. Capps emphasized he wanted to give try this product because it was a product he was unfamiliar with.  No misrepresentation or material omission motivated his purchase or caused his harm.  Deborah DiBenedetto must prove a direct correlation between Defendants' representation and her loss.  *Heyert v. Taddese,* 2013 WL 3184626 at *13 (N.J.App. June 25, 2013).  When she purchased Grove Square's product, Ms. DiBenedetto felt the coffee would be not-instant coffee because the package pictured an individual serving cup (Doc. 141, p. 6).  Her belief that all individual serving cups, or "k-cups" contain only ground, versus micro-ground (instant) coffee, is both not accurate and not enough to show causation between

Page 5 of 7

Defendants' packaging and her dissatisfaction with the product.   In order to succeed on her claim, Carol Ritchie must prove she actually relied on the packages representations.   *See Williams v. United Cmty. Bank,* 724 S.E.2d 543, 549 (N.C. Ct. App. 2012).   Ms. Ritchie, however, stated that she purchased the product because it "looked pretty good"—not enough (Doc. 137, p. 10).

Summary Judgment is "the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation omitted). The Court must, and does, look at any evidence in the light most favorable to the Plaintiff here, but when Defendants point out that there is an absence of evidence to support the nonmoving party's case then summary judgment is appropriate.   *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Plaintiffs have not shown evidence to support their claims.

That this Order is brief does not reflect a mere surface analysis of the motion for summary judgment.   The Court has read all the papers.   Further and importantly, these parties have been before the undersigned on this matter several times.   The Court understands the claims and the facts presented and finds there are no genuine issues of material fact in dispute.   The Court has seen the packaging at issue—Plaintiffs bring it to each hearing—and finds that it is not designed to mislead consumers.   It says what it is.   Judgment is proper as a matter of law because none of the Plaintiffs have shown their pecuniary loss was caused by Defendants' fraud, deceit, or mislabeling.   The motion for summary judgment is **GRANTED**.   The Court did read the expert reports to which Defendants objected, so the motions at Docs. 149 and 150 are **DENIED**—though those report excerpts were not dispositive.   Judgment will enter for Defendants and this case closed on the Court's docket.

**IT IS SO ORDERED.**

**DATED**: November 20, 2013

s/ *G. Patrick Murphy*

G. PATRICK MURPHY
United States District Judge

# TAB

# "4"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

RICHARD MCMANUS, EDNA     )
AVAKIAN, CHARLES CARDILLO,)
BEN CAPPS, DEBORAH        )
DIBENEDETTO, and CAROL    )
J. RITCHIE, et al.        )
                          )
        Plaintiffs,       )        Case No. 3:11-cv-00565-GPM
                          )
v.                        )
                          )
STURM FOODS, INC., and    )
TREEHOUSE FOODS, INC.,    )
                          )
        Defendants.       )

## PLAINTIFFS' MOTION TO RECONSIDER MEMORANDUM AND ORDER (DOC. 138) AND ALTERNATIVELY TO SUBMIT NARROWER SUBCLASS DEFINITIONS

Plaintiffs respectfully request that the Court reconsider its Memorandum and Order dated August 26, 2013 (DOC. 138), and alternatively, to grant Plaintiffs leave to redefine the subclasses. The primary reason the Court should reconsider its Memorandum and Order is to take advantage of the Seventh Circuit's very recent decision in *Butler v. Sears, Roebuck and Co.*, dated August 22, 2013, and attached hereto as Exhibit "A." Second, the Court should also reconsider in order to allow Plaintiffs to narrow the definition of the subclasses and/or propose new subclasses. Third, Plaintiffs presented a fraud by omission argument, whereby at all relevant times, Defendants failed to disclose two material facts: (1) the product did not contain a filter; and (2) the product was 95% instant. These omissions go to the heart of the analysis regarding whether a reasonable consumer would have been misled by Defendants' marketing of its product, which is the relevant inquiry under the various consumer fraud statutes. Fourth, the

Court applied the holding of *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) in an overly restrictive manner not taking into account the salient differences between the two products at issue in that action – diet coke from a fountain and diet coke in a bottle - and the one formulaic package that all class members purchased in this case.[1]  Other pertinent matters are also addressed herein warranting reconsideration.

### ARGUMENT

A.    The Court Should reconsider its Decision on Class Certification in Light of the Seventh Circuit's Recent Opinion in *Butler v. Sears, Roebuck and Co.*.

*Butler v. Sears* is the Seventh Circuit's most recent pronouncement on consumer class action suits.  Judge Posner first noted that the "question presented by the Supreme Court's remand is one of law—whether the *Comcast* decision cut the ground out from under our decision ordering that the two classes be certified." Exhibit A at p. 3.  He then reiterated why the mold claim had been properly certified:

> The basic question presented by the mold claim—are the machines defective in permitting mold to accumulate and generate noxious odors?—is common to the entire mold class, although damages are likely to vary across class members (the owners of the washing machines). A class action is the efficient procedure for litigation of a case such as this, a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost to any one of them large enough to justify the expense of an individual suit. A determination of liability could be followed by individual hearings to determine the damages sustained by each class member. The parties probably would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines. In that event the hearings would be brief; indeed the case would probably be quickly settled.

*    *    *    *    *    *    *

---

[1] Hence, in that action, the court would have to delve into the purchase decisions of consumers for the fountain diet coke that may have never formed any opinion about either of the two products. Here, by contrast, we have a select targeted group of consumers with certain expectations, that all purchased a product in similar packaging that was marketed as a true NBE when in fact it was not.

2

> Sears argued that most members of the plaintiff class had not experienced
> any mold problem. But if so, we pointed out, that was an argument not for
> refusing to certify the class but for certifying it and then entering a judgment
> that would largely exonerate Sears—a course it should welcome, as all class
> members who did not opt out of the class action would be bound by the judgment.

Exhibit A at pp. 3-4. (bold underline added)

As for the second class, Judge Posner noted:

> The second class action involves a computer device that gives instructions to a
> washing machine's various moving parts. . . . The plaintiffs allege that Sears
> knew about the problem yet charged each owner of a defective machine hundreds
> of dollars to repair the central control unit, and that after the defect was corrected
> in 2005, Sears continued to ship machines containing the earlier manufactured,
> defective units. . . .The principal issue in the control-unit class action is whether
> the control unit is indeed defective. **The only individual issues concern the
> amount of harm to particular class members, and we pointed out that it was
> more efficient for the principal issue—common to all class members—to be
> resolved in a single proceeding than for it to be litigated separately in
> hundreds of different trials**.

Exhibit A at p. 5. (bold and underline added)

Rejecting Sears' contention that efficiency is not a proper manner to look at class

certification, Judge Posner cited earlier Seventh Circuit precedent embracing that very notion:

> As we explained in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
> 672 F.3d 482, 491–92 (7th Cir. 2012), distinguishing *Wal-Mart Stores, Inc. v.
> Dukes*, 131 S. Ct. 2541 (2011), **a class action limited to determining liability on
> a class-wide basis, with separate hearings to determine—if liability is
> established—the damages of individual class members, or homogeneous
> groups of class members, is permitted by Rule 23(c)(4) and will often be the
> sensible way to proceed**. See Advisory Committee Notes to 1966 Amendment of
> Rule 23(b)(3); *Pella Corp. v. Saltzman*, 606 F.3d 391, 393–94 (7th Cir. 2010) (per
> curiam).

Exhibit A at p. 7. (bold and underline added)

Judge Posner further explained that the predominance inquiry has a qualitative aspect to

it, as some issues are more important for purposes of class certification than others. He wrote:

> Sears thinks that predominance is determined simply by counting noses: **that is,
> determining whether there are more common issues or more individual**

3

> issues, regardless of relative importance. That's incorrect. An issue "central
> to the validity of each one of the claims" in a class action, if it can be resolved
> "in one stroke," can justify class treatment. *Wal Mart Stores, Inc. v. Dukes*,
> *supra*, 131 S. Ct. at 2551. That was said in the context of Rule 23(a)(2), the rule
> that provides that class actions are permissible only when there are issues
> common to the members of the class (as of course there are in this case). But
> predominance requires a qualitative assessment too; it is not bean counting.

Exhibit A at pp. 8-9. (bold and underline added)

Here, the overriding predominant issues are whether Defendants fraudulently marketed the Grove Square product as a NBE, knowing in fact that it wasn't, and whether Defendants committed fraud by omission by not disclosing the absence of a filter with the product and the fact that the product was 95% instant. Indeed, to the extent that the state consumer protection statutes allow for exemplary damages for willful or intentional conduct on the part of Defendants, resolution of that issue will clearly predominate. To the extent the Court's Memorandum and Order is replete with pronouncements that the proposed subclasses are overbroad because they could contain purchasers who "never saw the deceptive advertising," or "knew the product was 'instant coffee,'" or who "bought the product because it was instant coffee," the Court has mistakenly created a burden for Plaintiffs that does not exist at this stage of the proceedings. As Judge Posner pointed out:

> And in *In re Inter-Op Hip Prosthesis Liability Litigation*, 204 F.R.D. 330, 345
> (N.D. Ohio 2001), we read that "common issues need only predominate, not
> outnumber individual issues." Or as we put it in *Messner v. Northshore University
> HealthSystem*, 669 F.3d 802, 819 (7th Cir. 2012), "Under the district court's
> approach [which our decision in *Messner* rejected], Rule 23(b)(3) would require
> not only common evidence and methodology, but also common results for
> members of the class. That approach would come very close to requiring
> common proof of damages for class members, which is not required. To put it
> another way, the district court asked not for a showing of common questions,
> but for a showing of common answers to those questions. Rule 23(b)(3) does
> not impose such a heavy burden."

Exhibit A at p. 9. (bold and underline added)

4

Finally, Judge Posner warned that imposing this improper burden could lead to the end of the class action device.

> It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification. Otherwise defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits. As we noted in *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30…. The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original). The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars. But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.

Exhibit A at pp. 9-10. (bold and underline added)

The same warning applies to this action. The undisputed facts show that Defendants engaged in a massive fraudulent scheme to dupe Keurig consumers into paying a premium price for a product that was overwhelmingly instant in nature which did not contain a filter, i.e., Defendants marketed their product as a true NBE knowing full well it was not. Defendants did this in order to be a first mover when Keurig's patent expired. If these cases do not proceed on a class basis, Defendants would have escaped liability for tortious harm of an enormous aggregate magnitude.

    B     To the Extent the Court has Concerns that the definitions of the proposed subclasses are overbroad the Court should Allow Plaintiffs the opportunity to narrow the Definitions and the Fact the Subclasses may Include some Consumers that May not Have a Claim is not Fatal

As this Court acknowledged in its Memorandum and Order, a court "should err in favor of maintaining class actions." *Trotter v. Klincar*, 748 F.2d 1177, 1184 (7th Cir. 1984). And it is also well settled that all class certification decisions are not final and may be revisited. In the 7th Circuit, a class determination is not static. As evidence and circumstances change, it is only proper that the court re-evaluate the class certification. *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U. A.*, 657 F.2d 890, 896 (7th Cir. 1981). Hence, to the extent the Court has any concerns about the present description of the subclasses, the Court could exercise its discretion to modify the proposed definition of the subclasses. *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982) (Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.)[2]

This Court concluded that Plaintiffs' proposed subclasses were not sufficiently "ascertainable" or "definite" because the subclasses could include "numerous people who have no claim at all," (Doc. 138 at p. 3), as they included "purchasers who knew, or who were indifferent to the product's insoluble coffee content." Id. at p. 4. Those purchasers, the Court found, could not "prove causation, reliance, or actual injury from Defendants' alleged misrepresentation." Id. Plaintiffs' Reply Memorandum in Support of Class Certification cited to the Court's attention the following pronouncement from *Butler v. Sears*, 702 F.3d 359, 362 (7th Cir. 2012): "Sears argues that most members of the plaintiff class did not experience a mold

---

[2]One simple edit to the proposed subclasses Plaintiffs propose is to exclude online purchasers. In fact, the 700,000 sales contained within the SymphonyIRI data do not include any online sales from Amazon. Rather, these are all retail sales and the vast majority of these sales occurred at Wal-Mart and a few other retailers. *Holling-Fry v. Coventry Health Care of Kansas*, 2010 U.S. Dist. LEXIS 94416 at * 18-19 (W.D.Mo. September 10, 2010) ("Although Plaintiff's proposed definition was somewhat overbroad in that it did not explicitly restrict the class to individuals who actually *paid* a copay in excess of what was permitted by the regulation, this is easily cured by amending the definition.")

problem. But if so that is an argument not for refusing to certify the class but for certifying it and then entering a judgment that will largely exonerate Sears--a course it should welcome, as all class members who did not opt out of the class action would be bound by the judgment." (Doc. 11 at pp. 6-7)  As shown *supra*, Judge Posner reiterated this principle in his most recent *Butler v. Sears* decision.  Exhibit A at p. 4.  Hence, to the extent there are class members that were satisfied with the product they may opt out of the class, or if they do not, they will be bound by a judgment in Defendants favor if they won at trial.[3]

C.    The Court Did not Take into Account the Fact the Plaintiffs' Claims included not only active Misrepresentation but Fraudulent Omission of Material Facts regarding the Product

The Court stated that in 2011 Sturm Foods changed its label to include the word "instant" and class members that purchased after that date "were not exposed to what Plaintiff's claim was Defendants' primary deception." (Doc. 138 at p. 8)  The Court's conclusion that $4 million in sales would have occurred with packaging containing the changed wording is not supported by the evidence.  Defendants' product had a one year shelf life and Defendants never recalled any of their packaging and sales continued to be made well into 2011 and 2012 that had soluble on the packaging.  In fact, Plaintiff Avakian, of the California subclass, sent a letter to Defendants in

---

[3] For the reasons explained further below, Plaintiffs contend that the Court has improperly considered the evidence regarding the number of consumers that may not have a claim because they knew, or who were indifferent to the product's soluble coffee content. Indeed, if a large portion of the Keurig consumers were in fact indifferent to the soluble content of the Grove Square product -- as this Court suggests -- why were the Defendants so worried whether consumers would notice that their product weighed less than a true NBE? (Doc. 99 at pp. 18-19) Likewise, why did the Defendants hide the true nature of their product and not proudly display in large font that it was 95% instant and did not contain a filter? Because, as their high paid marketing firm informed them, the use of the word instant was a no no. (Doc. 99 at p. 19 of 45) Or, as the buyer for A&P succinctly stated, "Jose they put instant coffee in a K-Cup . . . not cool.  It would not take long for consumers to figure it out.  I am not interested."(Doc. 99 at p. 16 of 45)

March of 2012 requesting, in part, that the Defendants recall their product from California shelves but they refused.

Moreover, Plaintiffs have never claimed that Defendants' primary deception was the use of "soluble" in lieu of "instant" on its packaging. Plaintiffs presented a fraudulent scheme wherein Defendants: (1) targeted a specific group of consumers, Keurig owners, who believed they were purchasing a premium product for use in their brewers; (2) prior to the launch of Grove Square consumers could only purchase a coffee product for use in their machines that contained fresh ground coffee and a filter; (3) designed their package to look like the other NBEs; (4) marketed their product as a true NBE knowing it wasn't; (5) used the word soluble on their packaging for a time instead of the word instant; (6) never disclosed on the package that the product did not contain a filter; (7) never disclosed on the package that it was 95% instant; (8) engaged in a digital marketing campaign that masked the true nature of its product; and (9) fabricated favorable reviews.

To the extent the Court has concluded that Defendants' insertion of the use of the word instant, "fixed what Plaintiffs allege is fraudulent" (Doc. 138 at p. 8), the Plaintiffs would contend that it most certainly did not, given that the packaging otherwise remained the same and the package still did not disclose that it was 95% instant and that it did not contain a filter. The litany of first time users of the product that continued to write Defendants well into 2012 asking whether the product was "instant," at a minimum, creates an issue for class certification regarding whether the Defendants fixed their fraud. Resolution of this issue would also predominate for purposes of class certification.[4]

---

[4] The materiality of Defendants' **representations and omissions** will be judged from the perspective a reasonable consumer, not the subjective views of a plaintiff. See *Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1145 (N.D.Cal. 2005); *Cirone-Shadow v. Union Nissan*,

D.   The Court applied the holding of *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) in an overly restrictive manner to the facts of this Case.

Early in its Memorandum and Order, the Court cites to *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-514 (7th Cir. 2006) for the proposition that a class cannot be certified "when the class definition could include millions of people who were not injured." (Doc. 138 at pp. 3-4) The facts of *Oshana* are readily distinguished from those before the Court in this action, but it appears the Court applied that holding in an overly restrictive manner to this action. *Oshana* involved bare bones allegations that Coca-Cola had failed to disclose that fountain Diet Coke and bottled Diet Coke were not the same product.[5] As the Seventh Circuit correctly found, countless members of Oshana's putative class could not show any damage, let alone damage proximately caused by Coke's alleged deception.

There is no discussion in *Oshana* at all of how Coca-Cola ostensibly practiced its alleged deception; here, by contrast, Plaintiffs have shown that Defendants marketed their product to a distinct class of consumers, who, prior to the launch of this product could only purchase a coffee product for use in their machine that contained ground coffee with a filter. There is no mention in *Oshana* of standardized packaging – nor could there be – because the product was dispensed from a fountain at different locations. Here, by contrast, a formulaic package patterned to look

---

955 F.Supp. 938, 944 (N.D.Ill. 1997) (standard for materiality of Illinois Consumer fraud Act claim is objective standard); General Electric Co., 302 A.D.2d at 314-15 (General Business Law § 349 or false advertising under § 350 is whether representations or omissions are "likely to mislead a reasonable consumer acting reasonably under the circumstances.") N.Y. GBL § 350-a provides: "In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, **but also the extent to which the advertising fails to reveal facts material in the light of such representations** . . ." Moreover, according to the New Jersey Consumer Fraud Act ("NJCFA") a defendant is liable "for omission of material facts whether "any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2

[5] This unremarkable assertion is akin to stating that canned beer and bottled beer are different from one another, and that both are different than beer from a keg.

9

like other NBEs was used to perpetrate the fraud.[6]   Finally, because the proposed subclasses in this action purchased their product in formulaic packaging, they would also have a fraud by omission claim that material facts were not disclosed on that packaging. Again, that would not be the case in *Oshana*. Hence, the Seventh Circuit's holding in *Oshana* is not a hindrance to certifying subclasses in this action.

> E.   The Court Engaged in Improper Speculation or Drew the Wrong Conclusions from the Evidence.

From the Court's Memorandum and Order it is apparent that the Court weighed the competing evidence, and perhaps, may have delved into the merits in more detail than is warranted at the class certification stage. Below are several examples of where the Court made findings that were speculative or not supported by the evidence.

> 1. Plaintiffs' current class definition includes individuals who were not exposed to Defendants' alleged misrepresentation; therefore the Court cannot presume reliance. (Doc. 138 at p. 7 of 26)

There is no further discussion from the Court regarding which individuals were not exposed to the misrepresentations. To the extent the Court is referring to online purchases, Plaintiffs will alter the class definitions to exclude online purchases. Plaintiffs contend that the overall packaging of the product was deceptive and misleading -- from the perspective of a reasonable consumer – an objective test -- and further, that Defendants failure to make known that the product was 95% instant coffee and lacked of a filter were material omissions. Hence, a presumption of reliance is warranted.

