No. 13-3843

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

LINDA SUCHANEK, et al.,
Plaintiffs-Appellants

v.

STURM FOODS, INCORPORATED, et al.
Defendants-Appellees

Appeal from the United States District Court for the
Northern District of Illinois
District Court No. 3:11-cv-00565-GPM-PMF and 3:11-cv-00889-GPM,
3:11-cv-01035-GPM, 3:11-cv-01068-GPM and 3:12-cv-00224-GPM

**APPELLANTS' REPLY BRIEF**

Peter H. Burke
J. Allen Schreiber
BURKE HARVEY, LLC
2151 Highland Avenue South, Suite 120
Birmingham, AL 35205
Phone:      (205) 930-9091
Fax:        (205) 930-9054


Counsel for Appellants

# TABLE OF CONTENTS

Introduction ................................................................................5

Response To Defendants' Statement Of The Case ................................................7

Argument.................................................................................12

  A.  Plaintiffs Satisfied all Requirements of Rule 23............................................12

    1.  Plaintiffs presented the type of Small Dollar Claims Ideally Suited
      for Class Treatment ................................................................12

    2. The District Court's Class Certification Analysis was Inherently
      Flawed because the Court Improperly Delved into the Merits and
      Concluded Many Class members did not have a Valid Claim .................14

    3. The district court Erred in not finding the Proposed Subclasses
      Satisfied the preponderance Requirement of Rule 23(b)...........................16

    4. Plaintiffs Satisfied Each Element of Rule 23(a) ........................................18

      a.  Numerosity .................................................................18

      b. Commonality.................................................................20

      c. Typicality ....................................................................22

      d. Adequacy of representation .................................................23

  B. Plaintiffs Presented material Question of facts on the Issue
    of Reliance Sufficient for a Jury to Decide the Issue making
    Summary Judgment Improper.........................................................23

  C. Plaintiffs Presented Sufficient Facts for both an Active Misrepresentation
    and an Omission Claim to go to the Jury.........................................25

  D. At a Minimum, a California and New Jersey Class Should be certified. ......... 29

  CONCLUSION .................................................................30

## TABLE OF AUTHORITIES

*Astiana v. Kashi Co*., 291 F.R.D. 493, 500 (S.D. Cal. 2013) ..................................24

*Bank of Waunakee v. Rochester Cheese Sales, Inc.* 906 F.2d 1185, 1188
(7th Cir. 1990)..................................................................................24

*Butler v. Sears*, 727 F.3d at 799 .............................................................15

*Carnegie v. Household Int'l. Inc.,* 376 F.3d 656, 661
(7th Cir. 2004) ..................................................................................13

*Chapman v. Wagener Equities, Inc.* 2014 U.S. App.
LEXIS 5962 (March 31, 2014) ..................................................... 15,19

*CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721 724-725
(7th Cir. 2011)..................................................................................22

*Chapman v. Wagener Equities, Inc.*at * 6.............................................................

*Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 256 .........................28

*Culver v. City of Milwaukee,* 277 F.3d 908, 910 (7th Cir. 2002) .........................20

*De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983) .......22

*Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, (N.D.Cal.2012)..........................27

*Eggleston v. Chicago Journeyman Plumbers' Local Union No.
130* 657 f.2d 890, 895 (7th Cir. 1981) ..................................................23

*Forcellati v. Hyland's, Inc.,* 2014 U.S. Dist. LEXIS 50600 (C.D. Cal.,
Apr. 9, 2014 2014) at * 23-24..............................................................20

*Forrest v. Prine,* 620 F.3d 739, 742-43 (7th Cir. 2010) .......................................25

*In re Mercedes-Benz Tele Aid Contract Litig*., 267 F.R.D. 113, 164-165
(D.N.J. 2010)....................................................................................30

*International Union of Operating Engineers Local No. 68 Welfare Fund*

*v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007) .................30

*Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998) ................................20

*Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762
(September 12, 2012) at * 35-36..........................................................6, 8

*Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762
(September 12, 2012) at * 25 ...............................................................10

*McCrary v. Elations Co., LLC*, 2014 U.S. Dist. LEXIS 8443 (C.D. Cal.,
Jan. 13, 2014) ................................................................... 19, 21, 22, 26

*Nilon v. Natural-Immunogenics Corp.*, 2013 U.S. Dist.
LEXIS 141728 at *2 N. 2 (S.D. Cal September 30, 2013)....................27

*Parko v. Shell Oil Co*, 2014 U.S. App. LEXIS 1018 at * 4 ................15,16

*Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014) .................15

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) ...........................17

*Pfaff v. Whole Foods Market Group Inc.*, 2010 U.S. Dist. LEXIS 104784
(N.D.Oh. 2010) ................................................................................20,21

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813 (1985) ...................13

*Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 523, 535 (N.D. Cal. 2012).......19

*Rosario v. Livaditis,* 963 F.2d 1013, 1017-1018 (7th Cir. 1992) ...........20

*United States v. Jones,* 29 F.3d 1549, 1553 (11th Cir. 1994)....................6