> 2. The Court makes note that "Defendants also reference an 'online marketing campaign' but provide little detail and no proof that named Plaintiffs were exposed to digital marketing." (Doc. 138 at p. 7 of 26)

---

[6] Defendants' employee, Ruegger, confirmed that Sturm had to "rearrange the packaging operation to put them into a display like Keurig had on the shelf," because Sturm wanted the finished product "to look like the Keurig product in box style," with a "round cartridge into a rectangular display similar to Keurig." (Doc. 99 at p. 22 of 45)

Plaintiffs assume that the Court meant to state that the "Plaintiffs also reference" the marketing campaign. Plaintiffs submitted proof to the Court that the marketing campaign for this product was unprecedented for the Defendants. Plaintiffs pointed out that Ruegger testified that although Sturm typically did not spend much on marketing it spent $235,000 in 2010 for direct marketing of the product and in 2011 spent another $263,000. He acknowledged that spending half a million dollars over fifteen months was a lot of money for this particular product, and the "size of this business doesn't justify the amount of expense we incurred." (Doc. 99 at p. 19 of 45)

3. The Court refers to extensive online sales (Doc. 138 at p. 8 of 26)

The Court's reference to 5,973 units sold at Amazon does not show extensive sales, but rather, as a percentage of overall sales just the opposite is true, as that number represents only .00846% of all identified sales. The overwhelming majority of sales occurred at WalMart and a few other retailers. In fact, soon after the product was launched, Walmart was worried that Grove Square might be perceived as a WalMart only product. In any event, Plaintiffs have decided to exclude online sales from the subclasses' definition.

4. Specifically, the court must consider whether plaintiff could have known the truth underlying the Defendant's fraud." (Doc. 138 at p. 10 of 26)

The evidence in the record shows that class members could not have known that the product was 95% instant and that it did not contain a filter. Defendants' marketing studies showed that although 30% of consumers noticed that Grove Square product weighed less, they did not equate that lesser weight to be a result of the instant coffee and lack of a filter. (Doc. 99 at p. 18 of 45) Numerous consumers wrote Defendants inquiring if the product was instant coffee and these inquiries continued well into 2012, or the entire time the product was on the market. Defendant's own employee, Jodi Rickert, the main person responsible for responding

11

directly to customer complaints, testified that she did not know the true nature of the product! She did not realize that the product was at least 95% to 96% instant in nature, only discovering that fact on the day of her deposition. (Doc. 99 at p. 17 of 45) If Defendants' own employee in charge of consumer complaints, could not ascertain the true nature of the product, how is that consumers were supposed to be able to determine that it was 95% instant and did not contain a filter?

And for those consumers who called the call center, they were lied to because the script told the service representatives to state the product was "not freeze dried," when in fact it was instant freeze dried coffee.[7] Because of the foregoing, the Court should apply class wide presumption of reliance to a New Jersey subclass to the NJCFA claim. Indeed, when the New Jersey Plaintiff, DiBenedetto, wrote Defendants and asked if it was instant coffee she was told in a letter that it was not. The presumption is clearly warranted under these circumstances.

> 5. Moreover, numerous class members could have known, appreciated, or easily learned that soluble coffee is distinct from ground coffee – precluding a presumption of reliance. (Doc. 138 at p. 10 of 26)

There is nothing in the record to support this inference and the overwhelming evidence is to the contrary. Consumers began complaining about the product and inquiring into the nature of its composition as soon as it was marketed, and these complaints and inquiries continued

---

[7] The misinformation regarding the product's composition was all encompassing. Amazingly, if a consumer complained that the coffee was instant and didn't taste good, the standard response to the consumer was "we feel this is better quality than instant because it is not freeze dried or instantized." The product was in fact overwhelmingly freeze dried coffee, always containing at least 95% to 96% instant freeze dried. "We stayed the route of freeze dried; national testing is being done using the formula with compact freeze dried." Schacter cautioned his sales force: "If you're ever confronted with 'your coffee is instant coffee, let them know there is no standard identity for instant coffee. Ours is NOT Freeze Dried." (Doc. 99 at p. 18 of 45)

throughout the entire it was marketed.[8]  Moreover, one has to ask how it is that the consumer would learn the meaning of soluble when the purchasing decision at the retailer is typically made quickly.  But, this analysis assumes that the only aspect of the fraud and deception was the use of soluble coffee in the product.  Again, the fraud and deception goes not only to the use of soluble coffee in a product Defendants marketed as a true NBE, but that the product was 95% instant combined with the lack of a filter.  A presumption of reliance is warranted for the New Jersey class.

6. Of course, out of a sample consisting solely of individuals who have taken the time to post a complaint or become named plaintiffs to a lawsuit, many will have unmet expectations. The Court will not assume most—or many—purchasers (of which there were approximately 700,000) had the same experience or mindset of such a narrow sample. (Doc. 138 at p. 12 of 26)

The Court's finding disregards several pieces of relevant evidence in the record.  The complaints began as soon as the product was launched and continued for two years.  Discountcoffee.com referred to the GSCs as the worst product launch it had ever experienced in its ten years of business.  Consumers were so outraged that Defendants fabricated favorable reviews on Amazon to combat the black eye.  They also lied to consumers that inquired about the nature of the product telling them that it was not instant freeze dried.[9]   See *In the Matter of*

---

[8] Defendants' own expert, Neal Roese, agreed that "generally speaking," the words "soluble and microground were new to consumers," and he would have been surprised to ever hear a consumer order a cup of "soluble coffee." (Doc. 99 p. 22 of 45)  Plaintiff's expert, Bobby Calder, opined that the term "soluble" was ambiguous and or meaningless for consumers.  In fact, if the term soluble was not ambiguous or misleading, why did the Defendants change that word on its own packaging?  This change, in and of itself, shows that a presumption of reliance is warranted.

[9] If the actual composition of the product being instant coffee was not relevant or not important, why would Defendants lie about it when communicating with consumers?  Why would Sturm's marketing agency, BD&H, say that the use of the word 'instant' is a real no-no and Defendants should avoid any reference to it if at all possible. (Doc. 99 at p. 19 of 45)  Why was Defendants' "online marketing campaign . . . carefully aligned with BD&H Marketing's brand strategy of delivering a delicious traditional cup of freshly brewed hot coffee." Id.

*Cliffdale Assocs., Inc.* 103 F.T.C. 110, 165 (1984) (deception occurs under the FTC Act when there is an omission likely to mislead consumers acting reasonably under the circumstances, and the omitted information is material; see also, *FTC v. 120194 Canada, Ltd.*, 2007 U.S. Dist. LEXIS 12657, 10-11, (N.D.Ill. February 12, 2007) (materiality shown through consumer declarations and complaints)[10]

> 7. Defendants point to consumer commentators who did not purchase because of a misrepresentation, but who instead wanted instant coffee, were indifferent to instant vs. ground, or were simply interested in a lower priced product (Doc. 138 at p. 13 of 26)

Even if the foregoing is true, the existence of some people who fit the foregoing categories does not preclude class certification. Judge Posner's most recent pronouncement in *Butler v. Sears* reaffirms that a class may be certified even though the initial definition includes members who have not been injured or do not wish to pursue claims against the defendant. See Exhibit A at p. 4.[11] Nonetheless, any satisfied consumers could opt out of the class action.

> § The class definition, however, includes consumers who purchased Grove Square Coffee before and after Defendants changed the package label to include the descriptive term "instant" and includes online purchases. . . These class members were subject to very different representations. The facts, therefore, are not common. (Doc. 138 at p. 20 of 26)

---

[10] See *Hitt v. Arizona Bev. Co., LLC*, 2009 U.S. Dist. LEXIS 16871, at *16-19 (S.D. Cal. Feb. 4, 2009) (permitting plaintiff "the opportunity to present evidence, such as a consumer survey, showing that [Defendant's] labeling and promotion is likely to deceive reasonable consumers")

[11] Although it appears the Court has concluded that there is a large group of consumers that fall into the foregoing categories, the evidence in the record suggests otherwise. "I am forwarding the link to the customer product comments based on the large number of negative reviews 42 of 44 and most of the comments extremely negative." (Doc. 99 at p. 17 of 45) The fabricated favorable reviews: "Guys – please go online this weekend and write up some good reviews on GSC on Amazon. Tell all your friends too. ☺.. I can help with language if needed." (Doc. 99 at p. 20 of 45) Amazon also noted in the same e-mail it would help with reviews on its end. Such conduct raises a red flag and calls into question whether the favorable reviews are in fact real.

Not all facts have to be the same in order to satisfy the commonality requirement of Rule 23. See *Butler v. Sears*, Exhibit A at p. 9 ("[T]he district court asked not for a showing of common questions, but for a showing of common answers to those questions. Rule 23(b)(3) does not impose such a heavy burden.")  Plaintiffs have already stated they will exclude the online purchasers from the subclass definition.  To the extent the Court believes that the change in the packaging from soluble to instant subjected class members to very different representations, Plaintiffs would request that the Court certify two subclasses in each state: those consumers that bought the original packaging with soluble and those that purchased packaging with the word instant.  See *Astiana v. Kashi* Co., 2013 U.S. Dist. LEXIS 108445 (C.D.Cal. July 30, 2013), discussed infra, wherein the court certified one subclass of all California residents who purchased Kashi Company's food products on or after August 24, 2007 in the State of California that were labeled "Nothing Artificial" and another subclass that purchased Kashi Company's food products on or after August 24, 2007 in the State of California that were labeled "All Natural")

Plaintiffs contend that Defendants substitution of the word instant for soluble did not alter the overall fraud because the same formulaic packaging was used and the fraud by omission – not calling out the product was 95% instant and that it did not contain a filter – was never cured.[12]  The fraud by omission remained constant regardless of which package class members purchased.  Nonetheless, certifying the two subclasses cures any issues relating to different representations.

> 9  Here, Plaintiffs seek injunctive relief because consumers are allegedly still being deceived by Grove Square Coffee packaging. . . Plaintiffs do not specify how the package should be rectified. (Doc. 138 at p. 23 of 26)

---

[12] Of course, both "soluble" and "instant" appeared in fine print on the package calling into further question whether any fraud was corrected. See *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (misleading claims on a food's label were not immunized by contrary information in fine print).

Defendants' own records showed that first time users of the product continued to be deceived by the product well into 2012. The deception was ongoing for two years. Plaintiffs sought injunctive relief because it is allowed under the various consumer protection statutes as long as the fraud is ongoing. Plaintiffs expressly stated in their class certification papers, the form of injunctive relief they sought: "As long as Defendants continue to market their GSCs, Plaintiffs seek an injunction requiring Defendants to call out the percentage of instant coffee on their packaging in large print and also alert consumers that the product does not contain a filter." (Doc. 99 at p. 24 of 45)  This change would rectify the fraud by omission of which Plaintiffs complain.[13]

>    10.    Have the class members seen the alleged misrepresentation?  Which version of the labeling did they see?  Did they notice the labeling?  What did they think the labeling text meant?  Did the packaging motivate their purchase?  Were they satisfied with the product?

Plaintiffs contend that Judge Posner's pronouncement in *Butler v. Sears* shows that the predominance inquiry needs to focus on the overriding qualitative issue of whether the packaging deceived, or was likely to deceive a consumer, the relative inquiries under the consumer fraud acts and not on these ancillary issues. He explained:

> Sears thinks that predominance is determined simply by counting noses: **that is, determining whether there are more common issues or more individual issues, regardless of relative importance. That's incorrect. An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment.** *Wal Mart Stores, Inc. v. Dukes, supra,* 131 S. Ct. at 2551. That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case). **But predominance requires a qualitative assessment too; it is not bean counting.**

Exhibit A at pp. 8-9. (bold and underline added)

---

[13] The Court may also "carve out" Plaintiff's monetary claims for certification under Rule 23(b)(3) while certifying Plaintiff's injunctive relief claims under Rule 23(b)(2). See *Aho v. Americredit Fin. Servs.,* 2011 U.S. Dist. LEXIS 80426, at *18-21 (S.D. Cal. July 25, 2011).

Here, the overriding predominant issues are whether Defendants fraudulently marketed the Grove Square product as a NBE. knowing in fact that it wasn't, and whether Defendants committed fraud by omission by not disclosing the absence of a filter with the product and the fact that the product was 95% instant. Indeed, to the extent that the state consumer protection statutes allow for exemplary damages for willful or intentional conduct on the part of Defendants, resolution of that issue will also clearly predominate.

F.    At a Minimum, the Court should certify the California[14] Subclasses

Plaintiffs call the Court's attention to the recent decision in *Astiana v. Kashi* Co., 2013 U.S. Dist. LEXIS 108445 (C.D.Cal, July 30, 2013), wherein the court refused to certify two nationwide classes under California law, but *sua sponte*, narrowed the proposed class definitions and instead certified two California state law classes. Several legal principles from that decision are applicable to the facts of this case, especially as it relates to the now proposed California subclasses.

As for whether the class was ascertainable, that court explained: "[T]he proposed class definition simply identifies purchasers of Defendant's products that included the allegedly material misrepresentations. Because the alleged misrepresentations appeared on the actual packages of the products purchased, there is no concern that the class includes individuals who were not exposed to the misrepresentation." Id. at * 10. Now that Plaintiffs propose excluding online sales from the class definition, and propose two subclasses for California – those consumers that purchased the packaging with soluble on it and those who purchased with instant on it, the subclasses fit the same parameters and are ascertainable.

Regarding the commonality requirement of Rule 23(a)(2) the court explained:

---

[14] The Court should also certify a New Jersey Class under the NJCFA because it also allows for a presumption of reliance.

Here, Plaintiffs have identified several legal and factual issues common to the putative class's claims, including whether the use of the term "Nothing Artificial" to advertise food products that contain the allegedly synthetic ingredients violates the UCL, FAL, CLRA, or Defendant's own warranties. By definition, all class members were exposed to such representations and purchased Kashi products, creating a "common core of salient facts." See *Ries*, 287 F.R.D. at 528. Courts routinely find commonality in false advertising cases that are materially indistinguishable from this matter. See *id.* at 537; *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 377 (N.D. Cal. 2010); *In re POM Wonderful LLC Marketing & Sales Practices Litig., No.* ML 10-02199, 2012 U.S. Dist. LEXIS 141150, 2012 WL 4490860, at *1 (C.D. Cal. Sept. 28, 2012) (certifying a class in an action alleging violations of the UCL, FAL, and CLRA arising out of marketing re regarding the health benefits of Pom Wonderful brand pomegranate juice). "[V]ariation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality." *Ries*, 287 F.R.D. at 537.

2013 U.S. Dist. LEXIS 108445 at * 16-17. (bold and underline added)

Here, the Court did not find typicality based in part on its assumption that "[e]ach class member's understanding of 'soluble' and 'microground,' each class member's expectations when he or she purchased Grove Square Coffee is at issue." (Doc. 138 at p. 21 of 26) The court in *Astiana v. Kashi* Co. rejected similar assertions from that defendant.

Defendant argues that the differences in Plaintiffs' perceptions and knowledge about Kashi products, as well as differences in their preferences and reasons for purchasing Kashi products, render them atypical of the proposed classes. "In determining whether typicality is met, the focus should be 'on the defendants' conduct and the plaintiffs' legal theory,' not the injury caused to the plaintiff." *Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005). Moreover, "individual experience with a product is irrelevant" because "the injury under the UCL, FAL and CLRA is established by an objective test. Specifically, this objective test states that injury is shown where the consumer has purchased a product that is marketed with a material misrepresentation, that is, in a manner such that 'members of the public are likely to be deceived.'" *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 534 (C.D. Cal. 2011).[15]

---

[15] A 'reasonable consumer' standard applies when determining whether a given claim is misleading or deceptive. A 'reasonable consumer' is 'the ordinary consumer acting reasonably under the circumstances,' and 'is not versed in the art of inspecting and judging a product, in the

2013 U.S. Dist. LEXIS 108445 at * 18-19 (bold and underline added).

The court further explained:

Relief under any of the UCL's three prongs is available "without individualized proof of deception, reliance and injury," so long as the named plaintiffs demonstrate injury and causation. *Mass. Mut. Life Ins. Co. v. Sup. Ct.*, 97 Cal. App. 4th 1282, 1289, 119 Cal. Rptr. 2d 190 (2002); *Tobacco II, 46 Cal.4th at 326-27.* "The UCL and false advertising law are both intended to preserve fair competition and protect consumers from market distortions," meaning that "in the eyes of the law, a buyer forced to pay more than he or she would have is harmed at the moment of purchase." *Kwikset*, 51 Cal.4th at 331, 334.

The CLRA is to be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Cal. Civ. Code § 1760*. Relief under the CLRA is available to "any consumer who suffers any damage as a result of the use or employment" of any unlawful "method, act, or practice." *Cal. Civ. Code § 1780(a)*. Such damage may result "through the materiality" of an alleged omission. See *Parkinson v. Hyundai Mot. Am., 258 F.R.D. 580, 595-96 (C.D. Cal. 2008)*. Upon a sufficient showing at the certification stage, whether an omission is "material[ ]" presents a "common question of fact suitable for treatment in a class action." *Mass. Mut.*, 97 Cal. App. 4th at 1294; *Stearns*, 655 F.3d at 1022 (holding that materiality is established "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question") (quoting *Steroid Hormone Prod. Cases, 181 Cal.* App. 4th 145, 155-56, 104 Cal. Rptr. 3d 329 (2010)).

2013 U.S. Dist. LEXIS 108445 at * 16-17.[16]

G.   An Unjust Enrichment/Restitution Class is Warranted

The Court wrote that if certified an unjust class of purchasers of GSCs "without showing reliance, deception, excessive price, or other indicia that the benefit received by the Defendant was indeed unjust, the class would sweep in a large number of individuals who could not have

---

process of its preparation or manufacture,'" quoting 1A CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES (4th ed. 2004), § 5:17, p. 5-103

[16] *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 256 ("[A] fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a 'reasonable [consumer]' would deem it important in determining how to act in the transaction at issue.")

been harmed by Defendant's conduct." (Doc. 138 at p. 17 of 26)[17]  A court awarding restitution under the California consumer protection laws has "'very broad' discretion to determine an appropriate remedy award as long as it is supported by the evidence and is consistent with the purpose of restoring to the plaintiff the amount that the defendant wrongfully acquired." *Wiener v. Dannon Co.*, 255 F.R.D. 658, 670-71 (C.D. Cal. 2009).  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 n. 13 (9th Cir. 2009) ("One might even say that, in effect, California has created to what amounts to a conclusive presumption that when a defendant puts out tainted bait and a person sees it and bites, the defendant has caused an injury; restitution is the remedy.")[18]

H.   *Shady Grove Orthopedic Associates v. Allstate Insurance Co., 130 S. Ct. 1431 (2010) Alleviates any federalism Concerns the Court Should Have*

The Court cites to *In re Bridgestone/Firestone, Inc.* 288 F.3d 1012 (2002) as support for its contention that this action will wrest hundreds of thousands of claims from state court. (Doc. 138 at p. 25 of 26)  Of course, that decision predates the passage of the Class Action Fairness Act ("CAFA") which expressly contemplated that certain class actions would be heard in federal court.  While the Court notes that neither the Alabama nor the Tennessee consumer protection statutes authorize private citizens to prosecute class actions, the Court ignores the Supreme Court's holding in *Shady Grove* which held that a state law was procedural and did not trump Federal Rule of Civil Procedure 23 which provides the requirements for bringing a class action in federal court.