*Williams v. Gerber Products*, 552 F.3d 934, 938 (9th Cir. 2008) ...........10

OTHER:

*Newberg on Class Actions*, 4th ed. § 3:10 at pp. 274-277 .......................22

*Newberg on Class Actions*, 4th ed. § 3:13 at pp. 328-329 .......................23

## INTRODUCTION

As previously explained, Defendants launched their Grove Square Coffees ("GSCs") in October of 2010 to be situated as first movers in the single serve market when Keurig's patent expired in September of 2012. Being the first mover was critical because "Sturm will have been packaging and processing for 2 years (Grove Square) by the time this product ships. "During this time we have gained experience and improved production and packaging processes in areas where others have yet to start." (Doc.99 at p.15 of 45). Once the patent expired, Defendants intended to sell a true equivalent product, which contained 100% fresh ground coffee with a filter, and reap the available profits in the billion dollar coffee market.[1] An employee of the Defendants even boasted: "we will be there with comparable if not better products with no perceived disadvantage . . . We will then solve the coffee issue by fall of 2012 and really be able to rock." (26951)

In the interim, the unsuspecting public would serve as guinea pigs as Defendants marketed the GSCs as a National Brand Equivalent ("NBE") even though they were cheap instant knockoffs. The significance of this coffee market

---

[1] "We will be the first to market with this product the day GMCR's patent expires in Sept. 2012." "We will be shipping a true NBE value proposition by October of 2012." "Come September of 2012 we will be able to sell fresh roasted coffee in a cup with a filter which is something GMC's patent restricts us from doing until then." (Doc.99 pp. 15-16 of 45)

to Defendants and Keurig cannot be overstated and its importance is shown by the ongoing ancillary litigation between those entities.

Indeed, at the summary judgment hearing, the district court inquired of defendants: "has Keurig filed a lawsuit against your client? Isn't this a better case between Keurig and – [your client]?" (Appendix at p. 149)[2] Now that Keurig's patent has expired, it appears that Defendants foray into the single serve market with a true NBE, i.e., 100% ground coffee with a filter, did not go as well as they had planned and they haven't been able "to rock" the single serve coffee market as their employee had boasted. On February 11, 2014, Defendants in this action filed a lawsuit against Keurig in the United States District Court for the Southern District of New York, 14-cv-00905, accusing Keurig of exclusionary conduct that violated the antitrust laws.[3] As this action demonstrates, these coffee wars between Defendants and Keurig are ongoing, and unless this Court reverses the district court and allows this action to proceed on a class basis, the Plaintiffs in this action,

_____

[2] Plaintiffs previously referenced Keurig's prior lawsuit against Sturm, when they pointed out Sturm had been denied summary judgment on Keurig's trade dress claim because material facts existed regarding the existence of a consistent overall look between the two products. See *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 (September 12, 2012) at * 35-36. Eventually, on February 26, 2013, those entities settled the non-patent claims asserted in that lawsuit.

[3] The Court may take judicial notice of that ancillary proceeding. Court orders and filings are the type of documents that are properly noticed under Rule 201(d) which directs that courts "shall" take notice when either party so requests and provides necessary information. *United States v. Jones,* 29 F.3d 1549, 1553 (11th Cir. 1994)

as well as the other consumers who were duped into buying the GSCs, would have been used as mere pawns as Defendants gained access to the billion dollar single serve coffee market.

<u>RESPONSE TO DEFENDANTS' STATEMENT OF THE CASE</u>

Plaintiffs briefly respond to Defendants' factual assertions, as these responses will put Defendants' assertions in proper context or otherwise show that material issues of fact exist on several issues.

Defendants would have the Court believe that it developed the GSCs "to emulate Starbuck Coffee's VIA® brand which combines and was labeled soluble (i.e., instant) and microground," and therefore the GSCs were "labeled to emulate Starbucks VIA® brand, not to avoid calling the product 'instant' as Plaintiffs assert." (Appellee's Brief at p. 2) What another manufacturer of an entirely different product decides to do with its marketing and labeling of its product, is wholly irrelevant to the issue before this Court. Moreover, VIA comes in a single serve packet that is opened up and its contents are then put in a cup and hot water is run over it, much like one would pour hot water over instant coffee. VIA is not compatible with a Keurig brewer and Defendants' analogy is unavailing.

"There is no evidence that GSC was 'designed to have the same look and feel as other available Keurig coffee products.'" (Appellee's Brief at p. 3) There is undisputed deposition testimony directly on point. Sturm's Executive Vice-

president and Chief Financial Officer, Robert Ruegger, admitted:

> A.     Now we had to rearrange the packaging operation to put them into a display like Keurig had on the shelf. That part was being done manually. Also, on the front end of the process where the product was blended together and fed into the fillers, there were some changes that had to be made there as well.
>
> Q.     You wanted the finished product to look like the Keurig product in box style?
>
> A.     In box style, yes.
>
> Q.     With the round cartridge in the box?
>
> A.     A round cartridge into a rectangular display carton similar to Keurig.
>
> Q.     And the expenditures you're talking about, you can't recall if it would be $750,000, but whatever they were was to enable you to make that look similar?
>
> MR. CONWAY:  Object to the form.
>
> THE WITNESS:  And to enable us to in a more automated fashion package the product in a similar fashion, yes.