---

[17]  Plaintiffs contend they have made such a showing as Defendants charged 60 cents per serving for instant coffee that was worth approximately 5 cents per serving.

[18]  See *Zeisel v. Diamond Foods, Inc.*, 2011 U.S. Dist. LEXIS 60608, 2011 WL 2221113, at *10 (N.D. Cal. June 07, 2011) (accepting plaintiff's contention for class certification purposes that "he will be able to prove the proper amount of restitution by relying on documents produced by [defendant] relating to net sales, profits, and costs, as well as retail prices of" the products at issue).  Plaintiffs submitted similar documents they had received from Defendants in order to calculate their damages related to unjust enrichment.

Respectfully submitted,

By:___/s/ Peter H. Burke_____
Peter H. Burke

**OF COUNSEL:**
J. Allen Schreiber, Esq.
W. Todd Harvey, Esq. ASB 3215-E64W
BURKE HARVEY & FRANKOWSKI, LLC
2151 Highland Avenue, Suite 120
Birmingham, Alabama 35205
Telephone:  (205) 930-9091
Facsimile:  (205) 930-9054
E-Mail:  pburke@bhflegal.com
        tharvey@bhflegal.com
*Attorneys for Plaintiffs Richard Mcmanus,*
*Edna Avakian, Charles Cardillo, Ben Capps,*
*Deborah Dibenedetto, and Carol J. Ritchie*

Patrick C. Cooper
James Ward
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, Al 35209
*Attorney for Plaintiff Edna Avakian*

Randy L. Gori
D. Todd Mathews
GORI, JULIAN AND ASSOC, P.C.
156 N. Main Street
Edwardsville, IL 62025
*Attorney for Plaintiff Linda Suchanek*

B. J. Wade
SKOUTERIS AND MAGEE, PLLC
Morgan Keegan Tower
50 N. Front Suite 920
Memphis, TN 38103
*Attorney for Plaintiff Carol Carr*

Michael H. Maizes
MAIZES & MAIZES LLP
2027 Williamsbridge Road, 2nd Floor
Bronz, NY 10461-1630
*Attorney for Plaintiff Paula Gladstone*

21

## CERTIFICATE OF SERVICE

I do hereby certify that on the 5th day of September, 2013, I served the foregoing via the Court's CM/ECF which will send notification to the following:

Michael Conway
Rebecca R. Hanson
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
*Attorneys for Defendants Sturm Foods, Inc.*
*and TreeHouse Foods, Inc.*

/s/ Peter H. Burke
Of Counsel

22

# EXHIBIT

# "A"

In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-8029, 12-8030

LARRY BUTLER, *et al.*, individually and on behalf of all others
similarly situated,

*Plaintiffs-Appellants, Cross-Appellees,*

*v.*

SEARS, ROEBUCK AND CO.,

*Defendant-Appellee, Cross-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 06 C 07023, 07 C 00412, 08 C 01832 —
Sharon Johnson Coleman, *Judge.*

On Remand from the Supreme Court of the
United States, No. 12-1067

SUBMITTED JULY 8, 2013 — DECIDED AUGUST 22, 2013

Before POSNER, RIPPLE, AND HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* The Supreme Court has vacated
our judgment in this class action suit (reported at 702 F.3d

359 (7th Cir. 2012)) and remanded the case to us for reconsideration in light of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). *Sears, Roebuck & Co. v. Butler*, 133 S. Ct. 2768 (2013) (mem.).

This suit, a diversity suit based on the breach-of-warranty laws of six states, is really two class actions because the classes have different members and different claims, though both arise from alleged defects in Kenmore-brand Sears washing machines sold in overlapping periods beginning in 2001 and 2004. One class action complains of a defect that causes mold (the "mold claim"), the other of a defect that stops the machine inopportunely (the "control-unit claim"). The district court denied certification of the class complaining about the defect that causes mold and granted certification of the class complaining about the defect that causes the sudden stoppage. The plaintiffs asked us to reverse the denial, and we did so; Sears asked us to reverse the grant, and we refused.

Sears asks us to remand the case to the district court for a fresh ruling on certification in light of *Comcast*, or alternatively to deny certification in both class actions. The plaintiffs ask us to reinstate our judgment, granting certification in both.

Sears' request for a remand to the district court is based to a significant degree on new evidence that has come to light since the district court ruled on certification in September 2011. But the case remains pending in the district court, and, as Sears itself emphasizes, rulings on certification in class action suits are tentative and can be revisited by the district court as changed circumstances require. Fed. R. Civ. P. 23(c)(1)(C); Advisory Committee Notes to 1966 Amend-

ment of Rule 23(c)(1); *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1202 n. 9 (2013); *Johnson v. Meriter Health Services Employee Retirement Plan*, 702 F.3d 364, 370 (7th Cir. 2012). What could it mean to remand a case to a court before which the case is pending?

The question presented by the Supreme Court's remand is one of law—whether the *Comcast* decision cut the ground out from under our decision ordering that the two classes be certified. There is no point in delaying our decision on remand to await consideration by the district court of factual issues that may be moot on the basis of the *Comcast* decision.

The claim in the mold class action is that because of the low volume and temperature of the water in the front-loading machines compared to its volume and temperature in the traditional top-loading machines, they don't clean themselves adequately and as a result mold accumulates that emits bad odors. Traditional household cleaners do not eliminate the molds or the odors. Roughly 200,000 of these Kenmore-brand machines are sold each year and there have been many thousands of complaints of bad odors by the machines' owners.

Sears contends that Whirlpool (the manufacturer of the washing machines) made a number of design modifications, and as a result different models are differently defective; Sears does not contend that any of the design changes eliminated the odor problem, only that they diminished it. The basic question presented by the mold claim—are the machines defective in permitting mold to accumulate and generate noxious odors?—is common to the entire mold class, although damages are likely to vary across class members (the owners of the washing machines). A class action is the

efficient procedure for litigation of a case such as this, a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost to any one of them large enough to justify the expense of an individual suit. A determination of liability could be followed by individual hearings to determine the damages sustained by each class member. The parties probably would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines. In that event the hearings would be brief; indeed the case would probably be quickly settled.

We added that if it turned out as the litigation unfolded that there were large differences in the mold problem among the differently designed washing machines, the district judge might decide to create subclasses (and for the further reason that Sears' liability might vary across the states embraced by the class action because of differences among those states' laws), but that this possibility was not an obstacle to certification of a single mold class at the outset.

Sears argued that most members of the plaintiff class had not experienced any mold problem. But if so, we pointed out, that was an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate Sears—a course it should welcome, as all class members who did not opt out of the class action would be bound by the judgment.

The second class action involves a computer device that gives instructions to a washing machine's various moving parts. In 2004 the company that supplied these control units in Kenmore washing machines altered its manufacturing process in a way that caused some control units mistakenly

to "believe" that a serious error had occurred and therefore to order the machine to shut down, though actually there had been no error. The plaintiffs allege that Sears knew about the problem yet charged each owner of a defective machine hundreds of dollars to repair the central control unit, and that after the defect was corrected in 2005, Sears continued to ship machines containing the earlier-manufactured, defective units.

The principal issue in the control-unit class action is whether the control unit is indeed defective. The only individual issues concern the amount of harm to particular class members, and we pointed out that it was more efficient for the principal issue—common to all class members—to be resolved in a single proceeding than for it to be litigated separately in hundreds of different trials. But we added that, as with the mold class action, the district court would want to consider whether to create different subclasses of the control unit class for the different states because of different state laws.

So how does the Supreme Court's *Comcast* decision bear on the rulings, just summarized, in our first decision?

*Comcast* holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges. *Comcast* was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable

to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." 133 S. Ct. at 1433. "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages. *Id.* at 1434 (emphasis added). "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof*)." *Id.* (emphasis added). And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, *Reference Manual on Scientific Evidence* 432 (3d ed. 2011), that "the first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." (emphasis the Court's). None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from…[the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'" 133 S. Ct. at 1430.

Unlike the situation in *Comcast*, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

Sears argues that *Comcast* rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." 702 F.3d at 362.

Nos. 11-8029, 12-8030                                    7

But in support of its argument Sears cites only the statement in the *dissenting* opinion in *Comcast* that "economies of time and expense" favor class certification, 133 S. Ct. at 1437—a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority *must* disapprove of.

Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in *Comcast*. But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact—the injury—of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

Furthermore and fundamentally, the district court in our case, unlike *Comcast*, neither was asked to decide nor did decide whether to determine damages on a class-wide basis. As we explained in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491–92 (7th Cir. 2012), distinguishing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), a class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed. See Advisory Committee Notes to 1966 Amendment of Rule 23(b)(3); *Pella Corp. v. Saltzman*, 606 F.3d 391, 393–94 (7th Cir. 2010) (per curiam).

But if we are right that this is a very different case from *Comcast*, why did the Supreme Court remand the case to us for reconsideration in light of that decision? The answer must lie in the emphasis that the majority opinion places on the requirement of predominance and on its having to be satisfied by proof presented at the class certification stage rather than deferred to later stages in the litigation. See 133 S. Ct. at 1432–33. The Court doesn't want a class action suit to drag on for years with the parties and the district judge trying to figure out whether it should have been certified. Because the class in *Comcast* was (in the view of the majority) seeking damages beyond those flowing from the theory of antitrust injury alleged by the plaintiffs, the possibility loomed that "questions affecting only individual members" of the class would predominate over questions "common to class members," rather than, as Rule 23(b)(3) requires, the reverse.

Sears argued passionately in its petition for certiorari that we had failed to make a sufficiently rigorous inquiry into predominance in allowing the two classes (the mold class and the control-unit class) to be certified. The petition was filed before the Supreme Court issued its decision in *Comcast*, and the Court may have felt that Sears should be allowed to amend its submission in light of *Comcast* and submit its amended argument to us in the first instance.

Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance. That's incorrect. An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment. *Wal-*

*Mart Stores, Inc. v. Dukes*, *supra*, 131 S. Ct. at 2551. That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case). But predominance requires a qualitative assessment too; it is not bean counting. In *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, *supra*, 133 S. Ct. at 1196, the Court said that the requirement of predominance is not satisfied if "individual questions…overwhelm questions common to the class," and in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997), it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." And in *In re Inter-Op Hip Prosthesis Liability Litigation*, 204 F.R.D. 330, 345 (N.D. Ohio 2001), we read that "common issues need only predominate, not outnumber individual issues." Or as we put it in *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 819 (7th Cir. 2012), "Under the district court's approach [which our decision in *Messner* rejected], Rule 23(b)(3) would require not only common evidence and methodology, but also common results for members of the class. That approach would come very close to requiring common proof of damages for class members, which is not required. To put it another way, the district court asked not for a showing of common questions, but for a showing of common answers to those questions. Rule 23(b)(3) does not impose such a heavy burden."

It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the dam-

ages of individual class members can be readily determined
in individual hearings, in settlement negotiations, or by crea-
tion of subclasses, the fact that damages are not identical
across all class members should not preclude class certifica-
tion. Otherwise defendants would be able to escape liability
for tortious harms of enormous aggregate magnitude but so
widely distributed as not to be remediable in individual
suits. As we noted in *Carnegie v. Household Int'l, Inc.*, 376 F.3d
656, 661 (7th Cir. 2004), "the more claimants there are, the
more likely a class action is to yield substantial economies in
litigation. It would hardly be an improvement to have in lieu
of this single class 17 million suits each seeking damages of
$15 to $30.... The *realistic* alternative to a class action is not
17 million individual suits, but zero individual suits, as only
a lunatic or a fanatic sues for $30" (emphasis in original).
The present case is less extreme: tens of thousands of class
members, each seeking damages of a few hundred dollars.
But few members of such a class, considering the costs and
distraction of litigation, would think so meager a prospect
made suing worthwhile.

There is a single, central, common issue of liability:
whether the Sears washing machine was defective. Two sep-
arate defects are alleged, but remember that this class action
is really two class actions. In one the defect alleged involves
mold, in the other the control unit. Each defect is central to
liability. Complications arise from the design changes and
from separate state warranty laws, but can be handled by the
creation of subclasses. See, e.g., *Johnson v. Meriter Health Ser-
vices Employee Retirement Plan, supra*, 702 F.3d at 365 (10 sub-
classes). These are matters for the district judge to consider
in the first instance, and Sears will be able to present to her

the evidence it's obtained since the district judge ruled on certification almost two years ago.

One last point. Shortly before our original decision, the Sixth Circuit had upheld the certification of a single mold class in a case identical to this one (the defendant, Whirlpool, was the manufacturer of the defective Kenmore-brand washing machines), except that it did not involve the other claim in our case, the control unit claim. *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, 678 F.3d 409 (6th Cir. 2012). Whirlpool sought certiorari, and the Supreme Court granted it, vacated the court of appeals' judgment, and remanded the case, just as in our case. 133 S. Ct. 1722 (2013) (mem.). On remand the Sixth Circuit, denying as we have done the defendant's motion to remand to the district court, and interpreting *Comcast* as we do, concluded that the requirement of predominance had been satisfied. *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, No. 10-4188, 2013 WL 3746205, at *2, *16–19 (6th Cir. July 18, 2013). The concordance in reasoning and result of our decision and the Sixth Circuit's decision averts an intercircuit conflict.

Our judgment of November 13, 2012, is hereby reinstated.

# TAB

# "5"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RICHARD MCMANUS, EDNA AVAKIAN, CHARLES CARDILLO, BEN CAPPS, DEBORA DIBENEDETTO, and CAROL J. RITCHIE, et al. | ) ) ) ) ) ) | CIVIL NO. 11-565-GPM |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| STURM FOODS INC., and TREEHOUSE FOODS, INC., | ) ) ) | |
| Defendants. | ) ) | |

# MEMORANDUM AND ORDER

**MURPHY, District Judge:**

On April 15, 2013 the Court heard argument on Plaintiffs' pending motion for class certification. (Doc. 99).   Plaintiffs claim that Defendant Sturm Foods, a dry grocery manufacturer and distributor, and Defendant Treehouse, as Sturm's sole owner, violated the consumer protection statutes and unjust enrichment laws of the eight named states with regard to their Grove Square Coffee single serving coffee product (Doc. 53).   Per the amended complaint, Defendants misrepresented and omitted the true nature of Grove Square Coffee products by indicating the product contained fresh ground coffee and a filter rather than "instant" or "soluble" coffee (Doc. 53).   Plaintiffs now seek certification of a class consisting of:

> All persons or consumers that during the Class Period – from September of 2010, until and including the present who purchased in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee Defendants' Grove Square Coffee ("GSQ") products.   Excluded from the class are: (a) Defendants' Board members of executive-level officers, including its

attorneys; (b) persons or entities who purchased the GSQ primarily for resale; (c) retailers or re-sellers of the GSQ; (d) governmental entities; and (e) any consumer that already received a refund from Defendants.

(Doc 99, p. 25-26).   After consideration of all the parties' papers and arguments, the motion is

**DENIED**.

## A. **Class Certification Standard**

To be certifiable, a class must first be definable, and then meet the requirements of numerosity, commonality, typicality, and adequacy. *See* FED. R. CIV. P. 23(a); *Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir. 1977).   If the action meets those requirements, it must also fall within one of the three enumerated Rule 23(b) categories.   *Spano v. The Boeing Co.,* 633 F.3d 574, 583 (7th Cir. 2011) ("(1) a mandatory class action (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior.").

Although the courts have broad discretion in deciding whether a proposed class satisfies Rule 23 requirements and should err in favor of maintaining class actions, the burden of proof falls to the party seeking class certification.   *Trotter v. Klincar,* 748 F.2d 1177, 1184 (7th Cir. 1984); *Arreola v. Godinez,* 546 F.3d 788, 794 (7th Cir. 2008); *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012).   The plaintiff must "establish (not merely allege) that the elements of Rule 23(a) are met." *Howland v. First American Title Ins. Co.,* 672 F.3d 525, 528 (7th Cir. 2012).   Class certification is a rigorous analysis in which courts may look beyond the pleadings to considerations that are "enmeshed with the merits of the claim" to determine if Rule 23's requirements are met, *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1429 (2013); while at the same time avoiding a "dress rehearsal on the merits." *Messner,* 669 F.3d at

811.

## B. __Definiteness__

The Court must first ensure that the class is sufficiently "defined." *Jamie S. v. Milwaukee Public Schools*, 688 F.3d. 481, 493 (7th Cir. 2012) ("a class must be sufficiently definite that its members are ascertainable."). The class should be "ascertainable," which it is if the court can determine membership with objective criteria. *Jamie S. v. Milwaukee Public Schools,* 668 F.3d 481, 493 (7th Cir. 2012). A class is, on the other hand, overbroad if it sweeps in a great number of members who "for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Messner,* 669 F.3d 802 at 824; *Kohen v. Pacific Inv. Management Co. LLC,* 571 F.3d 672, 677 ( 7th Cir. 2009) ("a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant."); *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 514 (7th Cir. 2006) (denying class certification when "[c]ountless members of Oshana's putative class could not show any damage, let alone damage proximately caused by Coke's alleged deception.").

A class is overbroad if it sweeps in many members who *could not have been harmed at all*:

> This distinction is critical for class certification purposes. . . [I]f a proposed class consists largely (or entirely, for that matter) of members who are ultimately shown to have suffered no harm, that may not mean that the class was improperly certified but only that the class failed to meet its burden of proof on the merits. If, however, a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.

*Messner,* 669 F.3d at 824 (internal citations omitted). The class cannot, then, include numerous people who have no claim at all. For example, in *Oshana,* the Seventh Circuit confirmed that a putative class was not sufficiently definite when the class definition could include millions of

Page 3 of 26

people who were not injured.   472 F.3d at 513.   The plaintiff in *Oshana* sued Coca-Cola for,

*inter alia,* violation of Illinois's Deceptive Practices Act, violation of which requires a plaintiff to

have been deceived and harmed by that deception.   *Id.* at 513-14.   The Seventh Circuit noted:

> Such a class could include millions who were not deceived and thus have no
> grievance under the [Act].   Some people may have bought fountain Diet Coke
> *because* it contained saccharin, and some people may have bought fountain Diet
> Coke *even though* it had saccharin.   Countless members of Oshana's putative
> class could not show any damage, let alone damage proximately caused by
> Coke's deception.

*Id.* at 514 (emphasis in original) (The Court found the putative class failed to show 'typicalility'

for the same reasons).

### 1.  Definiteness of the Consumer Protection State Law Claims

Plaintiffs have moved for certification of eight subclasses, each comprised of class

members bringing claims under their respective state consumer protection and unjust

enrichment laws.   (Docs 99, p. 25-26; 111-1).   Determining whether these classes are

overbroad requires inquiry into the recovery requirements under the individual state law

claims.

The Court finds that under the state consumer protection laws requiring causation or

actual reliance, the Plaintiffs' class definitions are overbroad.   The class definition

includes all individuals who purchased a Grove Square Coffee product.   This definition

necessarily includes purchasers who knew, or who were indifferent to the product's

insoluble coffee content.   For those purchasers, Plaintiffs cannot prove causation,

reliance, or actual injury from Defendants' alleged misrepresentation.   For this reason

Plaintiffs' claims under Alabama, New York, New Jersey, North Carolina, Illinois, and

South Carolina are overbroad and improper for class certification.