(Deposition of Robert Ruegger, pp. 56-57) (Defs' Appendix, SA238)

The court in *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 (September 12, 2012) at * 35-36 found that Keurig's coffee line had a distinct look and feel that included:

> [1] an image of single-serve beverage cartridges, with at least one beverage cartridge depicted on its side and one beverage cartridge depicted right-side up, and a tagline below the image of the cartridges that states they are for use in Keurig brewers, [2] an image of spilled coffee beans, [3] an indication of the coffee's roast strength on a graded bar with shading varying from light to dark, along with an

indication whether the coffee is caffeinated, [4] perforations for opening the package that form an opening that is tapered in a vshape and ending in a u-shaped tab, [5] prominent lettering displaying the name of the beverage, and [6] another face of the packaging providing a product story.

Defendants' GSCs contain similar imagery on each point.  The package front contains two cartridges, one of which is on its side next to spilled coffee beans.  Below that is a bar showing the coffee's strength from light to dark.  There are also perforations for opening the box, along with prominent letters displaying the name of the beverage.  On the back of the box is the Coffee Lover's Bill of Rights and on the other side is a product story that says Great Coffee, Plain and Simple.  Pictures of the box from all sides are contained in the record at Sealed Doc – Ps' Evid Submission in Support of Motion for Class Cert, Exh "Z".  Again, as Defendants' marketing study showed, all of the K-Cups were sold in "formulaic packaging," and Defendants incorporated this "formulaic packaging" into their product design, look and feel.

"There is no evidence that Sturm ever claimed GSC contains only ground coffee or a filter. . . " (Appellee's Brief at p. 4)  Plaintiffs have never made any such claim.  Instead, the failure to disclose the percentage of instant coffee in the product and its lack of a filter, serve instead, as the basis of Plaintiffs' fraudulent omission claims.  "Keurig sells . . . café mocha and cappuccino mixes as well as, other k-cup products that do not contain filters, including hot chocolate, Chai Latte

and cider." (Id.)  This lawsuit does not involve those other products but only involves sale of the GSCs and reference to these other products is a red herring.See *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 (September 12, 2012) at * 25 ("Keurig has not placed the above-described statements on the K-Cup packaging - such as hot chocolate packaging - and a consumer would be well aware that non-coffee-based products - such as hot chocolate - would not contain coffee or need a filter.")

"Plaintiffs offer no evidence that any GSC package representations are false." (Appellee's Brief at p. 4)  That is not the standard Plaintiffs must satisfy under the various state consumer protection statutes, which apply the "reasonable consumer" standard. See *Williams v. Gerber Products*, 552 F.3d 934, 938 (9th Cir. 2008) ("Under the reasonable consumer standard, Appellants must 'show that ' members of the public are likely to be deceived.' . . . these laws prohibit 'not only advertising which is false, but also advertising which [,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"[4]

---

[4] As the Ninth Circuit further explained: "Here, there are a number of features of the packaging Gerber used for its Fruit Juice Snacks product which could likely deceive a reasonable consumer. The product is called `fruit juice snacks` and the packaging pictures a number of different fruits, potentially suggesting (falsely) that those fruits or their juices are contained in the product. Further, the statement that Fruit Juice Snacks was made with 'fruit juice and other all natural ingredients' could easily be interpreted by consumers as a claim that all the ingredients in the

"The term 'soluble' is used in the coffee industry and by coffee marketers to sell instant coffee." (Appellee's Brief at pp. 4-5)  Defendants' own expert Roese admitted that the term "soluble" was unknown to consumers. (Sealed Doc – Ps' Evid Submission in Support of Motion for Class Cert, Exh "U", p. 36 lines 14-24). Moreover, notwithstanding Defendants' after the fact explanation of why it changed its labeling from "soluble" to "instant," to supposedly follow the example of VIA®, Plaintiffs presented facts that it was done for other reasons, i.e., "I guess we can't say it's not instant anymore."  (Sealed Doc – Ps' Evid Submission in Support of Motion for Class Cert, Exh "O", p. 73 lines 12-13)

"Appellants' assertion that Sturm was interested in consumers perception of the weight and look of dispensed GSC as part of a scheme to deceive consumers, is also unsupported by evidence."  (Appellee's Brief at p. 5)  Plaintiffs' Motion for Class certification contained the following paragraph:

As with previous tests none of the participants noticed any difference between the single serve cups with respect to weight and none noticed the Sturm cup emitted a distinct rattle when shaken. When facts made known to participants they did not equate with quality." (4517)  "By the way the difference in weight was noticed by 30% of respondents  . . .but this recognition did not play into any negative assessment of Sturm . . .but this could be an issue if pointed out to the trade." (6110)  "Minimal consumer Risk based on 2/23

product were natural, which appears to be false. And finally, the claim that Snacks is 'just one of a variety of nutritious Gerber Graduates foods and juices that have been specifically designed to help toddlers grow up strong and healthy' adds to the potential deception.'"  552 F.3d  at 939.