California and New Jersey, on the other hand, permit a class-wide presumption of reliance or causality for class certification purposes in limited circumstances.   Consequently, certification for subclasses under these states laws requires more thorough analysis, as follows. After examination, however, the Court finds it cannot presume reliance or causation under either state's jurisprudence—both the New Jersey and California class definitions are also overbroad.

### a.   California and New Jersey

Plaintiffs seek relief under the California's Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §17200, and False Advertising Law ("FAL"), California Business & Professional Code, §17500.   "The CLRA establishes a statutory remedy for unfair methods of competition and unfair or deceptive acts . . . which results in the sale of goods to a consumer."   *Gonzales v. Proctor and Gamble Co.*, 247 F.R.D. 616, 624 (S.D. Cal. 2007).   The UCL prohibits any business practice that is unlawful (forbidden by law), unfair (harm brought to the victim outweighs any benefit), or fraudulent (is likely to deceive members of the public).   *Gonzales*, 247 F.R.D. at 625.   The FAL makes advertising products or services by "untrue or misleading" statements unlawful.   Violations of the FAL are also unfair competition under the UCL.   *Gonzales*, 247 F.R.D. at 625 .

Under §17204 of the UCL, a private individual may bring suit only if he or she has "suffered injury in fact and has lost money or property as a result of the unfair competition. Similarly, the FAL requires an actual economic loss caused by the Defendant's conduct, and the CLRA requires each class member to have an actual injury caused by the unlawful practice. *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 537-38 (N.D. Cal. 2012).   So, the private rights of action under each of the statutes requires plaintiffs to prove an actual loss, but allow a

class-wide presumption of actual loss if the defendant's alleged misrepresentations were material and made to the entire class.   An inference of reliance may be established on a class wide basis with a showing of materiality.   *Id.* ("As with the UCL and FAL, under the CLRA, '[c]ausation, on a class-wide basis, may be established by materiality.   If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class.'"); *see also Davis-Miller v. Automobile Club of Southern California*, 201 Cal.App.4th 106, 121 (2011) (The CLRA "requires that plaintiffs show . . . not only that a defendant's conduct was deceptive but that the deception caused them harm. Causation, on a class-wide basis, may be established by materiality."). 'Materiality' is objective and exists if a "reasonable man would attach importance to [the misrepresentation's] existence or nonexistence in determining his choice of action in the transaction in question." *In re Tobacco II Cases*, 46 Cal.4th 298, 326-27 (Cal. 2009).

The inference of reliance is only appropriate if all purported class members were exposed to the alleged misleading advertising. *Davis-Miller*, 201 Cal.App.4th at 121 ("we do not understand the UCL to authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice."); *Pfizer Inc. v. Superior Court*, 182 Cal.App.4th 622 (2010) (denying class certification when a large number of class members were never exposed to the misleading product labeling and advertisement).

In general, purchasers of a product labeled with the alleged misrepresentation have necessarily been exposed, but all products must have contained the misrepresentation. *Contrast Ries*, 287 F.R.D. at 537 ("by definition, all class members were exposed to such

representations") *and Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 365 (granting class certification when all beverage bottles falsely represented that they were bottled in New Mexico) *with Pfizer*, 182 Cal.App.4th at 622 (denying class certification when many of the products' labels did not include the alleged misrepresentation).

To presume exposure on the basis of an advertising campaign, it must have been "extensive and long term." *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 596 (9th Cir. 2012); *In re Pom Wonderful LLC.*, No. ML 10-02199 DDP, 2012 WL 4490860, at *5 (C.D. Cal. Sep. 28, 2012) (Given the wide geographical scope over which [the defendant] disseminated its health claims [the alleged deceptive advertisement] and the apparent success of Pom's marketing efforts [referring to 90% of class members surveyed who cited health claims as their primary reason for purchase of Pom] . . . reliance can be inferred."): *Davis-Milller*, 201 Cal.App.4th at 115 (upholding the trial court's determination that "sporadic and limited advertising" cannot create a presumption that the misrepresentation was made to the entire class); *In re Tobacco II Cases*, 46 Cal.4th at 327-28 (noting the tobacco companies engaged in long term "saturation" marketing).

Plaintiffs' current class definition includes individuals who were not exposed to Defendants' alleged misrepresentation; therefore the Court cannot presume reliance. The amended complaint and motion for class certification allege that the Defendants' use of the word "soluble" rather than "instant," package design, and store placement were deceptive. (Doc. 99 p. 9-11; Doc 53 p. 5-7). Defendants also reference an "online marketing campaign," but provide little detail and no proof that named Plaintiffs were exposed to digital marketing. (Doc 99 p. 19; Doc 99 p. 41).

Some purchasers in retail locations, like consumers in *Chavez* and *Ries*, were necessarily exposed to the advertisement on the packaging.   *Ries*, 287 F.R.D. at 537; *Chavez*, 268 F.R.D. at 365.   However, this is not so for many purchasers.   In 2011 Sturm Foods changed its label to include the word "instant."   (Doc. 108, p. 14).   Class members that were exposed to the packaging after this date (nearly 4 million dollars of gross sales; a vast majority of the overall sales during the class period, (Doc 101-13, p. 1092)) were not exposed to what Plaintiffs claim was Defendants' primary deception.   A fraudulent advertising campaign need not "consist of a specifically-worded false statement repeated to each and every [member] of the plaintiff class." *In re Pom Wonderful LLC.*, 2012 WL 4490860, at *4.   Nevertheless, there is a difference between a Defendant "simply altering the wording or format of his misrepresentation" in order to "escape much of his liability," *Id.*, and a Defendant substantially altering the representation to fix what Plaintiffs allege is fraudulent.   *See Mazza*, 666 F.3d at 596 (finding a class overbroad the court stated: "while Honda might have been more . . . diligent in disclosing the limitations of the CMBS system, its advertising materials do not deny that limitations exist.   A presumption of reliance does not arise when class members were exposed to quite disparate information from various representatives of the Defendant.")

Moreover, the record indicates that extensive sales occurred online, and the class as defined by Plaintiffs includes these online purchasers.   (Doc 113, p. 4) (5,973 units sold on Amazon); (Doc 53, p. 5) (Sturm also sells products through E-Bay and discountcoffee.com). Like the class members in *Pfizer* who purchased mouthwash bottles that did not contain the "as good as floss" misrepresentation, consumers who purchased the product after the packaging change, or bought the product online without ever seeing the packaging or product placement,

could not have been exposed to the alleged misrepresentation prior to purchase.   *Pfizer*, 182 Cal.App.4th 622 (2010).

Plaintiffs' amended complaint does not contain sufficient evidence of an "extensive and long term" advertising campaign such that a presumption of exposure is appropriate.   There is no decades-long market saturation here.   *See In re Tobacco II Cases*, 46 Cal.4th at 327-28.   No named Plaintiff indicates he or she was exposed to Defendants' online marketing.   (Doc. 108, p. 28).   Since the Court cannot presume that most purchasers were exposed to the alleged misrepresentation, materiality cannot be presumed and Plaintiffs cannot adequately allege actual injury for the California class.   *Davis-Miller*, 201 Cal.App.4th at 125 ("An inference of class-wide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class.").

Similarly, in New Jersey, in order to state a private claim under the New Jersey Consumer Fraud Act ("NJCFA"), a consumer must allege three elements: unlawful conduct; an ascertainable loss; and a causal relationship between the unlawful conduct and the ascertainable loss.   *Heyert v. Taddese*, 2013 WL 3184626 at *13 (N.J.App. June 25, 2013).

New Jersey draws a distinction between reliance and causation.   *Heyer*, 2013 WL 3184626, at *13, *citing Lee v. Carter-Reed Co., L.L.C.,* 203 N.J. 496, 522 (2010) ("Causation under the CFA is not the equivalent of reliance. To establish causation, a consumer merely needs to demonstrate that he or she suffered an ascertainable loss 'as a result of' the unlawful practice.").   Reliance is not required for recovery under the CFA, but causation is.   Dabush v. Mercedes-Benz USA, LLC, 874 A.2d 1110, 1121 (App. Div. 2005) ("While the element of traditional reliance required in a fraud case need not be proven in order to recover damages under

the CFA, a private plaintiff must still "prove a causal nexus between the alleged [misrepresentation]" and his or her damages.").

"Courts have generally found causation to be established for CFA purposes when a plaintiff has demonstrated a direct correlation between the unlawful practice and the loss, but have rejected proofs of causation that were speculative or attenuated." *Heyer*, 2013 WL 3184626, at *13; *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248 ("In cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages."); *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.* 192 N.J. 372, 389 (2007) ("Our statute essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss.").

New Jersey courts apply a class-wide presumption of causation in very limited circumstances. *Varacallo v. Massachusetts Mut. Life Ins.* Co., 752 A.2d 807, 809 (N.J. Super. Ct. App. Div. 2000); *see Local No. 68 Welfare Fund*, 192 N.J. at 392, (rejecting plaintiff's attempt to use a quasi-fraud on the market theory "in place of a demonstration of an ascertainable loss or in place of proof of a causal nexus between defendant's acts and the claimed damages."). "Before applying a 'presumption of causation' to an NJCFA claim, a court must consider not only the defendants' course of conduct, but also that of the plaintiffs." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 610 (3d Cir. 2012). Specifically, the court must consider whether plaintiff could have known the truth underlying the defendant's fraud. *Marcus*, 687 F.3d at 610 ("there was no evidence that class members could have known the truth behind the defendant's representations

and it was "inconceivable" that 'more than a very small number' would have purchased their policies despite knowing the risks that defendants allegedly concealed.").

Because Plaintiff's class potentially includes a great many individuals who bought Grove Square Coffee products because of, or in spite of, knowing that it contained instant coffee, the class includes a great number of individuals who could not prove causation or an ascertainable loss under the NJCFA.  These individuals suffered no lost value or incurred no "out of pocket expenses" as a result of the Defendant's alleged misrepresentation.  *Smith*, 2011 WL 900096, at *4.  Moreover, numerous class members could have known, appreciated, or easily learned that soluble coffee is distinct from ground coffee—precluding a presumption of causality.  *Marcus*, 687 F.3d at 610.  Since this class definition potentially sweeps in a great number of individuals that could not show harm resulting from defendant's conduct, the New Jersey class definition is fatally overbroad.

### b. **Illinois**

To prevail on a claim for damages under the Illinois Consumer Fraud and Deceptive Practices Act, a plaintiff must prove: (1) a deceptive act or practice by the defendant; (2) that the act or practice occurred in the course of conduct involving trade or commerce; (3) that the defendant intended the plaintiff to rely on the deception; and (4) that actual damages were proximately caused by the deception.  *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 850 (Ill.2005).  In order to prove proximate causation "in a cause of action for fraudulent misrepresentation brought under the Consumer Fraud Act, a plaintiff must prove that he or she was actually deceived by the misrepresentation".  *Martinez v. River Park Place, LLC*, 980 N.E.2d 1207, 1219 (Ill. App. 2012).  The plaintiff must show that but-for the defendant's

deception, plaintiff would not have made the (injurious) purchase. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). Illinois does not provide for causation to be inferred. *Clark v. Experian Info. Solutions, Inc.*, 256 Fed.Appx. 818, 822 (7th Cir. 2007).

Plaintiffs' class definition is premised solely on *purchase* of the allegedly misrepresented product (Doc. 99, p. 18). So, included are purchasers who never saw the allegedly deceptive advertising, or who knew the product was 'instant coffee' but purchased it anyway, or who bought the product *because* it was instant coffee. Plaintiffs counter that because purchasers 'must' own a Keurig coffee maker, all of the purchasers therefore 'must' have believed that the Grove Square Product was of the same kind and quality that he or she had purchased for their Keurig machines from Keurig-licensed companies (Doc. 99, p. 28) ("this distinct group of consumers expected a coffee product that contained ground coffee with a filter; not a product that was overwhelmingly instant in nature."). Plaintiffs point to the depositions of class representatives and consumer complaints. (Doc. 53, p. 6; Doc. 53, p. 7-20; Doc 99, p. 14).

This evidence, however does not solve the irreparably overbroad class definition. Of course, out of a sample consisting solely of individuals who have taken the time to post a complaint or become named plaintiffs to a lawsuit, many will have unmet expectations. The Court will not assume most—or many--purchasers (of which there were approximately 700,000) had the same experience or mindset of such a narrow sample. Deception/causation under ICFA is an individualized issue, and cannot be inferred by class representatives' mindset. *Clark*, 256 Fed.Appx. 818, 822 (7th Cir. 2007). Here, even the affidavits of named plaintiffs aren't consistent. For example, Plaintiff Deborah DiBenedetto indicates all she noticed about the product was the price. (Doc. 100-5, p. 5) Defendants point to consumer commenters who did

not purchase because of a misrepresentation, but who instead wanted instant coffee, were indifferent to instant vs. ground, or were simply interested in a lower priced product.   (Doc 108, p. 33) ("price great compared to K-cups;" "great value for the price;" "I have no problem with it being instant, if it tasted good").   As the Northern District of Illinois concluded in *Korsmo v. Am. Honda Motor Co., Inc.,* proposed class members who made purchases for reasons other than the alleged misrepresentation "were not deceived and suffered no harm, [therefore] the proposed classes are not sufficiently definite to warrant class certification of the ICFA claim or the unjust enrichment claim."   *Korsmo v. Am. Honda Motor Co., Inc.,* No. 11 C 1176, 2012 WL 1655969 at *5 (N.D. Ill. May 10, 2012)); *see also Thorogood v. Sears Roebuck and CO.*, 547 F.3d 742, 748 (7th Cir. 2008) (listing numerous reasons class members may have purchased an allegedly fraudulently advertised product apart from Defendant's representations).

As the proposed Illinois class includes a great number of improper class members, including those who "cannot show any damage, let alone damage proximately caused by [defendants'] alleged deception," the Illinois class is fatally overbroad.   *Oshana v. Coca-Cola Co., 472 F.3d 506, 514 (7th Cir. 2006).*

### c.   **Alabama**

A false statement or deceptive practice is not actionable under the Alabama Deceptive Trade Practices Act ("ADTPA") unless it causes the plaintiff actual damages.   Ala. Code § 8-19-10(a)(1985); *EBSCO Industries, Inc. v. LMN Enterprises, Inc.*, 89 F. Supp. 2d 1248, 1266 (N.D. Ala. 2000) (granting summary judgment for defendants on ADPTA claim based on earlier finding that no consumers were actually deceived by allegedly false advertising); *Billions v. White & Stafford Furniture Co.*, 528 So. 2d 878, 880 (Ala. Civ. App. 1988) (no ADTPA claim

where admittedly false statement did not cause damages).  As Plaintiffs' sweeps in a great number of individuals who could not have been harmed by Defendants' conduct, and is fatally overbroad.

### d.  New York

Plaintiffs seek relief under Section 349(h) and 350 of the New York General Business Law.  "A plaintiff under Section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."  *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611-12 (NY. 2000) (citations omitted).   In *Stutman* plaintiffs alleged that because of defendant's deceptive act, they were forced to pay a $275 mortgage prepayment fee that they had been led to believe was not required.   In other words, plaintiffs alleged that defendant's material deception caused them to suffer a $275 loss.   The court found that this allegation satisfied the causation requirement.  *Id*. at 612-13.   Showing causation is required, though showing actual reliance is not.  *Id.; Small v. Lorillard Tobacco Co., Inc.*, 720 N.E.2d 892, 897 (NY. 1999) ("proof that 'a material deceptive act or practice caused actual, although not necessarily pecuniary, harm' is required to impose compensatory damages."); *Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005)

Section 350 prohibits "[f]alse advertising in the conduct of any business." N.Y. Gen. Bus. Law § 350.   "In order to establish a claim under either section, a plaintiff must show '(i) that the act or practice was misleading in a material respect, and (ii) that the plaintiff was injured.'" *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 697 (2d Cir. 1994).   An injured person

has been defined as one who was misled or deceived by the alleged false advertisement. *McDonald v. N. Shore Yacht Sales, Inc.*, 513 N.Y.S.2d 590, 593 (NY 1987).

Like Section 349, Section 350 requires plaintiffs to show causation to recover. *Bevelacqua*, 39 Misc. 3d, at 1216 ("While justifiable reliance is not an element of a claim under either of these provisions, a plaintiff must, nevertheless, show that the defendant's material deceptive act caused the injury.") In *Bevalacqua,* the court dismissed the claim because of "plaintiffs' inability to establish a direct connection between their injury and [defendant]'s conduct. *Id.*

Here, Plaintiff's class almost certainly includes a great many individuals who bought Grove Square Coffee products because of, or in spite of, knowlege that it contained instant coffee. These purchasers are therefore not worse-off because of the alleged misrepresentation. Too many potential class members were not-mislead and/or not injured, so the class is fatally overbroad.

### c. North Carolina

Relief under the North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA) requires actual reliance. N.C. Gen. Stat. §77-1.1; *Williams v. United Cmty. Bank*, 724 S.E.2d 543, 549 (N.C. Ct. App. 2012). "Actual reliance is demonstrated by evidence [the] plaintiff acted or refrained from acting in a certain manner due to [the] defendant's representations." *Id.* (citing *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 662 (1995)) (inquiring into whether plaintiffs had actually seen alleged misrepresentations, and whether the misrepresentations played any role in their decision making).

Because the UDTPA unambiguously requires actual reliance, and because the proposed class likely includes great swaths of purchasers who did not rely on Defendants' alleged misrepresentation, the North Carolina class is also fatally overbroad.

### f.  South Carolina

Relief under the South Carolina Unfair Trade Practices Act (UTPA) requires plaintiff to show causation.   S.C. Code Ann § 39-5-140(a)(1985); *Fisher v. Pelstring*, 4:09-CV-00252-TLW, 2010 WL 2998474, at *17 (D.S.C. July 28, 2010) (Dismissing a UTPA claim, the court stated: "To recover under this statute plaintiffs must show actual causation. Because there is no causal relationship between the plaintiffs and defendant . . . the requisite proximate cause is absent.").   As above, the class is overly broad to meet a causation requirement.

### g.  Tennessee

To recover under the Tennessee Consumer Protection Act of 1977 ("TCPA"), a plaintiff must prove (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an "ascertainable loss of money or property. . . or thing of value." *Cloud Nine, LLC v. Whaley*, 650 F. Supp. 2d 789, 797-98 (E.D. Tenn. 2009).   The TCPA does not require reliance, but does require plaintiffs show "the defendant's wrongful conduct proximately caused their injury."   *Cloud Nine*, 650 F. Supp. 2d at 798.   Causation under the TCPA requires "that there be some direct relation between the injury asserted and the injurious conduct alleged." *Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.*, W199901061COAR9CV, 2000 WL 1390171, at *4, *6 (Tenn. Ct. App. Sept. 26, 2000).   For example, in *Harvey v. Ford Motor Credit*, a

Page 16 of 26

Tennessee appellate court found no causation when the "plaintiff [did] not allege that he would have refused to engage in the transaction had he known that some portion of his payment would go to the dealer (the alleged fraudulent omission). *Harvey v. Ford Motor Credit Co.*, 03A01-9807-CV-00235, 1999 WL 486894 (Tenn. Ct. App. July 13, 1999).

Plaintiffs here cannot show that this class would have refused to engage in the transaction had they known that the product was instant rather than ground coffee, so it too is too indefinite for certification.