Research; cup weight cup rattle Coffee color while dispensing.
(11432) (Doc. 99 at p. 18 of 45)

As for defendants' contention that consumer reaction to the GSCs varied, (Appellee's Brief at p. 9), such an assertion plays fast and loose with the record. A review of the Amended Complaint (Doc. 53 at ¶¶s 34-51) provides just a small sample of the comments Defendants received about the GSCs. Discount Coffee forwarded complaints to Sturm and said "Grove Square has been the poorest performing introductory product that we have had in our 12 year history." Id. at ¶ 61. Treehouse's general counsel acknowledged receipt of a "large number of negative reviews 42 of 44 and most of the comments extremely negative." Defendant's employee Overly went so far as to fabricate favorable reviews on Amazon to combat the "black-eye" of legitimate reviews. (Sealed Doc – Ps' Evid Submission in Support of Motion for Class Cert, Exh "B" – Grove Square27837)

## ARGUMENT

A.     Plaintiffs Satisfied all Requirements of Rule 23.

This Court should remand this action to the district court with instructions to certify the subclasses as set forth below.

### 1.     Plaintiffs presented the type of Small Dollar Claims Ideally Suited for Class Treatment.

The economics of class action litigation has often been described.  As the United States Supreme Court explained in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813 (1985):

> The plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually, nor would he affirmatively request inclusion in the class if such a request were required by the Constitution.  If, on the other hand, the plaintiff's claim is sufficiently large or important that he wishes to litigate it on his own, he will likely have retained an attorney or have thought about filing suit, and should be fully capable of exercising his right to "opt out."

In *Butler v. Sears*, Judge Posner quoted from this Court's earlier opinion in *Carnegie v. Household Int'l.  Inc.,* 376 F.3d 656, 661 (7th Cir. 2004) for the proposition:

> [T]he more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30.... The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original). The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars.  But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.

Even the district court raised the viability of any claim proceeding on an individual basis, at the hearing on the motion for summary judgment.

> *THE COURT:* You would want to try one of these individual cases?

> *MR. BURKE:* No. That's why we filed our motion to reconsider on the class, your Honor. And as Judge Posner said that these individual cases -- you know, you can do a lot of fraud to a lot of people, and if it can't proceed as a class action, then the defendant is going to get away with a lot of tortious conduct.
>
> *THE COURT:* That was in the *Sears* case here just recently on the Supreme Court.
>
> *MR. BURKE:* And that is a primary reason that we filed the motion To reconsider, your Honor.

(Appendix at p. 151, lines 9-20)

The undisputed facts show that Defendants engaged in a massive fraudulent scheme to dupe Keurig consumers into paying a premium price for a product that was overwhelmingly instant in nature and which did not contain a filter, i.e., Defendants marketed their product as a true NBE knowing full well it was a cheap knockoff. If these cases do not proceed on a class basis, Defendants would have escaped liability for tortious harm of an enormous aggregate magnitude.

> 2. The District Court's Class Certification Analysis was Inherently Flawed because the Court Improperly Delved into the Merits and Concluded Many Class members did not have a Valid Claim.

Defendants devote several pages of their Brief arguing that there are vast numbers of members of the subclasses that suffered no injury. (Appellee's brief at pp. 30-32) As shown in Plaintiffs' initial brief, this line of inquiry runs afoul of the

teachings of both *Butler v. Sears*, 727 F.3d at 799 ("Sears argued that most members of the plaintiff class had not experienced any mold problem. But if so, we pointed out, that was an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate Sears") and P*arko v. Shell Oil Co*, 2014 U.S. App. LEXIS 1018 at * 4 ("The defendants are thus asking us to put the cart before the horse. How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified

Recently, this edict was restated in *Chapman v. Wagener Equities, Inc.* 2014 U.S. App. LEXIS 5962 (March 31, 2014). In denying a Rule 23(f) petition, Judge Posner once again explained whether or not a member of a class has a valid claim is not an issue to be addressed at the certification stage:

> `How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified.' *Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014) (emphasis in original). Recipients of faxes who don't have rights under the Telephone Consumer Protection Act just wouldn't be entitled to share in the damages awarded to the class by a judgment or settlement. Which goes to show that the defendants' argument about ownership is not really addressed to the appropriateness of class certification, and so doesn't belong in this appeal. The argument is not that a class should not have been certified but that some persons or firms have been mistakenly included in it. If the argument had merit (it doesn't), it would merely encourage the district judge to create subclasses, one of which (the owner subclass) could win while the lessee subclass lost.

Id. at * 5-6.