### 2.  State Law Unjust Enrichment Overbreadth Analysis

In addition to state law fraud claims, Plaintiffs also seek relief for unjust enrichment. "Under a typical, but certainly not uniform, definition of unjust enrichment, a party may recover if he or she proves an unjust retention of a benefit, including money, by one party to the detriment of another party, against the fundamental principles of justice, equity, and good conscience."

If Plaintiff's class were certified to include all individuals who purchased Grove Square Coffee products, without showing reliance, deception, excessive price, or other indicia that the benefit received by the Defendant was indeed *unjust*, the class would sweep in a large number of individuals who *could not have been* harmed by Defendant's conduct. In *Cleary v. Philip Morris, Inc.*, the Seventh Circuit affirmed dismissal of an unjust enrichment claim based on deceptive marketing of tobacco when the proposed class consisted of "Illinois residents who bought or smoked cigarettes." 656 F.3d 511, 519 (7th Cir. 2011). The Court stated:

> According to the plaintiffs, the class of people with a valid unjust enrichment claim would include the consumer who bought cigarettes and was never injured in any manner by his purchase. It would include the consumer who was satisfied by his cigarette purchase and planned to continue purchasing cigarettes. It would include the consumer who would not have acted any differently had he been fully

Page 17 of 26

informed about cigarettes, but bought them anyway regardless of the defendants' marketing. It would include the consumer who was not deceived by the marketing because he was personally aware of the true nature of cigarettes, but still bought cigarettes despite their addictive and harmful nature—or even because of it.

*Id.* at 519. Similarly here, the proposed class includes members who could not have been harmed by Defendant's conduct, precluding certification.

### 3. Ascertainability

It must be "administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 490 (S.D. Ill. 1999). The administrative burden of using subjective membership criteria obviates the judicial efficiency that is the fundamental motive for class actions. *See Jamie S. v. Milwaukee Public Schools,* 668 F.3d 481, 496 (7th Cir. 2012) (denying class certification for indefiniteness when "identifying disabled students who might be eligible for special-education services is a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria."); *Simer v. Rios,* 661 F.2d 655, 669 (7th Cir. 1981) (noting that determining whether potential class members "knew of the existence of the regulation and were discouraged from applying for [state heating] assistance . . . would be a burden on the court and require a large expenditure of valuable court time."); *Alliance,* 565 F.2d at 978 ("In those cases in which class certification has been denied on account of indefiniteness, the primary defect in the class definition has been that membership in the class was contingent on the state of mind of the prospective class members.").

In *Oshana* for example, class membership was based on purchase of the product: objective conduct. *Oshana v. Coca-Cola Bottling Co.,* 225 F.R.D. 575, 577, 580 (N.D. Ill. 2005). Nonetheless, the Court determined the class was improper because "to recover, class members

Page 18 of 26

would be required to show they were misled, deceived, tricked, or treated unfairly. Class membership implies a state of mind element that requires an individual examination of each class member." *Id.*; *see also Kohen v. Pacific Inv. Management Co. LLC,* 571 F.3d 672, 678 ( 7th Cir. 2009) ("[defendant] states correctly in its reply brief that 'a proper class definition cannot be so untethered from the elements of the underlying cause of action that it wildly overstates the number of parties that could possibly demonstrate injury.'"); *Simer v. Rios,* 661 F.2d 655 (7th Cir. 1981) ("The change of characterization of the issue in the case from one of state of mind to conduct should not serve as a talisman to decide the difficult issue of whether an identifiable class exists.").

Here, the only way to avoid over-inclusiveness would be to impose criteria limiting class membership to individuals *properly* captured by the underlying claim. However, any such criteria would necessarily be subjective. Limiting class membership to individuals that were actually exposed to the deceptive packaging or advertisement would be largely subjective and thus improper. *See In re Yasmin*, 2012 WL 865041, at *16. This Court sees no way to limit class membership without an impermissible plaintiff-by-plaintiff subjective inquiry. Plaintiff's proposed class is unascertainable and also fails under a routinized Rule 23 analysis.

### **RULE 23 ANALYSIS**

#### 1. **Rule 23(a)(1): Numerosity**

Rule 23(a)'s first requirement is that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no fixed numerosity rule," *Westefer*, 2006 WL 2639972, at *2 (citing *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986), and class sizes may range from 10 to 100,000 or more, *Abbott v.*

*Lockheed Martin Corp.*, 286 F.R.D. 388, 395 (S.D. Ill. 2012). When evaluating potential class size, courts may "make common sense assumptions in order to find support for numerosity." *Westefer*, 2006 WL 2639972, at *2; *accord, e.g., Arreola*, 546 F.3d at 798 (estimating class size based on average number of patients seen by an orthopedist per week). Plaintiffs allege, based on sales data, that approximately 700,000 units were sold altogether and tens of thousands of units were sold in each of the eight states during the class period. This is sufficient to satisfy the numerosity requirement. (Doc 99, p. 26.)

### 2. Rule 23(a)(2): Commonality

Federal Rule 23(a)(2) requires at least one question of law or fact common to the class. FED. R. CIV. P. 23(a)(2); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). This is a low threshold that may be met with a showing that the class's claims depend on a common contention capable of class-wide resolution, even if there are other factual variations among the grievances of the class members. *Id.* at 594. One way to demonstrate a "class wide contention" is to show "standardized conduct by defendants toward members of the class." *Id.* at 594. Here each state law consumer protection statute cited by Plaintiffs requires an objective showing that the Defendant engaged in an unfair or deceptive act or practice. The class definition, however, includes consumers who purchased Grove Square Coffee before and after Defendants changed the package label to include the descriptive term "instant" and includes online purchases (Doc. 99, pp. 9-11, 19, 41; Doc. 53 p. 5-7). These class members were subject to very different representations. The facts therefore, are not common. As discussed above, neither is application of the law common. Plaintiffs cannot show commonality.

### 3. Rule 23(a)(3): Typicality

Rule 23(a)(3) requires the "claims or defenses of the representative parties [to be] typical of the claims or defenses of the classes." FED. R. CIV. P. 23(a)(3).   For satisfactory typicality, "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. the Boeing Co.*, 633 F.3d 574, 586 (7t Cir. 2011).

Here, the class representatives have not shown that their claims are congruent with absent class members such that their interests are adequately aligned.   Each class member's understanding of "soluble" and "microground," each class member's expectations when he or she purchased the Grove Square Coffee product is at issue.   These individual variations are "not merely factual differences regarding the circumstances of how their claims initiated-they impact the very legal theories on which the class can proceed." *Oshana*, 225 F.R.D. at 580.   Because there are glaring question of how and *whether* potential class members were injured (even as-between the *named* Plaintiffs some purchasers read the script on the box, some did not), there is no typicality and class certification is improper.

### 4.  Rule 23(a)(4): Adequacy

"The adequacy inquiry consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).

With respect to the first consideration (adequacy of representative parties), the court must ensure the class representative "possess[es] the same interest and suffered the same injury as the class members." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985 (7th Circ.

2002).   The primary purpose of this inquiry is to "uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).   The question of whether these named plaintiffs suffered the same injury as the absent class members is, of course, outstanding, as there is no way to know that all purchasers were befuddled by Defendants' packaging.

With respect to the second consideration (adequacy of counsel), Rule 23 requires a court that certifies a class also appoint counsel that will fairly and adequately represent the interest of the class.   FED. R. CIV. P. 23(g)(1)(B).   Factors relevant to adequate counsel include: "work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the actions; counsel's knowledge of the applicable law, and the resources council will commit to representing the class." FED. R. CIV. P. 23(g)(1)(C)(i).   This Court recognizes named plaintiffs are represented by able and experienced counsel who have zealously advocated on behalf of all class members. Counsel is adequate.

### 5. Rule 23(b)(2): Class-wide Injunctive Relief

Even if the Rule 23(a) requirements had been met, the proposed class must also satisfy the requirements of one of the three Rule 23(b) categories.   *Spano*, 633 F.3d at 583.   Plaintiffs seek certification for their proposed classes under Rule 23(b)(2) and 23(b)(3).   Section 23(b)(2) "authorizes a no-notice and no-opt-out class for 'final injunctive relief or corresponding declaratory relief [that operates] with respect to the class as a whole.'" *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 897 (7th Cir. 1999).   This rule recognizes that "declaratory or injunctive relief will usually have the same effect on all the members of the class as individual suits would." *In re Allstate Ins. Co.*, 400 F.3d 505, 506-07 (7th Cir. 2005).   However, where

"final relief relates exclusively or predominantly to money damages" certification is improper under 23(b)(2) because class members would likely prefer independent actions, and because 23(b)(2) lacks notice and an opportunity for class members to opt out. *In re Allstate Ins. Co.,* 400 F.3d 505 (7th Cir. 2005); *Jefferson,* 195 F.3d at 897 ("principles of sound judicial management, and constitutional considerations (due process and jury trial), all lead to the conclusion that in actions for money damages class members are entitled to personal notice and an opportunity to opt out"); FED. R. CIV. P. 23 Advisory Committee Note.

Here, Plaintiffs seek injunctive relief because consumers are allegedly still being deceived by Grove Square Coffee packaging (Doc. 53, ¶ 134-43). Plaintiffs do not specify how the packaging should be rectified. Indeed, this Court remains dubious that there is much substantive difference between 'instant' and 'ground,' when the product is—in either case—a packaged small cup of powder. In any event, the Court finds that the injunctive relief sought here is secondary. This is a damages claim and thus not properly certified under R.23(b)(2). *Pella Corp. v. Saltzman,* 606 F.3d 391, 395 (7th Cir. 2010); *In re Allstate Ins. Co.,* 400 F.3d at 507.

**Rule 23(b)(3): Predominance and Superiority**

### a. Rule 23(b)(3): Predominance

A party seeking certification under Rule 23(b)(3) must show "(1) that the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members; and (2) that a class action is superior to other available methods of resolving the controversy." *Messner,* 669 F.3d at 811. Predominance analysis under R.23(b)(3) "begins, of course, with the elements of the underlying cause of action." *Erica P.*

Page 23 of 26

*John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011).   If an element or issue may be proved by the same evidence for all class members it is a "common question," while an individual question requires evidence that varies from member to member.   *Messner*, 669 F.3d at 815.   Although the inquiry is similar to determining commonality, the predominance standard is far higher, *Amchem Prods. v. Windsor*, 521 U.S. 591, 623–34 (1997).   Predominance requires common questions, on a whole, to outweigh individual questions.   *See In re Yasmin & Yaz Mktg.*, 275 F.R.D. 270, 276 (S.D. Ill. 2011).

The Seventh Circuit has held that, in cases requiring individual subjective inquiries into causality, individual questions predominate over common questions.   *See Siegel v. Shell Oil Co.*, 612 F.3d. 932, 935 (7th Cir. 2010) (holding individual questions predominate when causality would require "individual proof as to why a particular plaintiff purchased a particular brand of gasoline"); *Thorogood v. Sears Roebuck and CO.*, 547 F.3d 742, 747 (7th Cir. 2008) (holding individual questions predominate when "each class member who wants to pursue relief against [defendant] will have to testify to what he understands to be the meaning of [the allegedly deceptive] label or advertisement…"); *Clark v. Experian Information SDolutions, Inc.*, 256 Fed.Appx. 818 (7th Cir. 2007) (holding individual questions predominate in consumer fraud case because proving proximate cause would require individualized proof).   Here, as outlined above, each state requires individualized proof of reliance, causation, or both.   Have the class members seen the alleged misrepresentation?   Which version of the labeling did they see?   Did they notice the labeling?   What did they think the labeling text meant?   Did the packaging motivate their purchase?   Where they satisfied with the product?   Why not?   *See Oshana*, 225 F.R.D. at 580-81 ("Without determining what each member saw, heard, or knew, it is impossible

to assign liability."). This process would far outweigh any judicial economy gained by certifying the classes. *Simer v. Rios*, 661 F.2d 655, 674 (7th Cir. 1981) (denying certification where a series of individual trials would be required for proof of each plaintiff's subjective mindset). Individual issues clearly predominate, making class certification improper.

### b. Rule 23(b)(3): Superiority

In determining whether a class action is superior to other forms of adjudicating class members' claims, Rule 23(b)(3) requires the court to consider: 1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; 2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; 3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and 4) the difficulties likely to be encountered in the management of a class action. FED. R. CIV. P. 23(b)(3).

Here, the Court finds the class unmanageable in light of the essential individualized inquires necessary to class members' claims. There are also federalism concerns here. *See In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1020-21 (7th Cir. 2002); *Thorogood*, 547 F.3d at 747. As in *Thorogood*, this case will wrest hundreds of thousands of claims from state courts, each with disparate bases for liability under their respective consumer protection statutes. 547 F.3d at 747. At the very least, as the court noted in *Thorogood*, "the procedural rules by which particular jurisdictions expand or contract relief will be ignored." *Id.* For example, neither the Tennessee, *Pontiac-GMC Truck, Inc.,* 249 S.W.3d 301 (Tenn. 2008), nor the Alabama, *Ex parte Exxon Corp.,* 725 So. 2d 930, 933-34 (Ala. 1998), consumer protection statutes authorize private

citizens to prosecute class actions.   These federalism concerns compound the difficulties of what is already an unwieldy class action.

## C.  CONCLUSION

The requirements for Federal Rule of Civil Procedure 23 are not satisfied and Plaintiff's motion for class certification is DENIED.

**IT IS SO ORDERED.**

**DATED**: August 26, 2013

/s/ *G. Patrick Murphy*
G. PATRICK MURPHY
United States District Judge

Page 26 of 26

# TAB

## "6"

```
1              IN THE DISTRICT OF THE UNITED STATES OF AMERICA
                    FOR THE SOUTHERN DISTRICT OF ILLINOIS
2       ─────────────────────────────────
                                         )
3       LINDA SUCHANEK, et al.,          )
                                         )
4                    Plaintiff(s),       )
                                         )
5           vs.                          )   Case No. 11-565-GPM
                                         )
6       STURM FOODS, INC., et al.,       )
                                         )
7                    Defendant(s).       )
        ─────────────────────────────────)

8

9

10

11                            MOTION(S)

12      BE IT REMEMBERED AND CERTIFIED that heretofore on 11/05/2013,
        the same being one of the regular judicial days in and for the
13         United States District Court for the Southern District of
        Illinois, Honorable G. Patrick Murphy, United States District
14      Judge, presiding, the following proceedings were recorded by
          mechanical stenography; transcript produced by computer.

15

16

17

18                           APPEARANCES:

19      FOR PLAINTIFF(s): D. Todd Mathews, Gori, Julian & Associates,
        PC, 156 N. Main Street, Edwardsville, IL 62025; and,
20
        Peter H. Burke and Joseph Allen Schreiber, Burke Harvey et al.,
21      2151 Highland Avenue, Suite 120, Birmingham, AL 35205; and,

22      FOR DEFENDANT(s): Michael M. Conway, Craig S. Fochler, and
        Aaron Weinzierl, Foley & Lardner, LLP - Chicago, 321 North
23      Clark Street, Suite 2800, Chicago, IL 60654

24      REPORTED BY: Molly N. Clayton, RPR, FCRR, Official Reporter
        for United States District Court, SDIL, 750 Missouri Ave., East
25      St. Louis, Illinois 62201, (618)482-9226,
                       molly_clayton@ilsd.uscourts.gov
```

1                    **INDEX OF WITNESS EXAMINATION**

2                                 **DX**       **CX**     **R-DX**     **R-CX**

3 No witness testimony.

4

5                           **INDEX OF EXHIBITS**

6 **EXHIBIT**                 **DESCRIPTION**        **Id'D**      **Rcv'd**

7 No exhibits identified or received.

8

9                      **MISCELLANEOUS INDEX**

10                                **PAGE**

11 No miscellaneous index entries.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *COURTROOM DEPUTY:* Linda Suchanek versus Sturm Foods

2    *et al.*, Case Number 11-565-GPM, is called for a hearing on all

3    pending motions.

4          Will the parties identify themselves for the record?

5          *MR. BURKE:* Peter Burke for the plaintiffs.

6          *MR. MATHEWS:* Todd Mathews for the plaintiffs.

7          *THE COURT:* Mr. Mathews.

8          *MR. SCHREIBER:* Allen Shreiber.

9          *THE COURT:* Mr. Schreiber.

10          *MR. FOCHLER:* Craig Fochler for the defense.

11          *MR. CONWAY:* Good morning, your Honor, Michael Conway

12    for the defendant.

13          *THE COURT:* Mr. Conway.

14          *MR. WEINZIERL:* Aaron Weinzierl for the defendants.

15          *THE COURT:* Aaron, good morning.  Glad to have

16    everyone.

17          *MR. WEINZIERL:* Thank you.

18          *THE COURT:* I'm trying to get my mind back on to the

19    civil side of the docket.  Mr. Conway was in here earlier and

20    trying to keep a young man out of prison, but it is about to

21    wear all of us out.  And we are doing our best.  God bless him,

22    he may make it, but we are going to find out next week.  So we

23    are going to go from the -- I won't say the sublime.  But we

24    are going to -- we are going to change horses here to speak.

25          Now, Mr. Conway, I've read your papers.  You are here

1   on a motion for summary judgment.

2           MR. CONWAY:  Yes, we are, your Honor.

3           THE COURT:  I know there's been some new submissions

4   I've started looking at yesterday, and I want to talk to you

5   about that.  You're wanting me to reconsider my earlier order

6   and revising the class.  I'm not ready to do that today.  I

7   want to hear -- but I am ready to hear this.

8           I always try to give everyone a chance to be heard on

9   everything.  I can come back -- I could hear this Wednesday

10  next week.  Does anybody want to be heard on that and have oral

11  arguments?

12          MR. BURKE:  On the motion to reconsider?

13          THE COURT:  Yes.

14          MR. BURKE:  I believe we would want oral argument,

15  your Honor.

16          THE COURT:  Well, Wednesday is about all I can -- is

17  about the only time I can fit in.  I'm trying to fit in some

18  loose ends.  But the week after that is my last week on the

19  bench, and I've got about 16 sentencings.  And that's going to

20  be about all I can do.

21          So how about you folks?  Can you get down here

22  Wednesday?

23          MR. CONWAY:  Sure, your Honor, we can.

24          THE COURT:  All right.  Thank you.  It is your motion.

25          MR. BURKE:  Are you talking about this coming

```
 1    Wednesday?
 2              THE COURT:  Yes.
 3              MR. BURKE:  Oh.  We --
 4              MR. MATHEWS:  Not two days but --
 5              THE COURT:  A week from Wednesday.
 6              MR. FOCHLER:  The 13th.
 7              THE COURT:  Yeah.  Right.  Veterans Day is on a
 8    Monday.
 9              MR. FOCHLER:  Right.
10              THE COURT:  And then we have Tuesday and Wednesday.
11    Yeah.
12              MR. FOCHLER:  That would be fine.
13              THE COURT:  That would be the 13th.  See everybody
14    Wednesday.
15         Linda, why don't we set these guys about nine.  I've
16    got Mr. Willis at eight.
17              COURTROOM DEPUTY:  Okay.
18              THE COURT:  So we will see how he is doing.
19         It is your motion, Mr. Conway.
20         MR. CONWAY:  Thank you, your Honor.  Mr. Fochler is
21    going to address our summary judgment motion.  I was going to
22    address the other one.  So go ahead and go.
23         MR. FOCHLER:  Your Honor, our summary judgment motion
24    is against each of the plaintiffs individually.  All the
25    plaintiffs have based their case on the contentions between
```

1  their pleadings and the more recent arguments that the use of

2  the terms "soluble" and "microground" on the package of the

3  Grove Square products are deceptive or misleading.  And then

4  that the whole package is --

5      As far as the "soluble" and "microground," only one of

6  the plaintiffs read it on the package.  The rest didn't read

7  it.  The one who read it understood it.  He knew what soluble

8  meant and he knew what microground meant.  If you haven't read

9  something, you can't be deceived by it.