The district court's speculation went so far as to encompass both purchasers and non-purchasers of the GSCs. The court speculated: "But there will be people who will buy it who are not misled. There are shrewd -- there are shrewd people. And it may be the very same product, and they would go in there and look at this and say, Hmmm, hokum, I will not buy that. So no matter how bad your product was, they were not misled." (Appendix at p.155, lines 11-16) Of course, those who did not buy were not misled, would not be members of the subclasses, and would not have a claim.[5]

> 3. The district court Erred in not finding the Proposed Subclasses Satisfied the preponderance Requirement of Rule 23(b)

Previously, Plaintiffs argued that *Butler v. Sears* teaches that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." 727 F.3d at 800. See also, *Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 4

---

[5] Defendants assert the vast majority of sales occurred after Sturm Foods changed its label to use the word 'instant' and "extensive sales" occurred online without purchasers seeing the packaging. (Appellees Brief at p. 31) Defendants overstate the evidence on these points. First, Defendants never established exactly when the label was changed. Second, as the GSCs were never recalled, its product remained in circulation with both soluble and instant on the packaging. Third, even well into 2012, consumers were still contacting Defendants as "first time consumers" inquiring if the GSCs were instant coffee. Fourth, online sales were not extensive but only accounted for approximately 5,000 units out of nearly 700,000 units sold. Finally, when they filed their Motion to reconsider, Plaintiffs moved to narrow their class definition to exclude online purchasers.

("Predominance is a qualitative rather than a quantitative concept. It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.")

In addition to the foregoing authority, this Court's decision in *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) also supports a finding of preponderance. There, this Court upheld the trial court's granting of class certification to subclasses of consumers from six states who alleged that they bought defective windows. In a per curiam opinion, the Court found:

> The district court held that the commonality requirement of *Rule* 23(a)(2) and the predominance requirement of *Rule* 23(b)(3) are both satisfied because the central questions in the litigation are the same for all class members--whether the ProLine windows suffered from an inherent defect when they left the factory, whether and when Pella knew of this defect, the scope of Pella's warranty, and the nature of the ProLine Customer Enhancement Program and whether it amended the warranty.

> In contrast to *Thorogood* where there were no common issues of law or fact and the court questioned whether anyone besides the plaintiff shared the same concerns with the product, here there is an economy to class treatment of the question whether the ProLine windows suffer from a basic design defect, the resolution of which has the potential to eliminate the need for multiple, potentially expensive expert testimony and proof that would cost considerably more to litigate than the claims would be worth to the plaintiffs. *See Thorogood,* 547 F.3d at 748. According to class counsel, they already have been contacted by over 350 consumers who have experienced the same wood rot problems set forth in the complaint. Where there are common issues and the accuracy of the resolution of those issues "is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific

issues to individual follow-on proceedings." *Mejdrech,* 319 F.3d at 911.

606 F.3d at 394.

Applying the same reasoning to this action, it is evident that the predominance requirement is satisfied. The overarching liability issues include whether the marketing of Defendants' GSCs was misleading or deceptive, or was likely or tended to deceive a Keurig consumer, whether Defendants attempted to mask or hide the true nature of their product, and whether they engaged in willful or intentional conduct by informing consumers that the product was not instant in direct communications to consumers and through a digital campaign. Resolving those issues in this proceeding will be more economical, efficient, and will preserve judicial resources than trying them in a myriad of individual actions.

4.      Plaintiffs Satisfied Each Element of Rule 23(a)

Plaintiffs have never contended that the holding of *Butler v. Sears* somehow did away with the requirements of Rule 23(a), as Defendants intimate. (Appellee's Brief at p. 28) In addition to satisfying the more stringent requirement of preponderance that is contained in Rule 23(b), Plaintiffs also showed they easily satisfied each of the lesser required elements of Rule 23(a). Defendants' assertions to the contrary are simply wrong.

a.      Numerosity

As this Court recently stated, a "class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Chapman v. Wagener Equities, Inc.* 2014 U.S. App. LEXIS 5962 (March 31, 2014) at * 5 <u>citing</u> *Kohen v. Pacific Investment Management Co.,*571 F.3d at 677-78. Defendants essentially concede the number of class members but argue instead that the subclasses are not sufficiently "identifiable by objective" criteria, necessitating an individual by individual inquiry for each member of the class using subjective criteria. (Appellees' Brief at p. 30)

The recent decision in *McCrary v. Elations Co., LLC*, 2014 U.S. Dist. LEXIS 8443 (C.D. Cal., Jan. 13, 2014) debunks that contention. There, the court certified a class of California consumers who purchased Defendants' joint supplement beverage touting claims of "healthier joints," "joint comfort," "joint flexibility," "joint comfort in 6 days." As the court explained, if class members had to have actual proof that they belong in the class, as Defendant's asserted, "there would be no such thing as a consumer class action." <u>Id</u>. at * 22, <u>citing</u> *Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 523, 535 (N.D. Cal. 2012) (finding ascertainability satisfied where class members were required to self-identify that

they purchased iced tea with "natural" on the label during the class period).[6]

Finally, to the extent this Court has any concerns about the subclasses' definition, it should remand the action to the district court and allow Plaintiffs to modify their class definition.