10     As a matter of fact, the *Kremers* case that the

11 plaintiffs cite themselves in their briefs points that out.

12 What the idea and issue there was against Coca-Cola.  There was

13 a contention about this isn't the original formula.  One of the

14 plaintiffs had never read the words "original formula" on

15 there, and it is just the sort of logic that:  I can't deceived

16 by something if I didn't read it on the package.

17     As far as the package as a whole -- and nobody

18 testified that they thought that this is ground coffee because

19 of the overall everything on the package, the entire package.

20 There's constant undefined references to formulaic packaging by

21 the plaintiff, but we don't know what that means.  But we do

22 know that none of the plaintiffs -- and they all gave the

23 reasons why they thought there was ground coffee in these

24 products.  None of them said it was the whole packaging.

25     The -- none of them said they relied on it because of

1    the whole packaging. Some of them said they bought it because

2    it was an attractive box. They liked the way it looked, but

3    not because the packaging told them it was ground coffee in the

4    entire packaging. Plaintiffs are -- they end up saying that --

5    see, that's not important what the different plaintiffs say.

6    Well, but what each plaintiff says on a motion for summary

7    judgment is important. You know, each one of these plaintiffs,

8    you look at them individually and their testimony basically

9    shows that they weren't deceived by what they've alleged in the

10    complaint is deceptive in the case.

11         The sort of sidestep by the plaintiffs to that is,

12    well, you've got to look at the reasonable man. And they

13    literally say at one point it is not important what the

14    plaintiffs say, which, again, it just doesn't make sense in an

15    individual summary judgment proceeding.

16         And when you say, Well, you have got to look at the

17    reasonable man, we think that's incorrect when we're talking

18    about what that plaintiff saw. But even if you wanted to look

19    at the individual -- the reasonable man, when it's misleading

20    and if there is doubt that the plaintiffs' only testimony

21    doesn't wipe them out.

22         The reasonable man standard, there is no dispute

23    requires extrinsic evidence that a significant percentage of

24    all the reasonable purchasers would be deceived, misled, and

25    would interpret that aspect of the package in question to be

1   misleading.   There is no evidence of that here.

2          Actually, we have got a little microcosm of plaintiffs

3   themselves that they're not identifying the soluble and

4   microground or the whole package.  They cite Dr. Calder.   He

5   did a study.  He didn't do a survey, twenty-some people.   And

6   he basically is breaking out packages, reading things to

7   people, things like that.  It is not the type of survey that

8   measures what happens in the marketplace.

9          They try to rely upon an expert report from another

10  case, a Mr. Klein.  And Mr. Klein's report -- and they want the

11  Court to take judicial notice of an expert report.  I don't

12  think that's going to -- it sort of wipes out all the rules

13  about expert reports and being able to respond to them.

14  Besides that, Mr. Klein's report and in his survey, when he

15  conducted it, to the extent that he asked about soluble and

16  microground, he didn't ask about the take-away from the whole

17  package.

18         He asked the respondents, Is it soluble or

19  microground?  You know, the soluble and microground, does this

20  package mean it is instant, or does it mean it is ground

21  coffee?

22         And in his deposition he was asked, Why didn't you ask

23  them if it meant soluble and microground coffee?

24         And he said, What's the difference?

25         And we asked him, Did you think that microground is

1   instant?

2          And he said, Yeah.

3          So he admitted that his results didn't mean anything.

4          *THE COURT:* Well, it seems to the Court when I read

5   the cases involving fraud and deceit, reasonableness comes into

6   play only on the issue of reliance. That is to say, your

7   reliance must be reasonable. You can't rely foolishly, as our

8   former chief judge on the Court of Appeals said in one of his

9   thousands of cases. So the objective man, the reasonable man

10  comes into play when we are talking about, Is your reliance

11  reasonable?

12         It's not enough if you rely, but you unreasonably

13  rely, even on a -- even on a deceitful statement.

14         Anything else you wish to say?

15        *MR. FOCHLER:* No, your Honor, just to cover, I guess,

16  wrap up with the omissions, is that this idea that 95 --

17  .95 percent instant or soluble and the rest microground somehow

18  matters. Omissions only count if the rest of the package is

19  misleading, and there's no evidence. And these people want

20  ground coffee, supposedly, so they wouldn't care what

21  percentage the mix was. That's it.

22         *THE COURT:* Next.

23        *MR. CONWAY:* That's it for our side, your Honor,

24  unless you wish to -- the plaintiffs have relied on

25  Mr. Calder -- Dr. Calder and his report, and we did have a

1    *Daubert* motion.

2         THE COURT:  I am aware of that.

3         MR. CONWAY:  So if you want to hear argument on that,

4    but otherwise, your Honor, we would stand on our papers.  And

5    that's what Mr. Weinzierl was going to talk to you about.

6         THE COURT:  Well, I hope I'm not disappointing you,

7    but you know over a career, you probably only hear a few

8    thousand *Daubert* motions.  I've always marveled at the idea

9    that we have *Daubert* motions in bench trials.  Like, you know,

10   oh, my God.  You know, what difference does it matter when you

11   hear it?  It will work out to be that way.

12        All right.  Who wants to speak for the plaintiffs on

13   this?

14        MR. BURKE:  I will, your Honor.

15        THE COURT:  Go right ahead.

16        MR. BURKE:  Um, I think if you step back and look at

17   each of the individual plaintiffs, they all testified that they

18   were, in fact, deceived.  Two of the plaintiffs, after

19   purchasing the product, felt so deceived they wrote the Better

20   Business Bureau to complain.  That certainly showed their state

21   of mind.

22        One of the plaintiffs, Deborah Dibenedetto, from New

23   Jersey, she was deceived.  She wrote the defendant and said

24   microground and soluble, what's soluble?  I had to look it up.

25   Why don't you tell us what it is?  Instant coffee.  And the

1  defendant wrote back saying, It is not instant coffee.  It is

2  better.

3       Plaintiff Capps, from South Carolina, he, too, took

4  his experience, he wrote the defendants, wrote reviews.  All of

5  these plaintiffs went to the store, saw the product.  And we do

6  believe you have to look at the totality of the product, its

7  setting.  It was packaged to look like the regular Keurig.

8  They marketed it to be a true equivalent product.

9       THE COURT:  Let me ask you this:  I was thinking about

10  this last week because my wife purchased some of this Keurig

11  stuff.  By the way, it's very expensive coffee.  You are better

12  off just to brew your own it seems to me, but so be it.

13       Has there been -- has Keurig filed a lawsuit against

14  your client?  Isn't this a better case between Keurig and --

15       MR. FOCHLER:  Your Honor, yeah, there was a lawsuit

16  filed in 2010.

17       THE COURT:  How did it work out?

18       MR. BURKE:  It settled.

19       MR. FOCHLER:  Keurig -- well, not all of it, actually.

20  It was patent, trademark, false advertising.

21       THE COURT:  Right.

22       MR. FOCHLER:  Keurig went for a preliminary injunction

23  on the trademark infringement and the false advertising.  After

24  three months and that much being submitted, they were denied

25  the preliminary injunction.  The patent -- as a matter of fact,

1    the federal circuit just came down affirming the dismissal of

2    the patent claim.  The trademark and the false advertising

3    case, for the most part, settled out, and we're still selling

4    Grove Square.

5         THE COURT:  That's kind of where I thought this case

6    would be, and I knew nothing about that litigation, by the way,

7    but I looked at it.

8         MR. FOCHLER:  Yeah.

9         THE COURT:  I thought, my goodness, this really is

10   probably a better case between the...

11        MR. BURKE:  Well, I would certainly agree that Keurig

12   had a right to bring a Lanham Act claim of false advertising.

13        THE COURT:  Right.

14        MR. BURKE:  But it doesn't mean the consumers don't

15   have an individual right under their own individual statute.

16        THE COURT:  Well, I don't think one scotches the

17   other.  It was --

18        MR. BURKE:  Right.

19        THE COURT:  It just seemed like a better case to me.

20        MR. BURKE:  Oh, sure, I would agree.  Different

21   burdens of proof.

22        THE COURT:  Right.

23        MR. BURKE:  But each of the plaintiffs went to the

24   grocery store and looked at it.  They saw the same package.

25   They went to the line, they checked out, they brought it home.

1    They looked at it.  They relied upon it.  If you are going to

2    try to ask whether every individual is going to see the same

3    word or the same image, we all know that ain't going to happen.

4    But that doesn't mean that from a reasonable consumer, whether

5    they would look at this package and see it and expect that it

6    would contain the same quality and type of what else they were

7    receiving, that's a factual issue that we believe, you know,

8    should go to the jury.  Let's see here.

9        THE COURT:  You would want to try one of these

10   individual cases?

11       MR. BURKE:  No.  That's why we filed our motion to

12   reconsider on the class, your Honor.  And as Judge Posner said

13   that these individual cases -- you know, you can do a lot of

14   fraud to a lot of people, and if it can't proceed as a class

15   action, then the defendant is going to get away with a lot of

16   tortious conduct.

17       THE COURT:  That was in the *Sears* case here just

18   recently on the Supreme Court.

19       MR. BURKE:  And that is a primary reason that we filed

20   the motion to reconsider, your Honor.

21       THE COURT:  Okay.

22       MR. BURKE:  And we cite to that, and I know that you

23   are not prepared to hear that today.

24       THE COURT:  No.  I will hear that -- we will hear that

25   next week.

1        Well, you have heard your -- you have heard what the

2   plaintiff says, that they've got a submissible case here

3   individually.

4        MR. FOCHLER:  Well, your Honor, actually, what -- I

5   did hear what the plaintiff said, and what the plaintiff says

6   is that the defendants went there and -- I'm sorry -- the

7   plaintiffs and they felt deceived.  And then there is a

8   statement that the plaintiffs looked and relied upon the

9   package.  But we've got the testimony they didn't look at

10  soluble and microground.  They didn't say it was the whole

11  package that deceived them.  As a matter of fact, the record's

12  pretty clear.

13       Yeah.  They did feel deceived, a lot of them, because

14  of facts that had nothing to do with the defendant's packaging.

15  It was located near the Keurig on the shelves.  It was made to

16  work on a Keurig machine.  Some of them mistakenly thought that

17  all Keurig products had ground coffee, which isn't true, which

18  is in the record.

19       You know, the fact that a consumer gets deceived, or

20  as your Honor was saying before, well, is it reasonable to rely

21  on it?  Well, they are not relying on the package here.  They

22  are relying on what they know about other products and about

23  sitting on the shelf.  The plaintiffs keep sidestepping the

24  issue.  It is nothing on this package that caused the problem.

25       THE COURT:  What do you say about their argument about

1    well, really, this is a case about an omission, which can in

2    certain instances be sufficient if you neglect to say something

3    about your product that you know should be said, the lack of

4    which would render it fraudulent?

5            MR. FOCHLER:  Yeah.  Well, first of all, as to the

6    individual plaintiffs.

7            THE COURT:  Mmm hmm.  Which is where we're at today.

8            MR. FOCHLER:  Right.  And they're saying, Well, we

9    should have had "instant" instead of "soluble" in there; for

10   soluble microground, instant microground.  They didn't read

11   soluble and microground.  I'm not sure why they would have read

12   instant microground, Number 1.

13           Number 2, the idea that they didn't know -- actually,

14   one of them read soluble and microground and understood it.

15   Four of them knew what soluble meant.  So -- and the others

16   maybe didn't know what it meant.  We don't know for sure all

17   the time.  So it's not like nobody knew what soluble meant.

18           Also, we submitted a survey of -- George Manus [ph]

19   conducted a survey, showed people the product, the package, and

20   then said, Well, you know, what does the package tell you about

21   it?

22           THE COURT:  Let me ask you this about this expert

23   testimony.

24           MR. FOCHLER:  Yeah.

25           THE COURT:  How does that come in on these individual

1   cases, I mean, when we're talking about fraud and deceit?  I

2   mean it seems to me that's almost always going to be an

3   individualized inquiry.

4        MR. FOCHLER:  I agree.

5        THE COURT:  How did this work on me?  I'm the one

6   that's saying that I was euchred out of my pay and, you know,

7   maybe the next fella wouldn't.  But...

8        MR. FOCHLER:  Agree, your Honor.  But we don't think

9   we should get there through the reasonable man standard.  As I

10  said earlier, we think that the basis is what happened with

11  each individual plaintiff.

12       THE COURT:  Yeah.  So all this study about surveys

13  and -- it just seems to me in these cases it just doesn't work

14  too well.

15       MR. FOCHLER:  No, just being careful sometimes, your

16  Honor, making sure things go a certain way.

17       THE COURT:  Look, here's what I'm going to do.

18       MR. BURKE:  I would say about the survey evidence,

19  your Honor, we have your seven plaintiffs.  As soon as they

20  started selling this product, they were receiving complaints by

21  consumers.  That is other anecdotal evidence that goes to the

22  issue of whether this is misleading.

23       THE COURT:  Right.

24       MR. BURKE:  This just didn't happen in a vacuum.

25       THE COURT:  But in the end, that bolsters the

1    misleading quality of whatever it is.  But if your plaintiff

2    wasn't misled, that's the end of the discussion.

3         MR. BURKE:  I guess what does it mean to be misled,

4    your Honor.  They all testified that they saw the product.

5    They purchased it.  They brought it home.  They expected to

6    receive the same they received every other time they bought a

7    Keurig product.  Instead, they got 96 percent instant coffee

8    with a little bit of microground soluble.  They were obviously

9    misled.  Why would two people write the Better Business Bureau?

10   Why would somebody send an e-mail directly to the company?

11        THE COURT:  But there will be people who will buy it

12   who are not misled.  There are shrewd -- there are shrewd

13   people.  And it may be the very same product, and they would go

14   in there and look at this and say, Hmmm, hokum, I will not buy

15   that.  So no matter how bad your product was, they were not

16   misled.

17        MR. BURKE:  And they didn't buy the product.

18        THE COURT:  And they didn't -- and they didn't buy the

19   product.  And then there will be those people that just don't

20   care.  You know, when I was a boy, you could get a 16-ounce RC

21   Cola for what you could an 8-ounce Coke.

22        MR. FOCHLER:  Right.

23        MR. BURKE:  And, really, we knew the difference.

24        THE COURT:  But we would rather have a 16-ounce RC

25   Cola for our dime than an 8-ounce Coca-Cola.  I mean -- so

1  that's the problem it seems to me.

2      *MR. BURKE:*  Actually --

3      *THE COURT:*  It's obvious -- it's obvious to me that

4  the manufacturer here packaged this in such a way that if you

5  weren't attentive or if you didn't care you would just say, you

6  know, I will put this in my machine.  And I don't know,

7  probably doesn't cost as much as a Keurig either, does it?

8      *MR. BURKE:*  There was a slight price difference.  And,

9  actually, your Honor, if I could go back to your example about

10  the Coke and the RC.

11      *THE COURT:*  Uh-huh.

12      *MR. BURKE:*  If they had priced this as not a true

13  equivalent but as a lower cost alternative, like the example

14  that you just gave.  Instead of selling this for 9.99, which is

15  a $1.50 less, just to get the people's attention, if they had

16  marketed this at $6 and put instant coffee 95 percent, we would

17  have never filed a lawsuit.

18      *THE COURT:*  But they did market it cheaper, I mean, a

19  buck fifty.

20      *MR. BURKE:*  But the price point was part of the

21  deception as well.  It was just low enough to entice you to try

22  it.

23      *THE COURT:*  Well, sure.

24      *MR. BURKE:*  But not too low to get your attention to

25  focus on what was truly in there.  They did studies on the

1   price point.

2       *THE COURT:*  But everything is marketed in that way.  I

3   mean marketing is a science.

4       *MR. BURKE:*  They knew their consumer.  They studied

5   their consumer.  They knew that the consumer liked to try these

6   things.

7       *THE COURT:*  Okay.  Well, here's what I would like to

8   do.  I want to see everyone a week from tomorrow.  And I will

9   sit down and read everybody's paper again.  And I'll tell you,

10  I think the defendants are right, but that doesn't mean that I

11  can't change my mind.  I'll look at all -- I'll look at all

12  this.

13      But it's perfectly clear to me that however this thing

14  comes down, you are going to be in the United States Court of

15  Appeals on this case.  This case is -- irrespective of how I

16  rule Monday, this case is going up, and the arguments are --

17  the arguments are all there.  And we'll see what -- we'll see

18  what they say.

19      It is just hard for me to see on this case, but I'm

20  going to look at it hard.  And we will go from there.

21      Have a good week.

22      *MR. CONWAY:*  Appreciate your time, your Honor.  Thank

23  you.

24      *THE COURT:*  Don't get lost in East St. Louis.  You

25  haven't had a bad day until you get lost in East St. Louis.  A

1   lawsuit is one thing.

2

3                          -oOo-

4                   REPORTER'S CERTIFICATE

5       I, Molly N. Clayton, RPR, FCRR, Official Court Reporter
for the U.S. District Court, Southern District of Illinois, do

6   hereby certify that I reported with mechanical stenography the
proceedings contained in pages 1 - 20; and that the same is a

7   full, true, correct and complete transcript from the record of
proceedings in the above-entitled matter.

8

9       DATED this 17th day of January, 2014.

10                          s/Molly Clayton, RPR, FCRR

11                          _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# TAB

## "7"

```
 1              IN THE DISTRICT OF THE UNITED STATES OF AMERICA
                    FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2      _____
                                            )
 3      LINDA SUCHANEK, et al.,             )
                                            )
 4                       Plaintiff(s),      )
                                            )
 5           vs.                            )  Case No. 11-565-GPM
                                            )
 6      STURM FOODS, INC., et al.,          )
                                            )
 7                       Defendant(s).      )
        _____)
 8

 9

10                              MOTION(S)

11      BE IT REMEMBERED AND CERTIFIED that heretofore on  04/15/2013,
        the same being one of the regular judicial days in and for the
12         United States District Court for the Southern District of
        Illinois, Honorable G. Patrick Murphy, United States District
13      Judge, presiding, the following proceedings were recorded by
           mechanical stenography; transcript produced by computer.
14

15                             APPEARANCES:

16      FOR PLAINTIFF(s):  D. Todd Mathews, Gori, Julian & Associates,
        PC, 156 N. Main Street, Edwardsville, IL 62025; and,
17
        Peter H. Burke and Joseph Allen Schreiber, Burke Harvey et al.,
18      2151 Highland Avenue, Suite 120, Birmingham, AL 35205; and,

19      Patrick Charles Cooper, Ward & Wilson, LLC, 2100 Southbridge
        Parkway, Suite 580, Birmingham, AL 35309
20

21      FOR DEFENDANT(s): Michael M. Conway, Craig S. Fochler, and
        Rebecca R. Hanson, Foley & Lardner, LLP - Chicago, 321 North
22      Clark Street, Suite 2800, Chicago, IL 60654

23      REPORTED BY:  Molly N. Clayton, RPR, FCRR, Official Reporter
        for United States District Court, SDIL, 750 Missouri Ave., East
24      St. Louis, Illinois 62201, (618)482-9226,
                         molly_clayton@ilsd.uscourts.gov
25
```

**INDEX OF WITNESS EXAMINATION**

|  | DX | CX | R-DX | R-CX |
|---|---|---|---|---|

No witness testimony.