<u>b</u>.    <u>Commonality</u>

Rule 23(a) (2) sets forth the commonality requirement which ensures that the class is "reasonably homogeneous." *Culver v. City of Milwaukee,* 277 F.3d 908, 910 (7th Cir. 2002) "The fact that there is some factual variation among the class grievances will not defeat a class action." *Rosario v. Livaditis,* 963 F.2d 1013, 1017-1018 (7th Cir. 1992).    Instead, a "common nucleus of operative fact is usually enough to satisfy the commonality requirement." <u>Id</u>. at 1018.    Courts have found a common nucleus of operative fact in situations where a defendant has engaged in standardized conduct toward members of the class. *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998)

In *Pfaff v. Whole Foods Market Group Inc.*, 2010 U.S. Dist. LEXIS 104784 (N.D.Oh. 2010) plaintiff brought a class action against Whole Foods under Ohio

---

[6] *Forcellati v. Hyland's, Inc.,* 2014 U.S. Dist. LEXIS 50600 (C.D. Cal., Apr. 9, 2014 2014) at * 23-24 ("Defendants present no persuasive arguments as to why an inability to absolutely confirm class members' identities should act as an independent bar to class certification. While it is undeniable that there is no surefire method to confirm on a class-wide basis whether class members actually purchased one of Defendants' products, this ascertainability problem is of no material relevance to Defendants, as it does not affect their bottom-line in any cognizable way, and there is no reason it should inure to Defendants' benefit.")

statutory and common law for failing to provide a 10% case discount that was advertized. In finding that commonality was satisfied the court explained:

> Here, there are many common factual and legal issues among the class members. For example, all class members purchased a case of products at an Ohio Whole Foods store, and Whole Foods made the same or substantially similar representations to all class members regarding the 10% case discount. <u>Common legal issues include whether Whole Foods' advertisements or representations were false or misleading and whether they were material</u>, as well as whether Whole Foods breached its contracts with the class members by failing to provide the promised case discount. The resolution of these questions would advance the instant litigation. Accordingly, Pfaff has shown sufficient commonality.

2010 U.S. Dist. LEXIS 104784 at * 11 (underline added)

Likewise, commonality is easily satisfied in this action. Here, plaintiffs have alleged an overarching fraudulent scheme that Defendants sold instant coffee in a K-cup, hoping that consumers "wouldn't figure it out." Common issues include whether the Defendants' box was misleading and deceptive, or tended to mislead and deceive, whether Defendants' communications with consumers that complained were false, misleading, and deceptive, and whether Defendants attempted to cover up the scheme with a digital and marketing campaign. *McCrary v. Elations Co., LLC*, 2014 U.S. Dist. LEXIS 8443 at * 31 ("Courts routinely find commonality in false advertising cases that are materially indistinguishable from this matter."

Finally, as Newberg's Treatise explains, "this requirement is easily met in most cases." *Newberg on Class Actions*, 4th ed. § 3:10 at pp. 274-277. It further notes that the "presence of individual questions will not prevent satisfaction of the Rule 23(a)(2) prerequisite. Id. at § 3:11 at p. 294.

<u>c</u>.    <u>Typicality</u>

Defendants' reading of the typicality requirement is too stringent. A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983). Here, all of the named Plaintiffs purchased the same product, in formulaic packaging at the grocery store,[7] and they all bring claims under their respective state's consumer protection laws and for unjust enrichment.

Moreover, typicality is determined with reference to the defendant's actions, not the defenses it may have against particular plaintiffs. *CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721 724-725 (7th Cir. 2011)    As Newberg's Treatise states: "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class to be represented, the typicality

---

[7] In their Motion to reconsider, Plaintiffs abandoned any purchases made on the internet as they comprised only 5,000 out of approximately 700,000 units sold. <u>See</u> *McCrary v. Elations Co., LLC*, 2014 U.S. Dist. LEXIS 8443 at * 36 ("With the exclusion of online consumers, the typicality requirement is satisfied.")

requirement is usually met irrespective of varying fact patterns which underlie individual claims." *Newberg on Class Actions*, 4th ed. § 3:13 at pp. 328-329.

<u>d</u>.     <u>Adequacy of representation</u>

Again, contending that individual issues relating to purchase decisions of each named Plaintiff somehow makes each Plaintiff inadequate, Defendants argue a standard of adequacy for class representatives that simply does not exist. (Appellee's Brief at pp. 37-38)  This Court's admonition in *Eggleston v. Chicago Journeyman Plumbers' Local Union No. 130* 657 f.2d 890, 895 (7th Cir. 1981), when it commented on a defendant's propensity for attacking the adequacy of a class representative, is equally applicable here:

> [I]t is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. When it comes, for instance, to determining whether "the representative parties will fairly and adequately protect the interests of the class," or the plaintiffs' ability to finance the litigation, it is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.

All of the named Plaintiffs have devoted substantial time and effort to this action and all are adequate class representatives.

<u>B.</u>     <u>Plaintiffs Presented Material Question of facts on the Issue of Reliance Sufficient for a Jury to Decide the Issue making Summary Judgment Improper</u>.

The district court's granting of summary judgment in favor of the Defendants is not entitled to any deference as this Court examines the issue anew.