**INDEX OF EXHIBITS**

| EXHIBIT | DESCRIPTION | Id'D | Rcv'd |
|---|---|---|---|

No exhibits identified or received.


**MISCELLANEOUS INDEX**

PAGE

No miscellaneous index entries.

```
 1              COURTROOM DEPUTY:  Linda Suchanek versus Sturm Foods

 2    et al., Case Number 11-565-GPM, is called for a hearing on all

 3    pending motions.

 4              Will the parties identify themselves for the record?

 5              MR. COOPER:  Your Honor, Patrick Cooper for the

 6    plaintiffs.

 7              THE COURT:  Mr. Cooper.

 8              MR. MATHEWS:  Todd Mathews for the plaintiffs.

 9              THE COURT:  Mr. Mathews.

10              MR. SCHREIBER:  Allen Schreiber, plaintiffs.

11              MR. BURKE:  Peter Burke for the plaintiffs.

12              THE COURT:  Mr. Burke.

13              MR. FOCHLER:  Craig Fochler for the defendant.

14              THE COURT:  Craig, your last name?

15              MR. FOCHLER:  Fochler.

16              THE COURT:  Vochler [ph].

17              MR. FOCHLER:  With an "F."  I'm sorry.

18              MR. CONWAY:  Michael Conway, your Honor.

19              THE COURT:  Mr. Conway.

20              MS. HANSON:  Rebecca Hanson for the defendants.

21              THE COURT:  Ms. Hanson, good afternoon.

22              What I've -- I've looked at the papers, and I'm going

23    to do this a little different.  I just have some questions for

24    everyone.

25              Now, Mr. Cooper, you are proposing, really, seven
```

1  subclasses in this case, one for each state.

2        MR. COOPER:  It is eight states, your Honor, but...

3        THE COURT:  Or eight, whatever it is.  And we're in

4  Illinois because the defendant's an Illinois corporation, but

5  we are not applying Illinois law in this case.

6        MR. COOPER:  Just to the Illinois complaint.

7        THE COURT:  Just to the Illinois complaint.

8        MR. COOPER:  Yes, your Honor.

9        THE COURT:  Okay.  Now, as to the recent Supreme Court

10  decision after ComCast, that doesn't trouble you?

11        MR. COOPER:  No, your Honor.  Because ComCast, the way

12  I viewed it, dealt with the issue of presenting common proof on

13  damages.  And they haven't challenged the damages, except for

14  the unjust enrichment claim, your Honor.  But ComCast

15  doesn't...

16        THE COURT:  Well, how would you go about -- how would

17  you try damages in this case?

18        MR. COOPER:  Your Honor, we have an expert, Candace

19  Preston.  She's been deposed.  And she ended up attaining in

20  computerized form all of the sales from the Sturm half for the

21  gross sale product, and she was able to identify state by state

22  exactly how much was sold for each state.  And you can take

23  that, your Honor, and simply apply it on a class-wide basis for

24  each state.

25        THE COURT:  Well, that assumes everyone's

1    dissatisfied, right?

2          *MR. COOPER:*  Well, your Honor, I'm glad you raised

3    that because that's one of the issues that they raised in their

4    complaint, which is that they say that there are a lot of

5    customers who actually wanted instant coffee or didn't care

6    about it.

7          And the fact of the matter, your Honor, is that if you

8    look at all nine of our plaintiffs, every single one of them

9    went in with the expectation of buying ground coffee in a

10   K-Cup.  Even their expert witness, Mr. Roese, in his deposition

11   that's in the Exhibit U, Page 6, says that he presumes that

12   they all went in with the expectation of buying ground coffee.

13         Now, the only exception they made to that is they

14   said, well, two of them, Carr and Gladstone, well, they say

15   they bought it because they wanted quality coffee.  Well, your

16   Honor, they're not like us, lawyers, or, you know, a judge like

17   you.  They're not -- you know, they're not wordsmiths.  But for

18   them, when they put a cup of coffee in there, they're expecting

19   ground coffee like this, your Honor.  This is what they expect:

20   ground coffee.  This is what they actually end up getting,

21   your Honor:  instant coffee.

22         *THE COURT:*  Okay.

23         *MR. COOPER:*  That's their expectation when they go in

24   there.  So if you look at our plaintiffs, they're -- none of

25   them are saying that they were happy.  Every one of them said

1   at the end of it, What we want is for them to say on this box

2   that it is instant coffee.  Nowhere on here does it say instant

3   coffee.

4          Then you look at, your Honor, if you could put up the

5   board, the email.  They get an email from discount coffee to

6   the president.  They say this is the worst performing product

7   we've ever experienced.  The consumer complaints on this are

8   off the charts, your Honor.  They said Grove Square continues

9   to struggle with high customer complaints.  Is there any talk

10  about dramatically changing the coffee taste profile or any new

11  instant products?

12         And it goes on to point out, your Honor, he lists some

13  of the complaints.  And these were vast -- these were a

14  enormous number of complaints.  They received over a thousand

15  complaints to themselves or to Amazon or to Discount Coffee

16  complaining about the product.  If you are talking about a

17  thousand complaints at $8 for a small box, that's $800,000

18  worth of consumers who actually bothered to complain.  That

19  doesn't even count the ones who didn't.

20         *THE COURT:*  Let me ask you this:  I don't quarrel with

21  the idea that you could have a very dissatisfied consumer.  But

22  as I think about these cases, wouldn't it be the case that for

23  every person who used this twice, that person then would be

24  disqualified?  That would be a complete defense to the case.

25         In other words, Mrs. Murphy goes in there and buys the

1   product.  And she takes the product, and she said, This just is

2   terrible.  Dissatisfied.  Okay.  It wasn't as marketed or what

3   their -- it didn't live up to her expectations.  Mrs. Jones

4   comes in, uses it, and then uses it again.  Mrs. Jones could

5   never be a plaintiff, could she?

6          MR. COOPER:  No, your Honor.  But I'm glad you

7   mentioned that.  Because there are, in fact, two of our named

8   plaintiffs who bought twice.  And the reason they bought twice

9   was because the first time they tried it, they thought there

10  was something dysfunctional about the coffee.  They thought

11  maybe it had been at Whole Foods too long or Big Lots or

12  someplace.  So they went and bought it the second time to

13  actually see if it was a bad batch that they originally got.

14         But, also, if you look at this second part of this

15  e-mail, your Honor, it talks about they had over -- they sold

16  over 311 boxes of medium roast, 226 dark, 105 light.  In this

17  e-mail, they say they only had one returning customer.  The

18  lowest he's ever seen.  So people were overwhelmingly --

19         THE COURT:  Yes.  But I don't quarrel with that.  I'm

20  talking about, though, in each -- how we put something together

21  as a class.  Because there are people that did go back the

22  second time and were satisfied.  And in their cases, in that

23  instance, they could never sustain a claim because, you know,

24  they paid for something, and they got it.

25         MR. COOPER:  Right.

         1              THE COURT:  I mean, you know, you could -- someone

         2     could say, for instance, Kentucky whiskey, Heaven Hill whiskey,

         3     is a great -- they say that's a great whiskey.  Well, if you

         4     are used to drinking Pappy Van Winkle or -- I mean, I'm not all

         5     that familiar with whiskey, but if you were.

         6              MR. FOCHLER:  It is just what you have heard.

         7              THE COURT:  Yeah.  But if you go back and get it a

         8     second time, and you said, Well, you know what?  It is pretty

         9     good whiskey.  You would never have a complaint that it had

        10     been misrepresented.

        11              Isn't that the problem in this case, is ascertaining

        12     who is in the class and who isn't.  Because it certainly can't

        13     be based on sales, because there are many of these sales where

        14     the people were content.  Now, what's -- what fraction of that

        15     is hard to determine, isn't it?

        16              MR. COOPER:  Mmm hmm.  Yeah.  Your Honor, I'm glad you

        17     raised that.  Because that's really the issue that Mike raised

        18     in his opposition brief, which is, he says you can't certify a

        19     class because it is going to include people who weren't

        20     injured, who might have liked the product.  That's what we had

        21     talked about.

        22              But, your Honor, the Seventh Circuit law, under Posner

        23     with the Kohen case -- and I can give you a copy of it here.

        24     What they say is it is inevitable with any class action that

        25     you are going to include some people who weren't injured, but

1    that's not the reason not to certify the class.  And the times

2    you don't certify the class is this -- in the case where with

3    *Oshana* that Mike cites, where you had a situation where the

4    plaintiff wasn't even injured.  And on top of that, what the

5    Circuit Court what the Court found was it was so broad it

6    included millions and millions of people who weren't injured.

7    You don't have that here, your Honor.  You don't have that, a

8    situation where it's only --

9        *THE COURT:*  How do you know -- how do you know that?

10       *MR. COOPER:*  We know it based on the complaints.  We

11   know it based on -- that went to Amazon, that went to Sturm.

12   We know that based on -- and the easiest way to figure it out,

13   your Honor, is if you accept the presumption that people went

14   to a store to buy a K-Cup with ground coffee, then that in and

15   of itself shows that.  Because they didn't go -- nobody -- not

16   one of our plaintiffs ever went in there with the intent of

17   buying instant coffee for a K-Cup.

18       You don't need a Keurig machine to make instant

19   coffee.  Why would you buy instant coffee when this costs you

20   66 cents with the way they sell it when you could go to Folgers

21   and put it in a cup of water, and it only costs you 4 cents.

22   It doesn't make any sense for them to actually go out and buy

23   instant coffee.  They are the only ones who have sold instant

24   coffee in a K-Cup.

25       They're the only ones now who sell instant coffee in a

1   K-Cup because it doesn't make any sense.  The reason they did

2   this was because they wanted to get into the market for K-Cups.

3   They are waiting on the patent to expire with Keurig.

4          And, actually, one of the biggest revenue generators

5   right now is their instant -- they have -- actually have

6   roasted coffee now in a K-Cup.  They now have cider now that

7   they use in the machine.  They have hot chocolate in the

8   machine.  But this was simply a means for them getting their

9   foot in the door with these companies so that they could

10  position themselves later to sell other things.

11         THE COURT:  But you agree with me that as to that

12  fraction of consumers who bought it the second time, they are

13  by very definition not injured plaintiffs.

14         MR. COOPER:  I agree with that, your Honor.

15         THE COURT:  Okay.

16         Now, Mr. Conway, what about these state violations,

17  where if it's a violation of the statute, they get a recovery

18  whether anybody's damaged or not?

19         MR. CONWAY:  Well, that's not the case, your Honor.

20  You know, one of the things -- and I'd like to come back a

21  little bit about all the other differences.  Because in

22  addition -- but let me answer your question first.  Every state

23  either requires reliance or causation, one or the other or

24  both.

25         For example, in California, where Mr. Avakia is the

1    UCL, it requires actual reliance.  In Illinois, your Honor

2    knows it requires causation.  You are going to have to look on

3    a fact-by-fact basis whether Sturm did something.

4          Mr. Cooper really just pointed out the flaw in his

5    case.  He said before these people heard about Grove Square,

6    they thought every K-Cup had ground coffee in it.  That's not

7    our doing.  There's nothing on the package that says that.  The

8    package doesn't say filter.  The package says soluble and

9    microground.  When this case started out, that was the issue.

10   But that's true.  And now, by the way, the last year plus, the

11   package says instant and microground.

12         So, your Honor, you are going to have not only the

13   people who were happy with it, you have the people who didn't

14   read the package.  Mr. Cardillo didn't read the package.  How

15   could he have been deceived by anything Sturm did?  The others

16   all read different things.

17         You know, the cases they cite, your Honor, for

18   example, like the *Palm [ph]* case that says it is healthy --

19   these are some district court cases in California -- or the

20   *Arizona Tea* case that said 100 percent natural, there was a

21   specific representation or a specific focus of advertising that

22   the plaintiffs' claimed was false.

23         Nothing like that here.  Nothing like that here.  One

24   plaintiff looks at the K-Cups.  It is a K-Cup.  You see it

25   right there.  It fits in the machine.  Another looks at it and

1 says Arabican coffee.  It is Arabican coffee.  It says soluble

2 microground.  It is soluble microground.  So what is the

3 misrepresentation?  So there is way beyond the people that are

4 happy with it.  If you look at the complaints, most of the

5 complaints are, I didn't like the taste.

6    *MR. BURKE:*  Well --

7    *MR. CONWAY:*  And so, your Honor, in those kind of

8 situations, those people don't have a claim.  And what the

9 ComCast -- coming back to your Honor's first question with

10 Mr. Cooper.  ComCast -- in the *Whirlpool* case, most

11 importantly -- very importantly*, ComCast* says, first of all,

12 the plaintiffs have to come in with evidence, not just

13 allegations, and they really build on the Walmart.

14   And, secondly, the evidence has to fit -- there was

15 damages, but the evidence has to fit the legal liability

16 theory.  The legal liability theory is that something on the

17 Grove Square box is a misrepresentation.  And they haven't

18 identified what that is.

19   So you are going to have to go, your Honor,

20 respectfully, if we had these people, you would have to show

21 what is it you read.  And when you get Mr. Cardillo -- if we

22 certified the class where Mr. Cardillo was the plaintiff, we

23 would move for summary judgment.  We would get summary judgment

24 against the class because he never read the package.

25    *THE COURT:*  I do think now we understand in these

1    cases that we get right to the merits of the case.

2            *MR. CONWAY:*  Correct.

3            *THE COURT:*  In class certification -- for my first ten

4    years up here we were.

5            *MR. CONWAY:*  Very different.

6            *THE COURT:*  -- just look --

7            *MR. CONWAY:*  I understand.

8            *THE COURT:*  Just look at the case.  Now look at the

9    merits which --

10           *MR. COOPER:*  Your Honor, may I --

11           *MR. CONWAY:*  In the *Whirlpool* case -- if I could

12   finish that thought, your Honor.  The *Whirlpool* case is very

13   important because when the Supreme Court vacated the Sixth

14   Circuit *Whirlpool* case, it's really telling us that, hey,

15   ComCast applies to the consumer class.  And we don't know what

16   the Sixth Circuit is going to do, I do understand that.  But

17   they are saying it has something to do with this.  And the

18   *Butler* case that the plaintiffs rely upon expressly said --

19   Judge Posner said, We approve the Sixth Circuit case.  We don't

20   want to create a conflict, a circuit conflict.  And there is a

21   cert. pending on that, so we will find out what happens to

22   that.  But the *Oshana* case that Mr. Cooper mentioned is -- the

23   three cases I'd like your Honor to really think about, the

24   *Oshana* case -- that's the Diet Pepsi -- or the Diet Coke case.

25           *MR. COOPER:*  It's artificial sweetener.  Yeah.

1        MR. CONWAY:  And, by the way, the plaintiffs don't

2   cite a word about that in their reply brief.

3        The *Lipton* case that was just decided in the district

4   court by the new judge, Judge Feinerman, which was a

5   supplement, a diet supplement, when it had a certain chemical

6   in it.  And for the very reason your Honor identified, he said

7   we can't certify the class.  Some people didn't care about the

8   chemical.  Some people knew it was there.  Some people didn't

9   want it there.

10        And then the third one, which we didn't even make too

11   much of in our brief, and I regret that.  But I would like your

12   Honor to look at Thorogood versus Sears, and it is a

13   Judge Posner decision.

14        THE COURT:  That has to do with the stinking clothes.

15        MR. CONWAY:  That had to do with stainless steel.

16        THE COURT:  Right.  And it was --

17        MR. CONWAY:  Right.  And whether they get mold on it.

18        THE COURT:  Whether they get mold on it.

19        MR. CONWAY:  Correct.  And there was a class action

20   brought in 27 consumer states.  And Judge Posner said the

21   reason we can't certify this -- he went through the damages.

22   He said, We don't know what the individual customer thought

23   when they saw stainless steel.

24        And we don't know what the individual customer found

25   on this package to be deceptive, if they even read it.  And if

1    you look at -- the reason we talked about the nine plaintiffs

2    is because every one of the plaintiffs -- we took their

3    depositions.  Ms. Hanson and I went around the country and took

4    their depositions where they were.  And they looked at

5    different things or no things or they bought it because it was

6    cheaper or they bought it because it was new or because they

7    thought it would be good coffee.

8          And so, your Honor, we don't even have uniformity or

9    typicality among the named plaintiffs.  So I think that your

10   Honor -- and the very first thing is you can't define this

11   class.  You couldn't send out a class notice to people.  Who

12   would get the notice?  Who would know whether they're bound?

13          And, of course, the basic thing in a class action is

14   it binds the defendant.  It binds the class.  Who is in the

15   class?  Who is going to be bound by this decision?  So I just

16   think it's a -- something that can't be overcome by the

17   plaintiffs, your Honor.

18          *MR. COOPER:*  Yeah --

19          *THE COURT:*  What is the -- now, from the plaintiffs'

20   point of view in this case, again, how do you -- how do you

21   actually try the case on a theory -- on a theory of damages?

22   What you've showed me is a -- is just a projection that if

23   everybody had a good case, you would get this much money.  So

24   how do you -- how do you measure damages in a case like this?

25          *MR. COOPER:*  Well, your Honor, it's not like, say, a

1    *Arizona Tea* where you advertise it is 100 percent all natural,

2    and then it is not, and you have to figure out some component

3    out of the price to take it away.  The reality here is what

4    people bought here, they thought it was ground coffee.  It was

5    instant.  Most of them just threw it away and never used it

6    again, so it is a complete loss of their purchase price.  If

7    they bought it for $8 --

8           *THE COURT:*  How do you know they thought it was ground

9    coffee?

10          *MR. COOPER:*  Because --

11          *MR. SCHREIBER:*  Your Honor, read what their own

12   experts say.  They all thought it was -- this is their experts.

13   This is their expert that they've paid, okay, your Honor.

14          And Allen took this deposition, and he asked a

15   question:  All of the individual plaintiffs we represent were

16   Keurig machine owners.

17          "Yes."

18          And he said "They were all coffee drinkers?"

19          And he says, "Yes, to the best of my knowledge."

20          And he goes on to say, "they all purchased single

21   serve coffee beverages before?"

22          Their expert says "yes."

23          And he says "and they all purchased single serve

24   coffee beverages that they brewed coffee."

25          Instant coffee, you don't brew.  Ground coffee is

1  brewed.

2          THE COURT:  Why not?

3          MR. COOPER:  Instant coffee -- okay.  Why don't you

4  brew --

5          THE COURT:  Don't you brew?  Don't you brew instant

6  coffee?  You pour some hot water in it.  You stir it up.  You

7  steam it.  I mean, who says that's not brewing coffee?