*Bank of Waunakee v. Rochester Cheese Sales, Inc.* 906 F.2d 1185, 1188 (7th Cir. 1990) ("We review the district court's decision to grant summary judgment *de novo* and use the same standard of decision making as that employed by the district court.")

Ironically, at the hearing for summary judgment, the district court essentially conceded that the packaging of the GSCs could be misleading to a reasonable consumer. The court noted that "[i]t's obvious -- it's obvious to me that the manufacturer here packaged this in such a way that if you weren't attentive or if you didn't care you would just say, you know, I will put this in my machine. And I don't know, probably doesn't cost as much as a Keurig either, does it?" (Appendix p. 156, lines 3-7)  Notwithstanding this pronouncement, the court found that none of the Plaintiffs were misled by Defendants' packaging.

The question this Court must answer, in the context of a consumer false advertising case, where all of the class members were exposed to the same formulaic packaging, is what constitutes reliance?  Plaintiffs' counsel posed the issue to the district court in the following manner:

> I guess what does it mean to be misled, your Honor. They all testified that they saw the product. They purchased it. They brought it home.[8] They expected to receive the same they received every other time they

---

[8] *Astiana v. Kashi Co.*, 291 F.R.D. 493, 500 (S.D. Cal. 2013)  (Because the alleged misrepresentations appeared on the actual packages of the products purchased, there is no concern that the class includes individuals who were not exposed to the misrepresentation."

bought a Keurig product. Instead, they got 96 percent instant coffee with a little bit of microground soluble. They were obviously misled. Why would two people write the Better Business Bureau? Why would somebody send an e-mail directly to the company? (Appendix p. 155, lines 3-10)

Here, a specific class of consumers, Keurig owners, all bought a product expecting a certain kind and quality, i.e., 100% ground coffee with a filter, the only type of product that was previously available for use in their Keurig machine prior to the launch of the GSCs. Defendants admit that they marketed their product as a NBE, a true equivalent to what was then available, and not as something different, i.e., a cheap imitation instant coffee alternative. Under these circumstances, a jury should determine the reliance issue. *Forrest v. Prine,* 620 F.3d 739, 742-43 (7th Cir. 2010). (To determine whether genuine issues of material fact exist, we ask if "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.")

C. Plaintiffs Presented Sufficient Facts for both an Active Misrepresentation and an Omission Claim to go to the Jury.

Defendants argue the GSCs' packaging was not misleading by omission because soluble and instant convey the same meaning, and therefore, putting the percentage of instant on the package would not convey any additional information, and further, because the Plaintiffs did not know if the GSCs contained a filter or not there was no need to say it did not have one. (Appellees' Brief at pp. 19-20) Defendants' argument is unavailing for several reasons.

First, there is a material question of fact on the meaning consumers proscribe to "soluble,"[9] and even accepting Defendants' assertion that coffee manufacturers use that term amongst themselves, Defendants' own expert admitted it was an unknown term to consumers. (Sealed Doc – Ps' Evid Submission in Support of Motion for Class Cert, Exh "U", p. 36 lines 14-24). He further admitted a consumer who would order a cup of "instant" coffee as opposed to a cup of "soluble" coffee.  A jury should determine if the use of "soluble" on Defendants' packaging, assuming a consumer could even see it in small type, was misleading or tended to mislead a reasonable consumer. (Doc 114 – p. 5 of 15).  *McCrary v. Elations Co., LLC*, 2014 U.S. Dist. LEXIS 8443 n.12 at * 48 ("Whether a reasonable consumer is likely to interpret the clinically-proven statements in a deceptive manner is a question for the jury.") <u>citing</u> *Bruno v. Quten Research Inst., LLC,* 280 F.R.D. 524, 532 (C.D. Cal. 2011).

Second, after consumers began complaining about the use of the word "soluble," Defendants did in fact change their packaging by substituting "instant" for "soluble."  While Defendants can argue to a jury that it did it because it was following the lead of VIA, an entirely different product not compatible for use in a Keurig, Plaintiffs should be allowed to argue to a jury they did it because of public outrage and as an attempt to minimize their liability.  Moreover, given that the

---

[9] Any dictionary would define "soluble" as capable of being dissolved in some type of solvent, usually water.  It is from the Latin *solvere* to dissolve.

word "instant" is in tiny to read font, Plaintiffs would contend that it did not cure or eliminate the deceptive nature of the advertising. The fact that first-time consumers continued to inquire well into 2012 as to whether the GSCs were instant creates a question of fact solely on that issue. (Sealed Doc – Ps' Evid Submission in Support of Motion for Class Cert, Exh "S").

Third, even if a consumer did not know anything about the percentage amount of instant coffee in the GSCs or whether the cartridge contained a filter or did not, prominently displaying that information on the package in 20 point font or larger, would have conveyed relevant and material information for a consumer's purchasing decision.[10] See Nilon v. Natural-Immunogenics Corp., 2013 U.S. Dist. LEXIS 141728 at *2 N. 2 (S.D. Cal September 30, 2013) (The spirit of this case, like most false advertising cases brought under the UCL and CLRA, is that plaintiffs paid for a product that, with more accurate information, they would have either paid less for or not bought at all.)