8          MR. COOPER:  Your Honor, it's not brewing coffee.  It

9  is soluble.  It dissolves.  But instant coffee -- I think even

10 Mike would admit this, is that instant coffee is not brewed.

11         MR. FOCHLER:  No.  We wouldn't admit it.

12         THE COURT:  Wait a minute.  Wait a minute.  But how --

13 I understand what you are saying, but how do you say that?  I

14 mean I don't -- is there some something out there that says

15 brewed coffee does not include instant coffee?  I mean you guys

16 are the experts.

17         MR. FOCHLER:  I can answer that question for you.  The

18 company Keurig that makes this machine and makes all these

19 cups, when they say -- when it sells the machine, it puts

20 material with it and put out ads that say all their products

21 are brewed -- their tea, their cocoa, their cappuccino, which

22 has instant coffee and no filter, and their cafe mocha.  Keurig

23 says they're all brewed, so there is no evidence that they're

24 not brewed.  I mean, you are right, they're brewed.  I mean,

25 the company --

1        *THE COURT:* Well, I'm not trying to take sides yet.

2  I'm listening to arguments, but I'm playing with these ideas

3  because I know all of you folks know about this case. But you

4  are still not answering my question: How do you go about

5  establishing damages? In other words, do you just say that

6  everyone that bought one of these gets their money back?

7        *MR. COOPER:* Ah, your Honor, what we would do, in the

8  class definition, we would have those who purchased Keurig

9  machines or owned Keurig machines and who purchased Grove

10  Square products, and that would be the class of people who

11  would be in it.

12        *THE COURT:* Well, that's a different question.

13        *MR. COOPER:* Okay.

14        *THE COURT:* How do you establish damages? What would

15  the damages be? I mean the coffee was worth -- let's say that

16  it had some value. I mean how would we go -- how would we go

17  about doing that? Like some people drink -- some people drink

18  coffee because they need to get a buzz. Like if you have to

19  drive 140 miles before you get up here to beautiful East

20  St. Louis in the morning, you leave at about 4:00, you stop at

21  one of these rest areas, you know, and you get some -- you get

22  some coffee. I mean that's --

23        *MR. COOPER:* You know, your Honor, I'm glad you asked

24  that. Because, actually, the case that dealt with that issue

25  is called <u>Pella versus Saltzman</u>. And it is actually a Seventh

1    Circuit case, 2010.  It's 606 F.3d 391.  And that's a case

2    where -- one, two, three -- six states were certified

3    individually by a judge, a district court judge in Illinois.

4    And there what the district court did in terms of the issue

5    about damages was it certified liability all those states and

6    then set aside the issue of damages.  And when Posner and the

7    circuit court judges looked at it, they actually affirmed the

8    certification on the liability issues for all six states and

9    left later the issue of, like, certification of damages.

10        MR. CONWAY:  Your Honor, if I could --

11        MR. COOPER:  So what I'm saying, your Honor, if that

12   is an issue for you, there are ways to get around this so that

13   we can at least try to get some sort of remedy for these

14   consumers for what we think was a fairly brazen fraud.  And

15   lastly, and then I'll turnover the mic, the really fundamental

16   issue in this case is the fact that instant coffee is not

17   brewed coffee.  Instant coffee is not ground coffee.  What is

18   equated as --

19        THE COURT:  I will grant you that instant coffee is

20   not ground coffee.

21        MR. SCHREIBER:  He didn't read the next sentence,

22   which is really where I think he is confused.

23        MR. COOPER:  Why don't you read it, okay.

24        MR. SCHREIBER:  The next sentence from the expert is

25   all of our plaintiffs thought they had bought ground coffee,

1   which is different.  And he agreed over objection, but he did

2   agree, that all of our plaintiffs thought they were buying

3   ground roast coffee.  And then I went on -- and all of them

4   made a complaint because they didn't buy -- it wasn't ground

5   roast coffee.  It was something other than ground roast coffee.

6           MR. COOPER:  And, finally, your Honor, Mike says there

7   is no misrepresentations on the box.  Well, what I would ask

8   you to look at, your Honor, is the quality promise.  And the

9   quality promise, your Honor, says:  Grove Square coffee is made

10  with some of the finest -- the world's highest coffee Arabic

11  beans roasted and ground to ensure peak flavor then packaged to

12  lock in optimum freshness.  This is instant coffee that they

13  are describing that way.

14          THE COURT:  Well, but you always -- you have to grind

15  coffee first, and then it's distilled.  I mean I understand

16  that.  I understand that.

17          All right.  Mr. Conway, what did you --

18          MR. CONWAY:  If I could go back to the *Pella* case.

19  The *Pella* case was a defective window case.  Every plaintiff

20  had a claim.  Every plaintiff had a claim.  They bought a

21  defective product, and so those are like the warranty cases.

22  The cases that they cite, not a one is consumer fraud.  They

23  have got the *Whole Foods* case.  That was a contract case.  They

24  promised everybody a discount if they bought a certain quantity

25  of water.  Everybody has liability.

1    We don't know who has the liability here, your Honor.

2 And that goes back to the issue of causation and reliance. And

3 the *Pella* case is very different because then you can go and

4 figure it out. They are really asking your Honor -- they are

5 really tossing it back to your Honor and saying, We don't know

6 who is in the class, but your Honor can figure it out later.

7 We don't know how to try the damages, but we will get

8 liability, and your Honor can figure it out later.

9    What the *ComCast* case says is they have to come up

10 with evidence. And Mr. Cooper, the good advocate that he is,

11 he talks about it is not brewed. Where is his evidence? Where

12 is his evidence? That's what the *ComCast* case says. The

13 plaintiff has the burden here. The plaintiff has to bring in

14 evidence at this hearing, and they didn't do that.

15    And so, your Honor, to come back with just a bit more,

16 even if what -- like Mr. Cooper says it is the coffee lovers

17 bill of rights, most of the plaintiffs didn't read it. Most of

18 his plaintiffs aren't in the class that he just identified. If

19 that's what he wants to go to trial on, who read that

20 statement, I would say seven of his nine plaintiffs aren't in

21 the class.

22    And I'm going to forget it if I don't -- the Tennessee

23 class, there is no class, your Honor. Not a single plaintiff

24 pled a claim under Tennessee law. Mrs. Carr lives in

25 Tennessee, but she brought a claim under Illinois law. We know

1    from the *Avery* case, you can't do that.

2           And Ms. Hanson asked her in the deposition, Do you

3    have any connection to Illinois?  Did you buy it in Illinois?

4           No.  No, there is no connection.

5           There is no plaintiff who pled a claim under Tennessee

6    law, so there can't be a Tennessee class.

7           THE COURT:  You know, when I look at these class

8    cases -- and I understand that this, by itself, might not be

9    dispositive.  But I'm always wondering, well, when it comes

10   time to prove up the case, how do you prove damages?  In other

11   words, we never do this for fun.

12          And now let's say that you have a case where someone

13   comes in, and they say, Look, I read this, and having read

14   this, I really thought I was getting what I understood to be

15   ground coffee, and this is what caused me to do it.  And I

16   drank this, and I'm just not happy with it.

17          Now, I don't know, what did you say one of these

18   things cost, 60 cents?

19          MR. COOPER:  It's 66 cents per cup.

20          THE COURT:  Okay.

21          MR. COOPER:  For a 12-pack.

22          THE COURT:  And by the way, I never had another cup of

23   that stuff.  I'm done.  Couldn't stand it.  Now, how much money

24   does she get back on a deal like that?  Did she drink the whole

25   cup, or did she wretch when she took the first drink?  Did she

1  get her buzz, or did she not get her buzz?  I mean those are

2  all -- I mean you are smiling, but this is part of a -- part of

3  the problem with a customer case like this.

4          MR. BURKE:  Your Honor, some of those statutes have a

5  statutory penalty, and we can prove it up.

6          THE COURT:  I was asking Mr. Conway about that.  And

7  what he says is, Well, it doesn't matter.  You can't prove

8  reliance or --

9          MR. CONWAY:  Causation.

10         THE COURT:  -- or causation, so I don't have to -- I

11 don't have to worry about that.

12         MR. COOPER:  But --

13         THE COURT:  And that's one of the first questions I

14 asked Mr. Conway because that is obvious -- that is an obvious

15 solution to their problem that I raised.  In certain cases, you

16 wouldn't have that problem.

17         It is kind of like the -- we get a lot of cases around

18 here, these facsimile cases.  It doesn't matter if you send out

19 an unsolicited facsimile, you pay for it.  I think that's a

20 commendable rule.  Anyone that's ever had their fax machine

21 backed up, you can't charge them enough as far as I'm concerned

22 for annoying me.  And that is true in those cases, and that's

23 the answer.  In certain cases, you just have a statute.  But

24 you still have to prove the other end of it.

25         MR. CONWAY:  And the fax cases they cite are important

1   because there is documentation.  In the *Hinman* case, they said,
2   We have a list of who got the faxes.
3           THE COURT:  Right.
4           MR. CONWAY:  And the safety --
5           THE COURT:  Well, they're "lay-down" cases.  If you
6   have got one of those cases, it is just --
7           MR. CONWAY:  Right.  They file them all the time.  I
8   see them.  But there is actually one of the safety guard cases
9   that's cited where they couldn't certify the class because the
10  people who sent out the list, there was no list.  And that's
11  what our situation is.  There is no documentation.  The cases
12  that have allowed a class have been when you could document who
13  is in the class and who is not.  And I really do want to come
14  back.  It is res judicata against the class.  We need to know
15  who is in the class.
16          THE COURT:  Listen, I understand that.
17          MR. CONWAY:  I know that, your Honor.
18          THE COURT:  There is as much in a class action for a
19  defendant as there is for a plaintiff because you can get rid
20  of a lot of trouble real quick.  You know, you just have to win
21  the case, and all these problems go away, right?
22          MR. CONWAY:  You are right.
23          MR. COOPER:  Your Honor, may I read?  This is a *Kohen*
24  case that Judge Posner wrote.  It's 2009.  And this deals with
25  what you are trying to -- having a class that includes people

1   who weren't injured.  And he says, What is true is that a class

2   will often include persons who have not been injured by the

3   defendant's conduct; indeed, this is almost inevitable because

4   at the outset of the case many of the members of the class may

5   be unknown or, if they are known, still the facts bearing on

6   the claims may be unknown.  And such a possibility or, indeed,

7   inevitability does not preclude class certification.

8           And, your Honor, there are cases out there in

9   Illinois, California, New York, New Jersey, where consumer

10  class actions have been certified.  They don't have a

11  documentation about who went and purchased a product from a

12  shelf in the grocery store.  It happens all the time.  We're

13  not creating new law on this.

14          THE COURT:  No.  I think the issue you have got in

15  your case is you are assuming that everybody is a plaintiff.

16  The way you have got your case, everybody that bought this is a

17  plaintiff.  That's how you start out.

18          MR. BURKE:  We can alter the class definition, your

19  Honor.

20          THE COURT:  What's that?

21          MR. BURKE:  We can narrow the class definition as you

22  intimated earlier.

23          THE COURT:  Well, how would you do that?

24          MR. BURKE:  You could go in and say that anyone who

25  purchased twice and, you know, was satisfied with the product

 1    is not a member.  You would say that anyone who had purchased

 2    the Grove Square product and, um, had previously only

 3    purchased -- there was only a standard that you could buy.  So

 4    there is a presumption coming in that there were very few

 5    second-time purchasers.

 6           *THE COURT:*  Why would you say that?

 7           *MR. BURKE:*  Because you could only -- the product was

 8    marketed as a true national brand equivalent.  It was made to

 9    look like everything else that was licensed, so we've alleged

10    that the formulaic packaging -- they didn't want the people --

11    they wanted the folks to look at the package, say, huh, I'll

12    try this, throw it in the grocery cart.

13           Their biggest concern was that they would actually

14    hold the packaging and notice that it weighed less and then

15    take that from their buying experience.  We're talking about

16    people here spending $9.  They are going to look at it.  They

17    are going to see fresh ground beans.  It was made to mimic the

18    national brand equivalent.  And we have alleged that there's

19    a -- the overall design is the misrepresentation.

20           We have also alleged fraud by omission.  If they

21    called out in large letters -- and this is where our injunctive

22    claim comes in -- that this product was overwhelmingly instant,

23    95 percent instant -- let's say, 20 character font on the front

24    there, no filter, while it is true they call it microground

25    soluble, if they, then, where they said soluble said 95 percent

1    soluble or instant, then the purchaser would actually have had

2    a decision.  So, no, they didn't expect everybody to read

3    everything on there.  Different things called it out

4    differently.

5           MR. CONWAY:  Your Honor, I just tell you, here's a

6    Keurig box.  They don't look anything alike.

7           MR. FOCHLER:  More than that, your Honor, if you look,

8    Keurig brewed is on every Keurig-approved package.  That's

9    their logo.  And this is what Keurig claims happens to be their

10   formulaic package.  Now, this product has no similarity to the

11   formulaic --

12          MR. COOPER:  Your Honor, we beg to differ.

13          THE COURT:  All right.  All right.  I will get both of

14   you now.  I think I understand this.  I think I understand this

15   case.  I think I understand the issues.

16          Now, Mr. Conway, was there anything else you wanted to

17   say?

18          MR. CONWAY:  Your Honor --

19          THE COURT:  You have given me three cases that you

20   want me to read very closely.

21          MR. CONWAY:  Yes, sir.

22          THE COURT:  I think I know those cases, but I'm going

23   to read them again in light of what you've told me.

24          MR. CONWAY:  I'm sure you do.  One last case,

25   Bridgestone/Firestone, your Honor.

1     THE COURT:  I'm familiar with *Bridgestone/Firestone*.

2     MR. CONWAY:  And it said subclasses don't work.  And I

3   think one thing that is telling here, your Honor, is we have

4   not gone through the elements of these claims.  The law is

5   different even -- and just so it is clear.  The unjust

6   enrichment is a case -- the *Clay* case from this district.  The

7   *Oshana* case is an unjust enrichment case, the *Lipton* case --

8   and they say unjust enrichment, and in that one they are asking

9   you to create an eight-state class, not a state by state, an

10  overall --

11    THE COURT:  Unjust enrichment in Illinois, at least in

12  the federal circuit, Seventh Circuit, is a very --

13    MR. CONWAY:  And some of the statutes require

14  knowledge by the defendant and some don't and so forth.  But we

15  appreciate your Honor.  I know we have inundated you with a lot

16  of paper.

17    THE COURT:  No.  It's been very helpful.  Now, what

18  did you want to emphasize?  What did you want to tell me that

19  you haven't had a chance to tell me?

20    MR. COOPER:  The inference class-wide on causation, in

21  California, you can -- actually, California is a reliance

22  state, and the courts allow an inference of reliance if the

23  misrepresentation or omission is material.  And we think we've

24  proven, your Honor, that there is a material omission here and

25  that reliance should be inferred class-wide.

1        New Jersey is causation, not reliance, your Honor.
2   And what the New Jersey Supreme Court just said in a case
3   called Lee versus Carter-Reed is that you can infer causation
4   class-wide.  And the fact that the named plaintiff actually
5   purchased a product that had a promise or was represented as
6   one thing and it wasn't that, in and of itself, that creates
7   the causation.
8        So that's New Jersey.  California, we believe we ought
9   to get certified because of the inference of reliance.  New
10  Jersey, we believe should get certified, your Honor, because of
11  the inference of causation.  New York, your Honor, is a
12  causation state.  New York, like New Jersey, allows an
13  inference of class-wide causation.
14       It happens when there's a material fact that has been
15  presented or an omission.  We believe New York, your Honor,
16  under these facts should be certified.
17       THE COURT:  And to be clear, what you are referring to
18  here is the quality promise.
19       MR. COOPER:  No, your Honor.  Way more than that, your
20  Honor.  We are referring to -- there is a case called Gerber.
21       THE COURT:  I'm looking at your box here.
22       MR. COOPER:  Right.  We are referring to when a
23  consumer comes in, your Honor, they see the K-Cup.  In their
24  mind, that means that is the licensed for Keurig and that
25  contains ground coffee.  They see coffee beans, your Honor.

1    They think that when they see that, that presents to them the

2    idea that it contains ground coffee.

3            Your Honor, when they -- the smallest print on this

4    box is where they say soluble microground.  You almost need

5    reading glasses to see that.  These people have spent hundreds

6    of thousand of dollars designing this box.  They know where to

7    draw attention and where not to draw attention.  You look at

8    the:  Great coffee, plain and simple.  When you read all this,

9    the totality of these images, the totality of the text, your

10   Honor, creates a belief in consumers who are already

11   predisposed to buying K-Cups with ground coffee that they

12   contain ground coffee.

13           Peter, do you have anything to add?

14           *MR. BURKE:*  I would just say that the cases have been

15   consolidated before your Honor, and the plaintiffs have worked

16   together.  While it's true that the Tennessee plaintiff

17   originally pled a claim under Illinois law, it is clear that

18   she, you know, has moved in the overall case to assert a claim

19   on behalf of the Tennessee citizens.  I mean, to accept the

20   distinction that Mike's making, I think, is putting form over

21   substance, given the way the cases have gone here for two

22   years.

23           *THE COURT:*  The case is under advisement.  We have got

24   plenty to do, and I'll get to this as quick as I can.

25           *MR. CONWAY:*  Your Honor, may I just benefit a quick

1   mention one case on the record, just a citation.  The citation

2   I've given to counsel is <u>Wilson versus Hewlett-Packard</u>, 668

3   F.3d 1136, (9th Circuit 2011), and it limits the *Falk* case that

4   they cite.

5        *MR. COOPER:*  Your Honor, may I make one final thing

6   since I have that board put up?  May I just explain that for

7   one second?

8        That is a description of the trade description for

9   Green Mountain's K-Cups.  And there was litigation between

10  Sturm, the defendants here, and Keurig, where Green Mountain,

11  which owns the Keurig machine, said they are trying to copy the

12  way they box up their K-Cups.  And what it says is an image of

13  the single serve beverage cartridge, at least one depicted on

14  the side and the other depicted right up.  Well, your Honor,

15  here's one on the side, and here's one up.

16       The second one is an image of spilled beans.  Spilled

17  beans.

18       An indication of the coffee roasted with a grade bar.

19  Well, here is a grade bar, your Honor.

20       Perforation for opening the package.  The form in

21  opening that's tapered in a V shape.  Here's a V shape, your

22  Honor.

23       And prominent lettering displaying the name of the

24  beverage.  Grove Square Coffee.  Prominent.

25     And another face of the packaging providing a product

1  story, and that's where you look at the coffee lovers bill of

2  rights, the quality promise, great coffee plain and simple.

3  They designed this packaging to fool people who were used to

4  buying K-Cups from Green Mountain into thinking it had the same

5  contents.  That was their whole overarching theme in this.

6      *MR. FOCHLER:*  Your Honor, there was no final decision.

7  There was a preliminary injunction decision which Keurig lost.

8  The Court denied the request for preliminary injunction against

9  the trade rights.

10      *THE COURT:*  Have a great day, folks.

11

12                          -oOo-

13                    REPORTER'S CERTIFICATE

14      I, Molly N. Clayton, RPR, FCRR, Official Court Reporter
   for the U.S. District Court, Southern District of Illinois, do
15  hereby certify that I reported with mechanical stenography the
   proceedings contained in pages 1 - 32; and that the same is a
16  full, true, correct and complete transcript from the record of
   proceedings in the above-entitled matter.

17
        DATED this 17th day of January, 2014.

18

19
                          s/Molly Clayton, RPR, FCRR
20                        _____

21

22

23

24

25