---

[10] *Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, (N.D.Cal.2012) ("Defendant contends that no reasonable consumer could be misled in light of the nutrient label on the package. This argument is not persuasive. As the *Williams* court said, "We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging.").

Of course, what was in the GSC package, or perhaps it is more accurate to state what was not in the GSC package, i.e., not 100% ground and no filter, was within the exclusive knowledge of Defendants.  See <u>Collins v. eMachines, Inc.</u> (2011) 202 Cal.App.4th 249, 256 ("[A] fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a reasonable [consumer]' would deem it important in determining how to act in the transaction at issue.")   Even when Plaintiff DiBenedetto e-mailed the Defendant and said what does "soluble" mean, call it what it is, call it instant, Sturm told her the product was not instant!

The Amended Complaint is rife with consumer's complaints that they would not have purchased the product if they had known it was instant, or if they wanted instant coffee they would have bought 5 to 7 jars for what they paid for the GSCs.[11]  Defendants clearly knew and understood that if it had conveyed this relevant and material information, which accurately described the product, it would have led to marginal sales at the GSCs' price point.

---

[11] "I have a Keurig coffee maker and came across your Grove Square product the other day at Wal-Mart.  <u>As it was next to the Green Mountain brand I usually buy, and it was $2 cheaper, I thought I would try it.  Imagine my disbelief when I took the first cup out of the package.  It felt different in weight and upon shaking it, sounded different.  I am a coffee drinker.  If I'd wanted instant, I would have bought a jar for considerably less money than I paid for 2 boxes of your crap.</u>" (GROVE SQUARE 0001971 and GROVE SQUARE 0001972) (underline added) (Doc.141 at p.11 of 23, n.13).

<u>D.</u>    <u>At a Minimum, a California and New Jersey Class Should be certified</u>.

Similar to the approach Defendants have taken in this action, the defendants in *McCrary v. Elations Co., LLC*, argued that the Court must make individual determinations of whether each member actually viewed the "clinically proven" claim, whether such statements were material to the class members' purchase of Elations, and whether consumers actually believed the product was ineffective and caused them damage.

In disposing of this argument, the court cited other cases interpreting the same California claims that are asserted here, and explained:

> Similarly, for a CLRA claim, "[i]f the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class.'" *In re Vioxx Class Cases,* 180 Cal. App. 4th 116, 125, 103 Cal. Rptr. 3d 83 (2009) (citation omitted) (emphasis in original). The materiality determination under the FAL, UCL, and CLRA requires an objective test where plaintiff must "show that members of the public are likely to be deceived" by the alleged misrepresentations. *Stearns,* 655 F.3d at 1020. Therefore, the determination of materiality, and thus reliance, is determined using objective criteria that apply to the entire class and do not require individualized determination. See *Tait v. BSH Home Appliances Corp.,* 289 F.R.D. 466, 480 (C.D. Cal. 2012) ("This objective test renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product.") (citation and quotation omitted).

*McCrary v. Elations Co., LLC*, 2014 U.S. Dist. LEXIS 8443 at * 42-43.   <u>See</u>

*Yokoyama v. Midland National Life Ins. Co.,* 594 F.3d 1087, 1089, 1094 (9th Cir.

2010) ("[T]here is no reason to look at the circumstances of each individual purchase in this case, because the allegations of the complaint are narrowly focused on allegedly deceptive provisions of Midland's own marketing brochures, and the fact-finder need only determine whether those brochures were capable of misleading a reasonable consumer.")

Likewise, a New Jersey class should be certified under the authority of *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007) ("[NJ CFA] essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss") and *In re Mercedes-Benz Tele Aid Contract Litig.,* 267 F.R.D. 113, 164-165 (D.N.J. 2010) ("Rather, they must show an `ascertainable loss' meaning that they `paid for a product and got something less than what had been promised.'")  Here, Defendants marketed the GSCs as a true NBE but the consuming public received a cheap instant knockoff.

<u>CONCLUSION</u>

For all the reasons in the initial brief and for the additional reasons stated herein, the Court should reverse the district court's grant of summary judgment and remand this action with instructions to certify the subclasses.

# CERTIFICATE OF COMPLIANCE

This brief contains 6,938 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (a)(7)(B)(iii).

Respectfully submitted,

By:   /s/ Peter H. Burke

Peter H. Burke

**OF COUNSEL:**

J. Allen Schreiber, Esq.
BURKE HARVEY, LLC
2151 Highland Avenue, Suite 120
Birmingham, Alabama 35205
Telephone:  (205) 930-9091
Facsimile:   (205) 930-9054

Patrick C. Cooper
James Ward
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, Al 35209

*Attorneys for Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of May, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by CM/ECF system. If some of the participants in the case are not, I have mailed the foregoing document by First-Class Mail, postage prepaid to the following:

Rebecca R. Hanson
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
*Attorneys for Defendants Sturm Foods, Inc.*
*and TreeHouse Foods, Inc.*

*/s/ Peter H. Burke*
OF COUNSEL